UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

_____

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| TRI-WIRE ENGINEERING SOLUTIONS, INC. | ) | |
| | ) | Case No. 21-11322 |
| Debtor. | ) | |

_____

## **DECLARATION OF RUBEN V. KLEIN IN SUPPORT OF FIRST DAY MOTIONS**

I, Ruben V. Klein, declare and state as follows:

### **Introduction**

1. I am the President of Tri-Wire Engineering Solutions, Inc. (the "Debtor"). In my work for the Debtor, I have been involved in all aspects of the Debtor's business, and am familiar with the Debtor's operations, finances, and books and records.

2. The Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on September 13, 2021 (the "Petition Date"). The Debtor intends to manage its business and financial affairs as debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. In order to enable the Debtor to operate effectively and without undue disruption during the early stages of its Chapter 11 case, and to place the Chapter 11 case on solid footing, the Debtor seeks certain "first day" relief from the Court.

3. I submit this declaration in support of the Debtor's first day motions in this Chapter 11 case. For the convenience of the Court, unless otherwise defined herein, the capitalized terms I use shall have the meaning ascribed to them in the respective motions referred to herein. In addition, except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my opinion based on my

experience and knowledge of the Debtor's operations and financial condition, or information

provided to me by the Debtor's owners or employees.  If I were called to testify, I could and

would testify competently to the facts set forth herein.  I am authorized by the Debtor to submit

this Declaration on its behalf.

### The Chapter 11 Cases

4.      Along with the Debtor's "first day" requests for relief, the Debtor has filed a

motion (the "Sale Motion") seeking authority to sell substantially all of its assets (the "Proposed

Sale").  The purchaser identified in each of these motions is ITG Communications, LLC

("ITG"), a Texas limited liability company with extensive operations in the telecommunications

industry.  Although not requesting such relief on an emergency basis, the Debtor is seeking,

through the Sale Motion and accompanying motion seeking approval of the Debtor's proposed

procedures for soliciting higher and better offers (the "Sale Procedures Motion"), this Court's

approval of the asset sale on an expedited basis.

5.      In addition to explaining the Debtor's requests for "first day" relief, this

Declaration is intended to provide background on the Debtor's business, its financial problems,

and its efforts to market and sell its assets leading up to the Chapter 11 filing.  Through this

narrative, it will become clear why the fast-track sale of the business is in the best interest of the

Debtor, its estate, and its creditors.

### Background

*A.      Debtor's Business and Organizational Structure*

6.      The Debtor was formed in 1999 and has since grown to be one of the largest

independent providers of consumer broadband installation and maintenance services for large

cable and telecom operators in the Northeastern United States.

7.      The Debtor is one of the dominant providers of installation and fulfillment services in the nine states in which it operates.  The Debtor has recently expanded its business, which now offers the following services:

- constructing, installing, and maintaining fiber connection to consumer homes ("FTTH");

- constructing telecommunications networks for municipalities and corporate customers, including aerial and underground construction;

- providing cable and broadband fulfillment for digital, data, and voice services; and

- supplying low-voltage, network, and data center wiring to meet WiFi and IT infrastructure needs.

These services are provided by a staff of approximately 396 of its own employees and approximately 182 technicians made available through third-party vendors under subcontractor agreements with the Debtor.[1]  The Debtor's operations generated approximately $55 million in revenue in 2020.  In the first six months of 2021, the Debtor generated approximately $26 million in revenue.  It provides approximately 10,000 service events per week.

8.      At its inception, the Debtor's sole stockholder and chief executive officer was John R. Wade, III ("Wade").  In December 2016, Wade disposed of all 1,520,000 shares of common stock by selling a portion of it to the Debtor, and the remaining shares to the Tri-Wire Employee Stock Option Trust (the "ESOP Trust") for the benefit of the Debtor's employees (the "ESOP Transaction").  Wade sold 820,000 shares of common stock to the ESOP Trust for $20,500,000 borrowed by the Trust from the Debtor, and the remaining 700,000 were redeemed by the Debtor for $17,500,000, with the consideration being provided through the issuance of two unsecured subordinated notes.

---

[1] Another 16 individuals work on the Debtor's construction projects through agreements with subcontractors.

**B.**     ***The Debtor's Creditors***

9.      The Debtor obtained financing for the ESOP Transaction from JPMorgan

Chase Bank, N.A. ("JPM").  JPM provided the Debtor with a senior term loan amount of

$15,500,000 (the "Term Loan"), which was subsequently advanced to the ESOP Trust to pay a

portion of the purchase price for the acquired shares.  JPM additionally provided the Debtor with

a revolving credit commitment of $8,000,000 (the "Revolving Commitment"), which, in addition

to working capital advances, gave the Debtor the ability to request the issuance of letters of

credit.  Pursuant to the agreements and instruments evidencing and securing the Term Loan and

the Revolving Commitment (collectively, the "JPM Loan Documents"), the Debtor granted a

first-priority security interest in all of its assets to JPM.  As of the Petition Date, the balance of

the Term Loan was $8,423,595, and the amount outstanding under the Revolving Commitment

was $2,034,786 (excluding $6,216,528  in letters of credit issued in favor of the Debtor's

automobile and workers compensation insurers).

10.      To finance the balance of the price for the stock purchased in the ESOP

Transaction, the Debtor obtained $5,000,000 in mezzanine financing (the "Mezzanine

Financing") from the Massachusetts Capital Resource Company ("MCRC").  In connection with

the Mezzanine Financing, MCRC received a warrant for the purchase of 31,417.62 shares of the

Debtor's common stock.  As of the Petition Date, the balance due to MCRC in connection with

the Mezzanine Financing was approximately $7.4 million.  The Mezzanine Financing is secured

by second-priority liens and security interests in all of the Debtor's assets.

11.      Additional financing of $1,000,000 was obtained in February, 2020, from the

Massachusetts Growth Capital Corporation ("MGCC") to support its working capital needs (the

"MGCC Loan").  As of the Petition Date, the balance due under the MGCC Loan was

approximately $870,000.  The Debtor granted a third-priority perfected interest on all of its

assets to secure the MGCC Loan.  Though the MGCC Loan documents reference a *second*

priority security interest, MGCC's perfected interest is junior to the interests of both JPM and

MCRC.

12.     Aside from its obligations to its secured creditors, the Debtor also has substantial

obligations to John Wade.  In connection with the ESOP Transaction, the Debtor redeemed

700,000 shares of common stock by issuing two unsecured promissory notes payable to Wade in

the aggregate amount of $17,500,000 (the "Wade Notes").  The first of the Wade Notes for the

original principal amount of $4,500,000 accrues interest at a rate of 12 percent per annum; the

second of the Wade Notes for the original principal amount of $13,000,000 accrues interest at

the applicable federal rate plus 150 basis points.

13.     The Debtor's accounts payable as of the Petition Date totaled approximately

$2,658,022, and  included approximately $686,125 to subcontractors performing fulfillment

services for the Debtor; and approximately $330,595 due and owing to the Debtor's insurance

providers.  In addition, the Debtor had approximately $1.2 million of accrued obligations to

employees for compensation and paid time off (which the Debtor expects will be paid and

honored in the ordinary course).

14.     Other significant liabilities include the Debtor's obligations under 20 leases of

real property at which it conducts its business operations.  The Debtor expects that most if not all

of these leases will be assumed and assigned to ITG (or to such other bidder that submits the

highest and best offer for the Debtor's assets) pursuant to Section 365 of the Bankruptcy Code in

connection with the Proposed Sale.

C.      *Financial Difficulties*

15.      The Debtor has encountered significant difficulties in recent years.  The indebtedness resulting from the ESOP Transaction—amounting to more than $38,000,000—created a substantial burden on the Debtor's cash flow and limited its ability to react to various changes in the marketplace.  In addition, prior to the consummation of the ESOP Transaction, John Wade caused the Debtor to convert its automobile insurance coverage to a high-deductible, retrospectively-rated program.  This had the effect of increasing the Debtor's insurance expense by a significant and burdensome amount.  In addition, the Debtor had not, in previous years and under prior management, controlled its automobile claims so as to minimize its deductible exposure—a continuing issue because premiums for the policy are based on historical loss rates.  As a result, insurance premiums and paid losses incurred in 2020 in connection with auto coverage totaled $1,822,814.  Moreover, due to the Debtor's poor loss history, it is required to secure its deductible exposure with letters of credit; $6.2 million of the Revolving Commitment is used to fund the issuance of letters of credit in favor of the Debtor's insurers, further straining its liquidity.  The lack of working capital has slowed the Debtor's development of its FTTH and construction business, which is considered its most significant opportunity for future growth and profitability.

16.      These issues hindered the Debtor's ability to react appropriately to the stresses of the COVID-19 pandemic and shifting factors in the industry.  Customer forecasts following the pandemic were overly ambitious, and these missed forecasts resulted in lower revenues for the Debtor.  Supply chain disruptions and associated shortages of necessary materials, in addition to severe weather in the first quarter of 2021, hindered the completion of the Debtor's construction

projects. Moreover, the Debtor faced stiff competition from similarly situated competitors who, amidst an already tight labor market, offered higher and faster payment terms to contractors.

17.     Adding to the Debtor's financial difficulties are its disputes with John Wade. In 2018, the Debtor's Board of Directors (aside from Wade) concluded that, in connection with the ESOP Transction, the purchase price of the Debtor's stock had been substantially inflated, largely due to Wade's nondisclosure of information regarding, *inter alia*, the Debtor's conversion of its automobile policies. The Board terminated Wade's employment, and Wade, in response, initiated litigation in the U.S. District Court for the District of Massachusetts (the "District Court"). Wade alleged, *inter alia*, that the Debtor and its directors and officers conspired to strip him of his equity in the Debtor, breached their fiduciary duties, and committed various fraudulent acts in the process (the "Wade Litigation"). The Debtor and the ESOP Trust filed counterclaims alleging various material misrepresentations and omissions made in connection with the ESOP Transaction.

18.     The District Court dismissed the claims asserted by Wade and the other plaintiffs by two decisions rendered in 2021. The remaining claims to be adjudicated are the Debtor's and the ESOP Trust's counterclaims against Wade. Presently, no discovery has commenced and initial disclosures have only recently been filed with the District Court. Nonetheless, the Wade Litigation has caused the Debtor to expend over $800,000 in legal fees which could have been put to better use operating its business.

**D.     *Marketing Efforts and Sale of the Debtor's Assets to ITG***

19.     Recognizing the financial difficulties it faced, including a deteriorating financial situation, the Debtor decided to sell its assets, in order to facilitate continued operations by a better-capitalized buyer able to continue those services without interruption. The Debtor

believes that the proposed sale of its business will maximize the value of its assets and is

therefore in the best interest its estate and its creditors.  It will also create an opportunity to

preserve many of the jobs of approximately 396 employees.  To effect this important sale, the

Debtor has filed the Chapter 11 case.

20.      In July 2021, the Debtor retained the services of SSG Advisors, LLC ("SSG"), a

well-known investment banking firm with a specialization in marketing distressed companies, to

explore possible sale options for the Debtor's business.  Upon its engagement, SSG began

immediately to market the assets of the Debtor.  SSG launched a full sales process for the

business assets primarily focused on strategic buyers, including ITG, and private-equity backed

portfolio companies.  SSG received and negotiated offers from several of these first-level

potential buyers.  At the same time, SSG contacted 43 additional potential strategic and financial

buyers, supplying them with a nondisclosure agreement (NDA) and, upon execution of that

agreement, a confidential information memorandum (CIM) and access to a data room for due

diligence.  A total of 14 parties—including John Wade—have executed the NDA and engaged in

the due diligence process.

21.      These efforts ultimately led to the Debtor's negotiation of a letter of intent with

ITG, executed on August 31, 2021.  In the letter of intent, ITG indicated its intent to acquire the

Assets and its willingness to serve as a stalking horse bidder for a Section 363 sale.  The Debtor

and SSG have since been responding to ITG's due diligence requests, and the parties negotiated

the APA that is the subject of the Sale Motion.

**E.      *Urgent Need for Accelerated Sale Process***

22.      The circumstances surrounding the Debtor's finances make clear that the Debtor

has a limited amount of time to complete the sale of its assets.  The company is not profitable

8

and is consuming cash at a significant rate.  In fact, without the proceeds of the DIP Financing,

we would be compelled to terminate operations immediately and terminate its entire workforce.

Even more important, our workforce—in particular, our technicians and subcontractors—is

critical not only to the Debtor's continued operations, but to consummation of the Proposed Sale,

which is conditioned on the Debtor remaining a going concern and ITG being able to retain a

substantial portion of the those technicians and subcontractors.  The cable fulfillment business is

a highly competitive one, and I am certain that many of our technicians will be receiving offers

from our competitors to join those companies.  Thus, a lengthy sale process would likely lead to

the loss of employees and subcontractors, which would have an adverse impact on the Proposed

Sale, or derail it altogether.  Accordingly, time is of the essence if the Debtor is to be able to

sustain ongoing operations and maximize the value of the Assets.

### **First Day Relief**

23.    Concurrently with the commencement of the Chapter 11 case, the Debtor has filed

several motions seeking orders that the Debtor believes are necessary to enable the Debtor to

operate its business with minimal disruption, to effectively administer its bankruptcy estate, and

to pursue the planned sale of its Assets.  Three of these motions seek immediate relief: one, the

Debtor's motion for authority to use the JPM's Cash Collateral, as such term is defined therein

(the "Cash Collateral Motion") on an interim basis;[2] second, the Debtor's motion to honor its

obligations to its employees (including prepetition payroll and fringe benefits, and related tax

obligations) in the ordinary course (the "Wage Motion"); third, the Debtor's motion to make

payments to subcontractors critical to the provision of fulfillment services to key customers, also

in the ordinary course (the "Subcontractor Motion"); and fourth, the Debtor's request to maintain

---

[2] The Cash Collateral Motion also seeks approval of debtor-in-possession financing, but not on an interim basis. Thus, the Debtor seeks only approval for the use of Cash Collateral in connection with its requests for first-day relief.

its current cash management systems and bank accounts (the "Cash Management Motion").

Without the use of Cash Collateral, the Debtor lacks funds with which to operate its business.  If

the Debtor cannot pay its employees and subcontractors in the normal course, it is highly likely

that many of them will seek work elsewhere in our highly competitive industry, to the detriment

of the Debtor's business operations.  And since the Proposed Sale is conditioned on ITG's ability

to preserve the Debtor's workforce, the failure to keep current in payments to employees and

subcontractors would jeopardize the transaction.  With respect to the Cash Management Motion,

the inability to use its current cash management system would require the Debtor to re-direct

payment from numerous customers; the resulting delays would cause unnecessary disruption to

the Debtor's cash flow and business operations.  Accordingly, I believe that prompt

consideration and approval of the Cash Collateral Motion, the Wage Motion, the Subcontractor

Motion and the Cash Management Motion is necessary to promote the efficient administration of

this Chapter 11 case and the Proposed Sale.

A.    Cash Collateral Motion

24.    The Debtors have concurrently herewith filed their Motion for (A) Interim and

Final Orders Authorizing Use of Cash Collateral and (B) Final Order Authorizing Secured

Financing Pursuant To 11 U.S.C. § 364(d), whereby the Debtor seeks Court approval, on both an

interim and final basis, of arrangements for financing the Debtor's business operations pending

the Proposed Sale.  The Debtor requires immediate funding to ensure that it is able to continue

operating its business and provide fulfillment services to its customers.  To that end, prior to

filing this Chapter 11 case, the Debtor secured JPM's agreement to permit the Debtor's use of

JPM's Cash Collateral on an interim and final basis for the Debtor's payment of necessary costs

and expenses substantially in accordance with the budget attached to the Cash Collateral Motion

(the "Budget").  The Cash Collateral Motion also seeks approval of proposed debtor-in-possession financing, but only at the final hearing on the Motion.

25..     The Debtor's interim use of Cash Collateral is to be governed by a proposed order (the "Proposed Cash Collateral Order") filed as an exhibit to the Cash Collateral Motion, which was negotiated with and agreed to by JPM, and which is subject to the approval of this Court. The Proposed Cash Collateral Order provides, among other terms, as follows:

- As adequate protection for the Debtor's use of Cash Collateral, the Proposed Cash Collateral Order would grant JPM a postpetition adequate protection lien, to the extent of any actual diminution in the value of JPM's prepetition collateral, on all of the Debtor's postpetition assets of the same types and forms in which JPM holds valid, perfected, enforceable security interest as of the Petition Date (the "Adequate Protection Lien"), plus a claim pursuant to Section 507(b) of the Bankruptcy Code, to the extent the Adequate Protection Lien is determined by the Bankruptcy Court to have been inadequate protection;

- Certain "Termination Events" based, in part, on events occurring in the Chapter 11 case, as well as the Debtor's failure to achieve certain milestones in connection with the Proposed Sale;

- The acknowledgement of the amount of JPM's claim, and the validity, extent and priority of the liens and security interests securing the same, subject to certain rights of any statutory committee appointed in the Chapter 11 cases to challenge such matters within the period of time set forth in the Proposed Cash Collateral Order; and

- A carve-out for the payment of certain fees and expenses of professionals incurred during the Chapter 11 case.

26.     These proposed financing arrangements will ensure that ongoing business operations and cable fulfillment services can continue without disruption.  Among other things, Cash Collateral will be used to honor employee wages and benefits, procure goods and services integral to the Debtor's ongoing business operations, and otherwise satisfy the Debtor's working capital needs in the ordinary course.  This will allow the Debtor to pay (and to maintain favorable relationships with) its vendors, suppliers, employees, subcontractors and customers, and will enable the Debtor to defray the costs of administration of the bankruptcy estate, including through payments of allowed compensation to estate professionals permitted by the Budget.

27..     Absent prompt, interim approval of the proposed financing arrangements, there is a significant risk of disruption to the Debtor's business operations, and which in turn would cause irreparable harm to the bankruptcy estate and the Debtor's sale efforts.  Based on my knowledge of the Debtor's finances, business operations, and current circumstances, I believe that the proposed cash collateral arrangements are quite reasonable, and are in the best interests of the Debtor and the bankruptcy estate.  Any alternative source of financing—if one were available—would almost certainly be more costly, requiring the payment of interest and fees to a lender, and any such lender would almost certainly seek a first priority security interest which is simply not available in light of the Debtor's current debt structure.  For this reason, I do not think that there is any viable alternative financing source at all, much less one that could compete on economic terms with the proposed Cash Collateral Order.

28.     I therefore believe that the Debtor's decision to agree to the interim financing

arrangements set forth in the Cash Collateral Motion constitutes the exercise of its sound

business judgment.  I believe that the negotiations between the Debtor and JPM leading to the

Proposed Cash Collateral Order were conducted at arm's length and in good faith, that the

proposed financing arrangements are the best available to the Debtor under the circumstances,

and that entry of the Court's orders approving the use of Cash Collateral both on an interim and a

final basis would be in the best interests of the Debtor's bankruptcy estate.

B.     <u>Wage Motion</u>

29.     As of the Petition Date, the Debtor employs approximately 396 employees (the

"<u>Employees</u>").  The Employees are responsible for supporting the Debtor's day-to-day

operations, providing cable fulfillment service to the Debtor's customers, working on cable

construction projects, and maintaining the Debtor's general operations and facilities.

30.     In addition to offering competitive wages and salaries, the Debtor offers its

Employees a comprehensive package of health and welfare benefits, eligibility for which is

based on a number of factors including hours worked and time employed, and compliance with

applicable laws governing employment and paid leave.  The Debtor intends to maintain these

benefit packages without change throughout the Chapter 11 case; they are described in greater

detail below.

*Wages and Salaries; Expense Reimbursement*

31.     As of the Petition Date, the Debtor has accrued payroll and Employee Benefit

obligations to its Employees totaling approximately $1,321,000, including:  (i) approximately

$460,000 covered by the payroll to be paid on September 17, 2021; (ii) approximately $296,000

covered by the payroll to be paid on September 24, 2021; (iii) approximately $33,000 covered by

the payroll to be paid on October 1, 2021; (iv) approximately $19,000 owed to third-party

vendors of Employee Benefits; (v) approximately $18,000 owed in incentive bonuses and

commissions to those Employees entitled to receive them; and (vi) approximately $495,000 of

accrued paid time off (PTO), including approximately $445,000 of accrued vacation and

approximately $50,000 of other PTO.  All of the prepetition wages and salary covered by the

three upcoming payrolls has been incurred within the past 180 days, and no Employee is owed

wages or salary in excess of the $13,650 priority claim cap specified in Section 507(a)(4) of the

Bankruptcy Code except that the estimated $15,000 commission accrued by the Director of

Business Development for the Debtor's Construction Division brings his total accrued

prepetition compensation slightly above such $13,650 priority threshold.   The Wage Motion

seeks authority to pay all these amounts as they come due, beginning with the Debtor's next

scheduled payroll processed on September 15, 2021 and paid on September 17, 2021.

32.     As an adjunct to wage and salary compensation, the Debtor typically reimburses

Employees for certain out-of-pocket business expenses in the ordinary course of business.

Historically, these expenses aggregated approximately $10,000 per month.  In addition, the

Debtor maintains a credit card account with American Express, and has issued company credit

cards tied to this account to six Employees.  The Debtor seeks authority to make any such

Employee expense reimbursements and to pay American Express bills as may be or become due

and owing in the ordinary course, whether or not allocable to the period before the Petition Date.

*Vacation; Paid Time Off; Paid Sick Leave; Other Paid Leave*

33.     By the Wage Motion, the Debtor seeks authority to honor its pre- and post-

petition obligations to the Employees for accrued vacation, paid time off, sick leave and other

related benefits.  The Debtor's ability to perform these obligations is, as one might expect, critical to maintaining Employee morale and to the retention of those Employees.

34.     The Debtor's vacation policy provides for paid vacation to its Employees based on their service time with the company, starting with five days paid vacation after one year of employment and increasing over the term of employment to a maximum of five weeks of paid vacation.  A few members of the corporate staff have different vacation arrangements.  All Employee vacation must be taken in the calendar year during which it accrues, and the Debtor has a "use it or lose it" vacation policy, such that unused vacation time will not be carried over to the following calendar year.  Earned, unused vacation is not paid out upon an Employee's separation unless required by governing state law.[3]  As of the Petition Date, the Debtor's aggregate obligations to the Employees for 2021 accrued vacation is approximately $445,000.

35.     The Debtor provides "paid time off" ("PTO") to all full-time Employees, and, with some exceptions, to regular part-time employees who are currently active with the Debtor. PTO accrues from commencement of employment and accrues over time, up to a maximum amount of 48 hours per calendar year (56 hours for New York-based employees), based on whether the Employee is full-time or part-time, the duration of the Employee's employment with the Debtor, and the nature of employment (e.g., management, technician, support staff).  As of the Petition Date, the Debtor's aggregate obligations to the Employees for 2021 accrued PTO is approximately $50,000.

36.     In addition to PTO and sick leave, the Debtor is required by applicable state or federal law to provide in certain circumstances paid leave for specified durations, such as for military leave, or to comply with the federal Family and Medical Leave Act.  In addition to such

---

[3] For Massachusetts-based Employees, the Debtor pays accrued PTO upon termination of employment, as required under Massachusetts law.  MASS. GEN. LAWS ch. 149, § 148.

legally required paid leave, the Debtor provides up to three days of paid leave for bereavement, and offers paid leave for jury duty. The Debtor does not accrue obligations for these "use as needed" types of paid leave, and just pays them in the ordinary course payroll. Any such leave used during the last two weeks would be covered in the ordinary course payroll described above and would be *de minimis*.

*Medical, Dental and Vision Insurance*

37.     The Debtor offers medical insurance and dental insurance to its Employees through Blue Cross Blue Shield of Massachusetts ("BCBS"). As of the Petition Date, 167 Employees participated in the Debtor's medical insurance plan and a slightly higher number of Employees participated in the dental insurance plan.

38.     The Debtor pays a portion of the medical insurance and dental premiums—the amount depends of the type of coverage (e.g., individual or family; HMO or PPO) selected by the Employee, and the Employee pays the remaining portion through a payroll deduction. The Debtor pays BCBS monthly for medical and dental coverage. The Debtor's monthly payments to BCBS for the Debtor's portion of medical and dental insurance premiums currently run about $62,000, and the Employees pay the balance through payroll deductions. As of the Petition Date, the Debtor estimates that it has fully paid BCBS for medical and dental insurance premiums through September, and accordingly the Debtor believes it has no prepetition obligation to BCBS; nevertheless, the Debtor seeks authority to pay any such prepetition medical or dental coverage obligation as may be or become due and owing, whether or not allocable to the period before the Petition Date.

39.     The Debtor makes vision insurance available to the Employees through VSP, on an Employee-paid basis. The Debtor pays VSP approximately $3,000 per month for the

coverage selected by its covered Employees, and recoups the payment through payroll deductions for the affected Employees. As of the Petition Date, the Debtor has paid VSP for September 2021 coverage; nevertheless, the Debtor seeks authority to pay any such prepetition vision coverage obligation as may be or become due and owing, whether or not allocable to the period before the Petition Date.

*Other Benefit Programs*

40. In addition to the above-described benefits, the Debtor intends to maintain the following benefit programs during the Chapter 11 case (to the extent paid by the Debtor, all premiums and contributions required under the programs were fully paid as of the Petition Date):

- A 401(k) retirement plan administered by Empower Retirement (formerly MassMutual), to which the Debtor ceased making matching contributions in 2021.

- Life insurance and disability insurance, on a voluntary basis, with USA Able. Employees pay all premiums for these coverages. The Debtor pays US Able for insurance coverage, and recoups those payments through affected Employee payroll deductions. Currently, aggregate premiums for these insurances run about $4,000 per month. As of the Petition Date, the Debtor estimates that it has fully paid for the Debtor's prepetition liability to US Able on account of these insurances; nevertheless, the Debtor seeks authority to pay any such insurance premium obligations as may be or become due and owing, whether or not allocable to the period before the Petition Date.

41. In sum, to enable the Debtor to transition seamlessly to post-petition business operations, it is essential that it be permitted to meet its obligations to the Employees in the ordinary course of business. As to the Employees, to the extent these obligations represent the

Debtor's prepetition obligations, they are predominantly, if not entirely, entitled to priority status under Section 507(a)(4), (5), or (8) of the Bankruptcy Code.  In addition, the payments are appropriately authorized under the doctrine of necessity applied by bankruptcy courts in similar circumstances.  Only by providing the Debtor with the tools necessary to achieve undisrupted business operations will the Debtor be able to maintain the value of their businesses, provide high-quality care to existing and new clients, and keep the pending sale processes on track toward a successful result.  For these reasons, the Debtor respectfully requests that it be authorized to pay, in the exercise of its business judgment, its prepetition obligations to the Employees as described in the Wage Motion, and maintain on a post-petition basis the benefit programs described therein, as and when such obligations become due in the ordinary course of the Debtor's business.

C.     Subcontractor Motion

42.     Historically, the Debtor has operated its fulfillment business utilizing a sizable portion of non-employee technicians provided through third-party vendors.  This approach has permitted us to match our workforce to the variable service requirements of the fulfillment business (some times of the year are historically busier than others) without being over-staffed or under-staffed, as might be the case if we attempted to employ directly all needed technicians.  As of the Petition Date, the Debtor has contracted with 22 subcontractors (the "Subcontractors") to provide technicians to the Debtor, on a subcontractor basis, to enable the Debtor to meet its fulfillment service obligations to its customers, including Comcast and Altice.  Collectively, the Subcontractors currently provide 182 technicians to the Debtor to enable the Debtor to operate its fulfillment business line and meet its obligations to its customers; a very few of the Subcontractors also support the debtor's construction line of business.

43.     The Subcontractor technicians are every bit as critical to the Debtor's ability to meet its obligations to its customers as the Debtor's own employees.  Without the continued availability of the 182 technicians provided by the Subcontractors, the Debtor would be unable to meet its fulfillment obligations to its customers, and would quickly lose a sizable portion—and possibly all—of such business and its associated revenues that constitute nearly 90 percent of the Debtor's overall revenues.

44.     Accordingly, the Debtor filed today its Motion for Order Authorizing Debtor to Continue to Make Weekly Payments to Technician Subcontractors (the "Subcontractor Payment Motion").  By the Subcontractor Payment Motion, the Debtor seeks authority to continue to make weekly payments to the Subcontractors in the ordinary course of business consistent with the Debtor's prepetition practice, regardless of whether any particular weekly payment covers prepetition services or post-petition services provided by Subcontractors and their technicians.

45.     The ability to make these payments is vital to the Debtor's ongoing business operations.  In reality, the Subcontractors are just as critical to the Debtor's ability to perform fulfillment services as are its own Employees.  At the same time, however, a number of the Subcontractors have, in light of the Debtor's prepetition cash flow issues, expressed significant concerns about continuing to work for the Debtor—a development that would not only jeopardize ongoing operations, but could derail the Proposed Sale as well.  Accordingly, I believe that authorization to make the weekly payments described in the Subcontractor Payment Motion is as important to the stability of the Debtor's business as paying the Employees.

D.     Cash Management Motion

46.     Almost all of the revenue generated by the Debtor's business operations is received through customer payments made by checks deposited by the Debtor into its existing

deposit account (the "Deposit Account"), or through wire transfers and ACH deposits made

directly to the Deposit Account.  The Debtor utilizes the Deposit Account to fund its other two

operating accounts, both also maintained with JPM, including an account used for all

disbursements other than payroll (the "Disbursement Account"), and a payroll account (the

"Payroll Account" and, together with the Deposit Account and the Disbursement Account, the

"Bank Accounts").  Funds transferred from the Deposit Account to the Disbursement Account

are used to pay the Debtor's expenses (e.g., rent, payments to subcontractors, other

administrative and overhead expenses), other than payroll expenses.  The Payroll Account is

used exclusively to make disbursements in connection with employee payroll expenses.  The

Debtor funds the Payroll Account every Wednesday for its weekly payroll issued every Friday.

47.     By the Cash Management Motion, the Debtor is seeking an order permitting it to

maintain their existing accounts at JPM, and to continue to utilize the cash management system

described above for the payment of expenses incurred in the operation of their businesses.  The

Debtor believes that continued use of the Bank Accounts is necessary to avoid disrupting its

business operations.  In particular, it would be extremely time-consuming to change payment

directions currently on file with all of the customers who are the source of the Debtor's revenues,

and the change requests would almost certainly delay the stream of revenues necessary to the

Debtor's business operations.  The result would be a disruption in the Debtor's cash flow,

jeopardizing the Debtor's viability and the Proposed Sale.  Additionally, if the Debtor's

management were required to focus on opening new accounts and coordinating new payment

arrangements with customers, it would be distracted from giving its full attention to maintaining

ongoing business operations and pursuing the Proposed Sale, the successful and prompt

consummation of which is the *raison d'etre* of this Chapter 11 case.  I believe that maintaining

ordinary course operations in an efficient, cost-effective manner is in the best interests of the

Debtor, its business operations, its employees, its customers, its creditors, and its estate, and will

promote the Proposed Sale.  I also believe that the continued use of the Bank Accounts will

promote continued, ordinary course operations and revenue without disruption that might prove

costly and endanger the Proposed Sale.

D.     <u>Other Motions</u>

48.     In addition to the Cash Collateral Motion, the Wage Motion, the Subcontractor

Motion and the Cash Management Motion, and the Sale Motions and Sale Procedures Motions,

the Debtor is today filing the following motions, for which it is not requesting "first day"

emergency relief:

- Application for Order Authorizing Retention and Employment of Casner & Edwards, LLP as Counsel for the Debtor;

- Debtor's Application for Order Authorizing Retention and Employment of Getzler Henrich & Associates, LLC as Financial Advisor to the Debtor;

- Debtor's Application for Order Authorizing Retention and Employment of SSG Advisors, LLC as Investment Banker;

- Debtor's Motion for Authority to Employ and Compensate Certain Professionals in the Ordinary Course of Business; and

- Debtor's Motion for Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals.

The Debtor's continued access to the professionals to be retained and compensated pursuant to

these motions will be vital to its ability to continue its business operations in the Chapter 11 case

and consummate the Proposed Sale.  I therefore believe that the relief sought therein is

appropriate, and request that it be granted by the Court in due course.

## <u>Conclusion</u>

49.     The Debtor has filed the Chapter 11 case to facilitate the sale of the assets of its business, having determined that such sale is in the best interests of its creditors, clients and employees.  To preserve the value of its business pending completion of the sale process, the Debtor requires the continued use of Cash Collateral to which JPM has agreed.

50.     Allowance of the Wage Motion will promote the seamless transition of the Debtor's business operations into Chapter 11, by minimizing the disruption to operations and employee morale that would undoubtedly ensue were the Debtor unable to pay its workforce in the normal course.  Authorizing the Debtor to maintain its existing cash management system, critical to the uninterrupted receipt of payments for its services from customers, will likewise promote undisrupted business operations, to the benefit of all interested parties.

51.     Accordingly, for the reasons stated herein and in each of the Cash Collateral Motion, the Wage Motion, and the Cash Management Motion, I believe that the relief requested in such motions is instrumental to the success of the Debtor's Chapter 11 case, and that prompt approval of such motions is in the best interests of the Debtor and its bankruptcy estate.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed at _WOBURN_ , Massachusetts this _13_ day of September, 2021.

_____

Ruben V. Klein, President of Tri-Wire Engineering
Solutions, Inc.