UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| TRI-WIRE ENGINEERING SOLUTIONS, INC. | ) | |
| | ) | Case No. 21-11322-CJP |
| Debtor. | ) | |
| | ) | |

**ORDER APPROVING DEBTOR'S SALE OF SUBSTANTIALLY ALL
ASSETS, INCLUDING CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES, PURSUANT TO SECTIONS 363 AND 365 OF THE BANKRUPTCY CODE,
FREE AND CLEAR OF LIENS, CLAIMS, AND INTERESTS**

Upon consideration of the *Debtor's Motion For Authority to Sell Substantially All Assets, Including Certain Executory Contracts and Unexpired Leases, Pursuant to Sections 363 and 365 of the Bankruptcy Code, Free and Clear of Liens, Claims, and Interests* dated September 13, 2021 [Dkt. No. 9] (the "Sale Motion"; capitalized terms used but not otherwise defined herein have the meanings given to them in the Sale Motion, the Sale Procedures Motion, or the APA (as defined below), as applicable), pursuant to which Tri-Wire Engineering Solutions, Inc. (the "Debtor") requested that this Court authorize the Debtor's sale (the "Sale") of substantially all of its assets utilized in operating its business, including without limitation (i) the Debtor's rights under leases of real property at which the Debtor conducts its business operations (collectively, the "Leases"), (ii) certain personal property, including equipment, furniture and inventory, (iii) certain contracts with third parties (together with the Leases, the "Assumed Contracts"), (iv) and certain other miscellaneous, specified assets as set forth in that certain Asset Purchase Agreement dated as of September 13, 2021 and attached hereto as Exhibit A (the "APA") between the Debtor and ITG Communications, LLC, a Texas limited liability company ("ITG"), including, without limitation, the right to use the Debtor's trade names and other intellectual

property (collectively, the "Assets"), to ITG, or its eligible designee, or to such other entity that submits the highest or otherwise best offer to acquire the Assets as determined through the sale procedures governing the Sale (the "Sale Procedures") approved by, and constituting Exhibit A to, the Court's order entered on September 23, 2021 [Dkt. No. 77] (the "Sale Procedures Order"); the Court having scheduled a hearing on the Sale Motion for October 26, 2021 at 2:00 p.m. (the "Sale Hearing"); the Debtor pursuant to the Sale Procedures Order having provided notice to creditors and other parties in interest of the Sale, the Sale Hearing, and the proposed assumption and assignment of the Assumed Contracts and proposed cure amounts for such contracts, and filed certificates of service of such notices and of the Sale Motion and the Sale Procedures Order with this Court [Dkt. Nos. 99, 100, and 134] (the "Certificates of Service"); the following objections to the Sale Motion or to the proposed assumption and assignment of a particular Assumed Contract having been filed:  (i) the Cure Objection of Cummings Properties, LLC [Dkt. No. 126] (the "Cummings Objection"), whereby Cummings asserts that the "Cure Amount" for its unexpired lease with the Debtor is understated by $1,259.69, and that the proper Cure Amount for such lease is $12,694.69; (ii) the Cure Objection of Huntington National Bank ("HNB") [Dkt. No. 139] (the "HNB Cure Objection"), whereby HNB asserts that the "Cure Amount" for its two equipment financing agreements with the Debtor total $8,460.83 and not $0.00 as proposed by the Debtor; (iii) the Limited Objection of HNB to the Sale Motion based on HNB's purchase money security interest (PMSI) in certain equipment proposed to be sold free and clear of such PMSI as part of the Sale [Dkt. No. 149] (the "HNB Sale Objection"); (iv) the Objection of Comcast Cable Communications Management, LLC ("Comcast") to both the Sale Motion and to the Debtor's proposed assumption and assignment of its Assumed Contract with Comcast [Dkt. No. 140] (the "Comcast Objection"); (v) the Limited Objection of the United

States Trustee [Dkt. No. 147] (the "UST Objection"), whereby the United States Trustee objects

to the proposed payments, as a carveout from proceeds of the Sale otherwise payable to the

Debtor's secured creditor JPMorgan Chase Bank, N.A. ("JPM"), to certain employees of the

Debtor entitled to incentive bonuses under the Debtor's incentive bonus plan disclosed to the

Court and parties in interest [Dkt. Nos. 144, 145] (the "Incentive Bonus Plan");  and (vi) the

Response to the Sale Motion filed by the Official Committee of Unsecured Creditors of the

Debtor (the "Committee") [Dkt. No. 150] (the "Committee Response"), whereby the Committee

reserved its rights with respect to the Sale Motion and the Sale pending negotiation of the final

form of the order approving the Sale; the Court having reviewed the Sale Motion, the Certificates

of Service, and the various objections to the Sale Motion, and having now conducted the Sale

Hearing and having considered the arguments of counsel, the offers of proof, and the matters

addressed at the Sale Hearing; and the Court having found and determined that the relief sought

in the Sale Motion is in the best interests of the Debtor, its estate, its creditors, and all parties in

interest, and that the legal and factual bases set forth in support of the Sale Motion establish good

cause for the relief granted herein; and after due deliberation and sufficient cause appearing

therefor, it is hereby

**FOUND AND DETERMINED THAT**:

**General**

A.    This Court has jurisdiction to hear and determine the Sale Motion pursuant to 28

U.S.C. §§ 157 and 1134.  Venue of the Debtor's Chapter 11 case in this District is proper

pursuant to 28 U.S.C. §§ 1408(a) and 1409(a).  Determination of the Sale Motion is a core

proceeding under 28 U.S.C. §157(b)(2), and the Court may enter a final order consistent with

Article III of the United States Constitution.  The statutory predicates for the relief requested in

the Sale Motion are Sections 105, 363 and 365 of the Bankruptcy Code and Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

**Compliance with Sale Procedures**

B.      The Debtor has complied with the notice provisions of the Sale Procedures Order by providing the notices approved under the Sale Procedures Order to (i) counsel for the United States Trustee, (ii) the Committee and its counsel, (iii) counsel to JPM, (iv) any entities known to hold a lien or security interest in any of the Assets, (v) all parties that have filed and served a request for notice in the Debtor's Chapter 11 case, (vi) the Internal Revenue Service, (vii) each of the Debtor's other federal and state taxing authorities, (viii) all non-Debtor parties to the Assumed Contracts, and (ix) all other known, non-employee creditors of the Debtor.  The notice of the Sale Hearing and of the relief sought by the Sale Motion, as reflected by the Certificates of Service, was proper, timely, adequate and sufficient and meets the requirements of Sections 102(1), 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006, was reasonably calculated to give actual notice of the relief contemplated by the Sale Motion, is appropriate and sufficient under the circumstances, and no other or further notice of the Sale, the Sale Procedures, the Sale Motion, the Sale Hearing, or the entry of this Order need be provided to any entity.

C.      Service of the Assumed Contracts Notice[1] was good, sufficient and appropriate under the circumstances, in compliance with the Sale Procedures Order, and no other or further notice need be given to any entity in respect of establishing the Cure Amounts for the Assumed Contracts.  Non-Debtor Contract Parties to the Assumed Contracts have had an opportunity to object to the Cure Amounts.  The Debtor, pursuant to the Sale Procedures Order, served adequate

---

[1] Capitalized terms used and not defined herein shall have the meanings ascribed to them in the Sale Motion, Sale Procedures Motion, Sale Procedures Order or APA, as appropriate.

assurance documentation reflecting ITG's financial ability to assume and perform the obligations to the Non-Debtor Contract Parties under the Assumed Contracts, and no Non-Debtor Contract Party has contested or questioned such adequate assurance.

D.      The Debtor has demonstrated good, sound and sufficient business purpose and justification, and it is a reasonable exercise of the Debtor's business judgment, (i) to sell the Assets to ITG on the terms and conditions set forth in the APA, (ii) to assume and assign the Assumed Contracts to ITG, and (iii) to consummate all transactions contemplated by the APA. The sale of the Assets and the assumption and assignment of the Assumed Contracts is in the best interest of the Debtor, its estate, its creditors, and other parties in interest.

**Highest or Best Offer**

E.      The Debtor and SSG Advisors, LLC ("SSG") marketed the Assets diligently, in good faith and in a commercially reasonable manner, to secure the highest and best offers for the Assets, including through the efforts of SSG to contact and make available offering and due diligence materials to potential purchasers and otherwise to make sale-related information about the Debtor, the Assets, and the Sale Procedures available to prospective purchasers of the Assets.

F.      The Debtor and SSG marketed the Assets and solicited bids for the Assets in compliance with the Sale Procedures Motion and the Sale Procedures Order, and creditors, parties in interest and other entities have been afforded a full, fair and reasonable opportunity to submit offers to purchase the Assets.

G.      The Debtor, SSG, and the Debtor's other representatives have complied in all material respects with the Sale Procedures and the Sale Procedures Order.  The Debtor has complied with the provisions of Sections 363 and 365 of the Bankruptcy Code as regards the sale of the Assets and the assumption and assignment of the Assumed Contracts.

H.    No competing Qualified Bid (or any bid) was submitted to acquire the Assets by any entity.  Consequently, no Auction was required or conducted, and ITG was designated as the Winning Bidder pursuant to the Sale Procedures (the "Winning Bidder"), with ITG's agreement to purchase the Assets pursuant to the APA constituting the Winning Bid for purposes of the Sale Procedures (the "Winning Bid").

I.    The consideration provided by the Winning Bidder pursuant to the APA (i) is fair and reasonable, (b) is the highest and best offer for the Assets, and (c) constitutes reasonably equivalent value for the Assets.

### Sale Free and Clear

J.    The Debtor may sell the Assets free and clear of all liens, claims, interests, rights of setoff, recoupment, netting and deductions, any successor or successor-in-interest liability theory, and other encumbrances of any kind or nature whatsoever (collectively, the "Encumbrances") (except for the Assumed Obligations and the Permitted Liens), because, in each case, one or more of the standards set forth in Section 363(f)(1) – (5) of the Bankruptcy Code has been satisfied, including, with respect to the HNB Objection, by virtue of the treatment afforded HNB pursuant to Paragraph 7 of this Order.  Those holders of Encumbrances who did not object, or who withdrew their objections, to the Sale or the Sale Motion are deemed to have consented pursuant to Section 363(f)(2) of the Bankruptcy Code.  Those holders of Encumbrances who did object fall within one or more of the other subsections of Section 363(f) and are adequately protected by having their Encumbrances, if any, attach to the net cash proceeds of the Sale attributable to the Assets in which such holder alleges an Encumbrance, in the same order of priority, with the same validity, force and effect that such Encumbrance had

prior to the Sale, subject to any claims and defenses the Debtor and its estate may possess with respect thereto.

K.      The Winning Bidder is not, and shall not be considered, a successor to the Debtor or its estate, and there is no continuity of enterprise between the Winning Bidder and the Debtor. The Winning Bidder (i) has not, *de facto* or otherwise, merged with or into the Debtor, (ii) is not a continuation or substantial continuation, and is not holding itself out as a mere continuation, of the Debtor or its estate, business or operations, or any enterprise of the Debtor, and (iii) does not have a common identity of incorporators, directors or equity holders with the Debtor.

L.      The Winning Bidder would not have entered into the APA and would not consummate the transactions contemplated thereunder if the sale of the Assets to the Winning Bidder, and the assumption and assignment of the Assumed Contracts to the Winning Bidder, were not free and clear of all Encumbrances (except as otherwise provided in the APA and this Order) or if the Winning Bidder would, or in the future could (except and only to the extent expressly provided in the APA and with respect to the Assumed Obligations and the Permitted Liens), be liable for any of such Encumbrances.

## Assumption and Assignment of Assumed Contracts

M.      The executory contracts and unexpired leases that the Debtor is authorized to assume and assign to the Winning Bidder pursuant to the APA and Section 365 of the Bankruptcy Code are identified on attached Exhibit B (such executory contracts and unexpired leases are hereinafter referred to, collectively, as the "Assumed Contracts"). Each of the Assumed Contracts is valid and binding, in full force and effect, and enforceable in accordance with its terms, and is property of the Debtor's estate pursuant to Section 541(a) of the Bankruptcy Code.

N. The assumption and assignment of the Assumed Contracts pursuant to the terms of this Order is integral to the APA and is in the best interests of the Debtor and its estate, creditors and other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtor.

O. The Debtor has provided adequate assurance, within the meaning of Section 365(b)(1) of the Bankruptcy Code, of the Debtor's cure of all defaults, obligations and liabilities under the Assumed Contracts, through the Debtor's undertaking to pay the cure amount for each of the Assumed Contracts as set forth on attached Exhibit B (the "Cure Amounts"), and through the Winning Bidder's ability to perform the Assumed Contracts once assumed and assigned to the Winning Bidder. The Cure Amounts set forth on attached Exhibit B have been adjusted from the Debtor's original asserted Cure Amounts (i) to reflect the increased Cure Amount asserted to be owed to Cummings pursuant to the Cummings Objection and (ii) to reflect the updated Cure Amounts for six subcontracts that were the subject of the Debtor's supplemental Assumed Contracts Notice [Dkt. No. 134]. For each Assumed Contract that is assumed and assigned at the closing of the Sale under the APA (the "Closing"), the Debtor shall pay the Cure Amount specified for such Assumed Contract in cash at the Closing or as otherwise directed by separate order of the Court. For any Assumed Contract for which the Cure Amount is specified to be "TBD," the Cure Amount shall be the amount determined by agreement between the Debtor and the non-Debtor party of such Assumed Contract or by order of the Court entered pursuant to Paragraph 16 of this Order. The assumption and assignment of the three construction contracts that are the subject of the Debtor's supplemental motion [Dkt. No. 152] (the "Supplemental Assumed Contracts Motion"), and the proposed "Cure Amounts" for such contracts, are not

addressed by this Order, but shall be addressed through a separate order entered with respect to the Supplemental Assumed Contracts Motion.

P.      To the extent that any non-Debtor party to any Assumed Contract objects, asserts or claims some greater amount is owed to it other than the Cure Amount with respect to the Debtor's obligations under the relevant Assumed Contract, such objection, assertion and/or claim is expressly overruled, unless it has been properly preserved for future resolution pursuant to the Sale Procedures Order and this Order.

Q.      The Winning Bidder has provided adequate assurance of its future performance under the Assumed Contracts within the meaning of Section 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

R.      The Winning Bidder may in accordance with the APA designate additional executory contracts to be additional Assumed Contracts, and the Debtor in accordance with the APA may seek this Court's further order authorizing the Debtor's assumption and assignment to the Winning Bidder of such additional Assumed Contracts.   The Winning Bidder may in accordance with the APA elect not to accept assignment of any one or more of the Assumed Contracts, and nothing in this Order requires the Winning Bidder to take assignment of any particular Assumed Contract.

S.      The Debtor shall continue to perform its post-petition obligations under the Assumed Contracts through the Closing or, as to any particular Assumed Contract, such earlier time as the Winning Bidder notifies the Debtor that the Winning Bidder has elected not to take assignment of such Assumed Contract and the Debtor has notified the non-Debtor contract party that such Assumed Contract will not be assumed and assigned.

## **Objections to the Sale**

T.      The various filed objections to the Sale have been addressed as follows: (i) the

Debtor agrees with the increased Cure Amount set forth in the Cummings Objection, as reflected

in the updated Cure Amount for the affected Assumed Contract set forth in attached Exhibit B;

(ii) the HNB Cure Objection is mooted by the treatment afforded HNB pursuant to Paragraph 7

of this Order and HNB's withdrawal of the HNB Cure Objection [Dkt. No. 162]; (iii) the HNB

Sale Objection is addressed through the treatment afforded HNB pursuant to Paragraph 7 of this

Order and HNB's withdrawal of the HNB Sale Objection [Dkt. No. 156]; (iv) the UST Objection

does not contest the Sale, only the use of Sale proceeds to make payments under the Incentive

Bonus Plan, which payments are a permissible use of, and carve-out from, JPM's collateral

proceeds; (v) the Comcast Objection has been resolved through (A) the agreement among the

Debtor, the Winning Bidder, JPM, and Comcast that Comcast will be paid the amount of

$262,400.00 at the closing of the Sale (the "Comcast Payment"), regardless of whether the

Debtor rejects the Comcast Agreement (as defined in the Comcast Objection) between the

Debtor and Comcast (the "Comcast Agreement") or assumes and assigns the Comcast

Agreement to the Winning Bidder, such Comcast Payment to be funded through funds made

available from the Winning Bidder's waiver of certain purchase price adjustments and provision

of additional consideration, and from JPM's collateral proceeds, as agreed by the Winning

Bidder and JPM, (B) the treatment afforded Comcast in Paragraphs 8 and 11 of this Order, and

(C) the execution and delivery by the Winning Bidder and Comcast of a side letter agreement or

new or amended statements of work or other documentation or agreements governing the

arrangements whereby the Winning Bidder will take over the Debtor's services to Comcast other

than through assumption and assignment of the Comcast Agreement, in form and substance

acceptable to both Comcast and the Winning Bidder (the "Side Letter"), which Side Letter shall

incorporate or be deemed to incorporate the provisions of Paragraph 8 of this Order; and (v) the

Committee Response is resolved through the Committee's assent to entry of this Order.

### Compelling Circumstances for an Immediate Sale

U.      It is essential that the Sale of the Assets occur within the time constraints set forth

in the APA.  Time is of the essence in consummating the Sale.

V.      The Sale does not constitute a *de facto* or *sub rosa* plan of reorganization or

liquidation because it does not propose to (i) impair or restructure existing debt of, or equity

interests in, the Debtor, (ii) impair or circumvent voting rights with respect to any plan proposed

by the Debtor, (iii) circumvent Chapter 11 safeguards, including those set forth in Sections 1125

and 1129 of the Bankruptcy Code, or (iv) classify claims or equity interests.

W.      The consummation of the Sale is legal, valid and properly authorized under all

applicable provisions of the Bankruptcy Code, including, without limitation, Sections 105(a),

363(b), 363(f), 363(m), 365(b) and 365(f), and all of the applicable requirements of such sections

have been complied with in respect of the Sale.

### Good Faith Purchaser

X.      The Winning Bidder is not an "insider" of the Debtor, as that term is defined in

Section 101(31) of the Bankruptcy Code, and is not otherwise affiliated with the Debtor.

Y.      The Winning Bidder has proceeded in good faith and without collusion in all

respects in connection with the sale process, in that: (i) the Winning Bidder, in proposing and

proceeding with the Sale in accordance with the APA, recognized that the Debtor was free to

deal with other interested parties; (ii) the Winning Bidder agreed to provisions in the APA that

would enable the Debtor to accept a higher and better offer; (iii) the Winning Bidder complied

with all of the provisions in the Sale Procedures Order applicable to the Winning Bidder; (iv) all payments to be made by the Winning Bidder and other agreements entered into or to be entered into between the Winning Bidder and the Debtor in connection with the Sale have been disclosed; (v) the negotiation and execution of the APA and related documents were conducted in good faith and constituted an arm's length transaction; (vi) the Winning Bidder did not induce or cause the Chapter 11 filing by the Debtor; and (vii) the APA was not entered into, and the Sale is not being consummated, for the purpose of hindering, delaying or defrauding creditors of the Debtor. The Winning Bidder is therefore entitled to all of the benefits and protections provided to a good-faith purchaser under Section 363(m) of the Bankruptcy Code.

Z.    Neither the Debtor, nor the Winning Bidder, nor their respective representatives engaged in any conduct that would cause or permit the APA, any of the other documents executed in connection with the APA, or the Sale to be avoided, or that would permit the recovery of excess value or the imposition of punitive damages, under Section 363(n) of the Bankruptcy Code.

AA.    In the absence of a stay pending appeal, the Winning Bidder may close the transactions contemplated by the APA at any time after entry of this Order, and cause has been shown as to why this Order should not be subject to the stay provided by Bankruptcy Rules 6004(h) and 6006(d).

## No Fraudulent Transfer

BB.    The consideration provided by the Winning Bidder pursuant to the APA (a) is fair and reasonable, (b) is the highest or otherwise best offer for the Assets, and (c) constitutes reasonably equivalent value (as those terms are defined in each of the Uniform Fraudulent

Transfer Act, the Uniform Fraudulent Conveyance Act, Uniform Voidable Transactions Act, and

Section 548 of the Bankruptcy Code).

<h3 align="center">Sale Proceeds</h3>

CC.     The compensation arrangements between the Debtor and SSG as set forth in the

engagement letter agreement between the Debtor and SSG dated July 27, 2021 (the "SSG Fee")

and approved by this Court [Dkt. No.  138] (the "SSG Employment Order"), call for payment of

the SSG Fee upon the closing of a sale transaction achieved through SSG's efforts.  From the

proceeds of the Sale, an amount equal to the SSG Fee shall be deposited in escrow (the "SSG

Fee Escrow"), and held by the Debtor or its counsel for payment of the SSG Fee upon the filing

and this Court's approval of a fee application respecting SSG's services in connection with the

Sale, as required under the SSG Employment Order.

DD.     The post-petition financing arrangements between the Debtor and JPM approved

by this Court's final financing order entered on October 1, 2021 [Dkt. No. 113]  (the "Financing

Order") provide that the post-petition loan made by JPM to the Debtor pursuant to the Financing

Order (the "Post-Petition Loan") be repaid from proceeds of the Sale at the Closing, and also set

forth parameters for application of Sale proceeds to payment of the Debtor's prepetition

obligations to JPM, one of which is entry of a sale order acceptable to both JPM and the

Committee.  Financing Order, at ¶ 11.  By operation of the Financing Order, JPM is entitled to

receive payment of its post-petition loan at the Closing.  Consistent with the Financing Order,

and with all affected parties' agreements and arrangements for the fundings and distributions to

be made to close the Sale, the parties have prepared the agreed flow of funds governing such

fundings and distributions attached as Exhibit C to this Order (the "Final Funds Flow").

**Miscellaneous**

EE.     It is necessary and appropriate, in order to ensure the validity of the sale of the Assets to the Winning Bidder and to ensure compliance with this Order, for this Court to retain jurisdiction to: (a) interpret and enforce the provisions of the APA, the Assumed Contracts, the Sale Motion, and this Order; (b) protect the Winning Bidder and any of the Assets against any asserted Encumbrances; (c) resolve any disputes arising under or relating to the APA, the Assumed Contracts, the Sale Motion, and this Order; and (d) determine the validity, extent and priority of asserted Encumbrances in, on, or to the Assets.

**WHEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

**General Provisions**

1.     The findings of fact entered above and the conclusions of law stated herein shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding by Bankruptcy Rule 9014.  To the extent that any finding of fact shall later be determined to be a conclusion of law, it shall be so deemed, and to the extent that any conclusion of law shall later be determined to be a finding of fact, it shall be so deemed. The findings made herein are based on the evidence and proffers presented on the record at or in connection with the Sale Hearing, at which no party in interest elected to cross-examine or present evidence. Any findings of fact or conclusions of law stated by the Court on the record at the Sale Hearing are hereby incorporated, to the extent they are not inconsistent herewith.  This Court's findings of fact and conclusions of law, set forth in the Sale Procedures Order, are incorporated herein by reference.

2.      The Sale Motion is GRANTED, and the Sale contemplated thereby is approved as set forth in this Order.

3.      All objections or other responses to the Sale Motion or the relief requested therein, or reservations of rights with respect thereto, including without limitation the Cummings Objection, the HNB Cure and Sale Objections, the Comcast Objection, and the UST Objection, that have not been withdrawn, waived or settled, are, except to the extent provided for by this Order, overruled on the merits with prejudice.

### Approval of APA and Sale Transaction

4.      The Sale to the Winning Bidder pursuant to the APA is authorized under Section 363(b) of the Bankruptcy Code.  The APA and all ancillary documents, and all of the terms and conditions thereof, are approved, and the Debtor is authorized to consummate the transactions contemplated thereby.

5.      Pursuant to Section 363(b) of the Bankruptcy Code, the Debtor is authorized and empowered to take any and all actions necessary or appropriate to (i) consummate the Sale of the Assets to the Winning Bidder pursuant to and in accordance with the terms and conditions of the APA, (ii) close the Sale as contemplated in the APA and this Order, and (iii) execute and deliver, perform under, consummate, implement and close the APA, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the APA and the Sale, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the APA and such ancillary documents.

6.      The APA and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto in accordance of the terms thereof without further order of the Court, provided that any such modification, amendment. or

supplement is not material and does not materially change the economic substance of the transactions contemplated thereby and pursuant to this Order.

### **Sale Free and Clear**

7.       Pursuant to Sections 105(a), 363(b), 363(f), 365(b) and 365(f) of the Bankruptcy Code, the Debtor is authorized to transfer the Assets at the Closing.  The Assets (including the Assumed Contracts) shall be transferred to the Winning Bidder upon and as of the Closing and such transfer shall constitute a legal, valid, binding and effective transfer of such Assets and, upon the Debtor's receipt of the Purchase Price, shall be free and clear of all Encumbrances, except for the Assumed Obligations and Permitted Liens under the APA.  Upon the Closing, the Winning Bidder shall take title to and possession of the Assets subject only to the Assumed Obligations and Permitted Liens; provided, however, that the Winning Bidder shall not be relieved of liability with respect to the Assumed Obligations and Permitted Liens, including any obligations accruing under the Assumed Contracts from and after the Closing.   All Encumbrances shall attach solely to the net proceeds of the Sale with the same validity, priority, force and effect that they now have as against the Assets, subject to any claims and defenses the Debtor and its estate may possess with respect thereto.  At or incident to closing of the Sale, HNB shall be paid $39,000 in full satisfaction of (i) the Debtor's obligations under the two equipment financing agreements that are the subject of the HNB Objection, and (ii) HNB's PMSI in the equipment that is the subject of those two equipment financing agreements (the "HNB Payment").  Upon receipt of the HNB Payment, HNB shall terminate its UCC-1 financing statements filed in respect of such equipment.

8.       Notwithstanding anything to the contrary in this Order or the APA, any personal property owned by Comcast or its parent, subsidiaries, or affiliates (the "Comcast Property") that

is now or hereafter in the possession of the Debtor, shall not be sold to the Winning Bidder but shall remain property of Comcast, and shall not constitute part of the Assets under this Order or the APA; provided, however, that the Winning Bidder shall be entitled to take possession of all such Comcast Property in the possession of the Debtor as of the Closing, subject to the terms of the Side Letter. In the event that the Comcast Agreement is not assumed by the Winning Bidder at or incident to the Closing, then (i) the Closing shall be conditioned on the Winning Bidder and Comcast entering into the Side Letter, and (ii) unless Comcast otherwise agrees to the Winning Bidder's retention of possession of the Comcast Property, the Debtor and the Winning Bidder shall cooperate with Comcast to allow Comcast to retrieve the Comcast Property in a commercially reasonable manner.  The Debtor's accounts receivable due from and owing by Comcast to the Debtor for the Debtor's services through the Closing Date shall be established through the normal reconciliation procedures, and other processes and contract terms for determining amounts owed, of the Debtor and Comcast under the Comcast Agreement, provided, however, that such amounts owed shall be payable without any setoff or reduction solely resulting from the Debtor's rejection of the Comcast Agreement; and provided, further, that Comcast's rejection damages shall not be used as a setoff or reduction against amounts owing to the Winning Bidder for post-Closing services to Comcast.  Nothing in this Paragraph 8 shall alter, amend, modify or waive (i) Comcast's rights and remedies against the Debtor under the Comcast Agreement  or applicable law, all of which rights are expressly preserved, or (ii) the Debtor's rights under the APA in the event that the Winning Bidder and Comcast are unable to reach agreement on the Side Letter.  In the event the Debtor rejects the Comcast Agreement pursuant to Section 365 of the Bankruptcy Code, Comcast shall nevertheless be entitled to full payment of the Comcast  Payment, and any rejection damage claims of Comcast may be asserted

solely in defense of, to reduce, or as setoff against, claims or counterclaims asserted by the Debtor or its estate against Comcast.

9.      Upon the Closing Date, and except as otherwise provided herein or in the APA, the Winning Bidder shall not bear liability for any liability or other obligation of the Debtor arising under or related to any of the Assets.  Without limiting the generality of the foregoing, and except as otherwise expressly provided herein or in the APA, the Winning Bidder shall not be liable for any Encumbrances on, in, or against the Debtor or any of its predecessors or affiliates, its estate, or the Assets, and the Winning Bidder shall have no successor or vicarious liabilities of any kind or character, including, without limitation, under any theory of antitrust, environmental, successor, or transferee liability, labor law, *de facto* merger, mere continuation, or substantial continuity, whether known or unknown as of the Closing Date, now existing, or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including, without limitation, liabilities on account of warranties, intercompany loans, receivables among the Debtor and its affiliates, environmental liabilities, workers' compensation "experience rating," unemployment tax "contribution rating" rule or regulation, or any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of any of the Assets prior to the Closing Date.

10.      Except as otherwise permitted by the APA or this Order, all persons and entities, including, without limitation, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade creditors, litigation claimants, and other creditors, holding Encumbrances of any kind or nature whatsoever on, in, or against the Debtor, its estate, or all or any portion of the Assets, arising under, out of, in connection with, or in any way relating to, the Debtor, the Assets, the operation of the Debtor's businesses prior to the Closing

Date, or the transfer of the Assets to the Winning Bidder, are hereby forever barred, estopped, and permanently enjoined from asserting against the Winning Bidder, or any of its affiliates, successors, or assigns, or their property or the Assets, such Encumbrances, including, without limitation, by taking any of the following actions against the Winning Bidder or its affiliates, or their successors, assets, or properties, to the extent any such actions arise under, out of, in connection with, or in any way relate to, the Debtor, the Assets, the operation of the Debtor's business prior to the Closing Date, or the transfer of the Assets to the Winning Bidder:  (a) commencing or continuing in any manner any action or other proceeding; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or other order; (c) creating, perfecting, or enforcing any lien or other claim; (d) asserting any set off, right of subrogation, or recoupment of any kind; (e) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Order or any other order of this Court, or the APA or actions contemplated or taken in respect thereof, or (f) revoking, terminating, or failing or refusing to transfer or renew any license, permit, or authorization relating to the Assets solely on the ground that (i) the Debtor is a debtor under the Bankruptcy Code or (ii) the Winning Bidder is a purchaser at a sale pursuant to Section 363 of the Bankruptcy Code.

11.     Notwithstanding anything to the contrary in this Order or the APA, following the closing of the Sale, the Winning Bidder shall permit Comcast commercially reasonable access to (a) the Debtor's books and records relating to the Wage & Hour Action (as defined in the Comcast Objection) that are transferred to the Winning Bidder under the APA (the "Wage Records"), and (b) the Debtor's former personnel who are then-currently employed by the Winning Bidder and who have knowledge of facts relating to the Wage & Hour Action; the

Winning Bidder's obligation to provide such access will be limited to records in its possession or control and the Winning Bidder shall have no obligation to curate or create any records or summaries of records.  Prior to destroying or otherwise relinquishing possession or control of the Wage Records, the Winning Bidder shall provide 30 days' written notice to Joel M. Walker, Esq., Nye, Stirling, Hale & Miller, LLP, 1145 Bower Hill Road, Suite 104, Pittsburgh, PA 15243, email: jmwalker@nshmlaw.com, to provide Attorney Walker the opportunity, through discovery, court order, or arrangements with the Winning Bidder, to copy or take possession of the Wage Records.

12.     If any person or entity that has filed statements or other documents or agreements evidencing Encumbrances on all or any portion of the Assets (including without limitation HNB) shall not have delivered to the Debtor prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary or desirable to the Winning Bidder for the purpose of documenting the release of all Encumbrances that the person or entity has or may assert with respect to all or any portion of the Assets, the Debtor is hereby authorized, and the Winning Bidder is hereby authorized, to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Assets.

13.     This Order is deemed to operate as an unconditional release, discharge and termination, effective as of the Closing, of all Encumbrances in, on, or to the Assets.  If the Closing does not occur, then such Encumbrances shall remain in effect.

14.     This Order is binding on filing agents and officers, all government departments and units, whether federal, state, local or of a foreign state (or subdivision thereof), who may be required by operation of law, or the duties of office or of contract, to accept, file, register or

otherwise record or release any documents or instruments or who may be required to report or insure any title or state of title in or to any of the Assets (all such entities being "Recording Officers"); provided, however, that nothing in this Order shall require Recording Officers to accept for filing any transfer document or instrument not accompanied by payment of any required conveyance tax or recording fee.  Each and every federal, state and local governmental agency or department is hereby required and directed (i) to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA, and (ii) to issue any certificate, including without limitation a certificate of good standing, necessary to effect or evidence removal of a lien, claim, or interest for corporate or other income taxes from the Assets.

15.      This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system maintained by any Recording Officer.  If any entity that has filed a financing statement or other document or agreement evidencing a lien, claim, or interest in, on, or to any of the Assets shall not have delivered to the Debtor prior to the Closing, in proper form for filing and executed by the appropriate individuals, termination statements, instruments of satisfaction, release of all liens, claims, or interests that the entity has with respect to any particular Assets conveyed pursuant to the APA, then the Debtor and the Winning Bidder are each hereby authorized to file, register or otherwise record a certified copy of this Order (or a Confirmatory Order (as defined herein)), which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release and discharge of such entity's liens, claims, or interests in such Assets.

### Assumption and Assignment of Assumed Contracts

16.      Subject to and conditioned on the Closing, the Debtor is authorized pursuant to

Section 365(a) of the Bankruptcy Code to assume and assign the Assumed Contracts to the

Winning Bidder.   All requirements and conditions under Sections 363 and 365 of the

Bankruptcy Code for the assumption by the Debtor and assignment to the Winning Bidder

of each Assumed Contract have been satisfied and, upon Closing, the Winning Bidder shall

be fully and irrevocably vested in all right, title and interest of each Assumed Contracts, and

each Assumed Contract shall remain valid and binding and in full force and effect for the

benefit of the Winning Bidder in accordance with its terms, notwithstanding any provision

in any such Assumed Contract (including those of the type described in Sections 365(b)(2),

(e)(1), and (f)(1) of the Bankruptcy Code) that prohibits, restricts, or conditions such

assignment or transfer.   The Cure Amounts constitute all of the amounts that are required to

be paid under Section 365(b)(1) of the Bankruptcy Code in connection with the assumption

and assignment of the Assumed Contracts; provided, however, that such Cure Amounts are

without prejudice to the Debtor's right to limit its cure payment for any particular Assumed

Contract to the actual amount due and owing for prepetition arrearages after accounting for

all payments made on account of such Assumed Contract, including without limitation

pursuant to this Court's order authorizing weekly payments to the Debtor's subcontractors

[Dkt. No. 43], and any dispute between the Debtor and an affected Non-Debtor Contract

Party concerning any such adjusted Cure Amount may be submitted on an expedited basis to

this Court for resolution.   The non-Debtor parties to the Assumed Contracts are hereby deemed

to have waived any and all prepetition claims other than the Cure Amounts.   Pursuant to Section

363(k) of the Bankruptcy Code, other than as provided for in the APA, upon the assignment of

the Assumed Contracts to the Winning Bidder, the Debtor shall have no further liability or

obligations with respect thereto.   For any Assumed Contract for which the Cure Amount is

22

specified to be "TBD," the Cure Amount shall be the amount determined by agreement between the Debtor and the non-Debtor party to such Assumed Contract or by separate order of the Court entered upon the motion of the Debtor or such non-Debtor party, and upon such determination of such Cure Amount, such Cure Amount shall supersede the currently specified "TBD" for such Assumed Contract for purposes of this Order.

17.     The Debtor shall continue to perform its post-petition obligations under the Assumed Contracts through the Closing or, as to any particular Assumed Contract, such earlier time as the Winning Bidder notifies the Debtor that the Winning Bidder has elected not to take assignment of such Assumed Contract and the Debtor has notified the non-Debtor contract party that such Assumed Contract will not be assumed and assigned. Any dispute regarding payment or performance of the Debtor's post-petition, pre-Closing obligations under an Assumed Contract prior to its assignment to the Winning Bidder (whether prior to, at, or after the Closing) shall be determined by this Court upon appropriate motion of the Debtor or the Non-Debtor Contract Party to the Assumed Contract, but shall not affect the validity of the assumption and assignment of such Assumed Contract pursuant to this Order.

18.     The Debtor and the Winning Bidder are hereby deemed to have provided adequate assurance of the Debtor's cure of prepetition defaults under, and of the Winning Bidder's future performance of, the Assumed Contracts in accordance with Sections 365(b)(1)(B) and (C) and 365(f)(2)(B) of the Bankruptcy Code.

19.     Notwithstanding any authority granted to the Debtor to assume and assign the Assumed Contracts, the assumption and assignment of any particular Assumed Contract shall become effective only upon the closing of a sale transaction involving the express designation of such contract as an "Assumed Contract" (or equivalent) under the operative transaction

documents.  The Debtor is authorized to pay the Cure Amount owed to a Contract Party to promote the Winning Bidder's entry into a new contract with such Contract Party in lieu of the Debtor's assumption and assignment of such Contract Party's Assumed Contract.

### Disbursements At Closing

20.     At the Closing, disbursement of the proceeds of the Sale and other funds payable incident to the Closing shall be paid in accordance with the Final Funds Flow, as follows:  (i) *first*, to JPM in an amount necessary to repay in full the Post-Petition Loan, as agreed to by the Debtor, JPM, and the Committee; (ii) *second*, to pay the Debtor or its counsel the amount of $400,000.00 to fund the SSG Fee Escrow; (iii) *third*, to pay the HNB Payment, the Comcast Payment, and Cure Amounts; (iv) *fourth*, as a carveout from proceeds otherwise payable to JPM, to pay the amounts due under the Incentive Bonus Plan, such payments to be made by JPM or pursuant to JPM's express written directions; (v) *fifth*, to pay all other items, including without limitation payments or reserves for accrued employee compensation, accrued professionals' compensation, payments for the Winning Bidder's buyouts of equipment lease obligations, and other items specified in the Final Funds Flow.

21.     Nothing in this Order is intended to vitiate the rights and obligations of the parties under the Financing Order, and, to that end, the provisions of Paragraphs 10, 11, 12, 13, and 15 of the Financing Order are incorporated into this Order, subject to the modification of Paragraph 15 of the Financing Order to provide that the Investigation Termination Date (as defined therein) shall be extended from October 29, 2021 to November 19, 2021, and provided that Paragraph 11 of the Financing Order shall not apply to any payments to JPM set forth in the Final Funds Flow.

### Miscellaneous

22.     The terms and provisions of the APA, together with the terms and conditions of

this Order, shall be binding in all respects upon all entities, including, without limitation, the

Debtor (including its employees, officers and directors), its estate, all creditors and equity

interest holders of the Debtor, the Winning Bidder, and their respective affiliates, successors and

assigns, agents and any affected third parties, including, but not limited to, all persons asserting a

claim against or interest in any of the Assets to be sold, conveyed or assigned to the Winning

Bidder pursuant to the APA.

23.     The transactions contemplated by the APA are undertaken by the Winning Bidder

without collusion and in good faith, as that term is defined in Section 363(m) of the Bankruptcy

Code, and accordingly, the reversal or modification on appeal of the authorization provided

herein to consummate the Sale shall not affect the validity of the Sale (including the assumption

and assignment of the Assumed Contracts), unless such authorization and such Sale are duly

stayed pending such appeal.   The Winning Bidder is a good faith buyer as that term is

contemplated by Section 363(m) of the Bankruptcy Code and, as such, is entitled to the full

protections of Section 363(m) of the Bankruptcy Code.

24.     The Committee is hereby granted derivative standing to serve as the Debtor's

estate's representative to investigate, settle, or prosecute the "Derivative Claims," which are all

claims and causes of action against all persons and entities arising from or related to the certain

transaction dated as of December 30, 2016 between and among the Debtor, John R. Wade, III,

JPMorgan Chase Bank, N.A., Massachusetts Capital Resource Company, Spinnaker Trust, in its

capacity as Trustee of the Tri-Wire Employee Stock Ownership Plan, and other persons and

entities, (the "Derivative Claims"), and to commence or continue any judicial proceeding with

respect to the Derivative Claims without further order of the Court, including, without limitation,

to seek to join as a party in the civil action that is a Derivative Claim numbered and styled Case

1:20-cv-10523-LTS, <u>John R. Wade, III, Sharon Wade, John Wade IV and Taylor Wade, v Tri-Wire Employee Stock Ownership Trust, Tri-Wire Engineering Solutions, Inc., Scott Perry and Robert R. Newell</u>, in the United States District Court for the District of Massachusetts. The Debtor shall cooperate with the Committee in the investigation, settlement, and prosecution of the Derivative Claims and provide such information as is reasonably requested by the Committee in connection therewith including, without limitation, full access to all non-privileged information regarding the Debtor's affairs and the Derivative Claims. The Committee and the Debtor are authorized to take all actions necessary to effectuate the grant to the Committee of derivative standing as set forth herein.

25.     The provisions of this Order shall be binding upon any Chapter 11 trustee or Chapter 7 trustee appointed in the Debtor's bankruptcy case and shall survive and be binding in the event of any dismissal of such bankruptcy case.

26.     Nothing contained in any Chapter 11 plan confirmed in the Debtor's case or the order of confirmation confirming any such plan shall conflict with or derogate from the terms of this Order.

27.     The Debtor and the Winning Bidder may request, and upon reasonable request this Court shall enter, an order (a "<u>Confirmatory Order</u>"), confirming the authorized sale of any specified Assets to the Winning Bidder pursuant to the APA and this Order, or otherwise clarifying or confirming with particularity any matter addressed by this Order, including without limitation as may be reasonably necessary or desired for purposes of establishing or recording evidence of title to specific Assets.

28.     No bulk sales law or similar law of any state or other jurisdiction shall apply in any way to the transactions contemplated by the APA, the Sale Motion, and this Order.

29.     This is a final order and is enforceable upon entry and to the extent necessary under Bankruptcy Rules 5003, 9014, 9021, and 9022.  This Court expressly finds that there is no just reason for delay in the implementation of this Order and expressly finds cause exists to waive all applicable stays imposed by Bankruptcy Rules 6004(h), 6006(d), and 7062 and such stays shall not apply to this Order, which shall be effective immediately upon entry on the docket, or to the transactions contemplated by the APA.

30.     This Court retains exclusive jurisdiction to:

    a.     Interpret, implement, and enforce the terms and provisions of this Order, any rights and remedies under the APA, and the assumption and assignment of the Assumed Contracts, including without limitation the sale free and clear and limitation of liability provisions;

    b.     Protect the Winning Bidder and any of the Assets against any liens, claims, or interests;

    c.     Resolve any disputes arising under or relating to the APA, the assumption and assignment of the Assumed Contracts, the Sale Motion, or this Order; and

    d.     Adjudicate all issues concerning asserted pre-Closing liens, claims or interests in, on, or to the Assets.

provided, however, that if the Court declines to exercise jurisdiction or is determined not to have jurisdiction over any such matter, then the parties shall be entitled to pursue resolution of any such matter in any other court of competent jurisdiction.

Dated: October 29, 2021

_____
Christopher J. Panos
United States Bankruptcy Judge

## Exhibit A

[Winning Bidder APA]

*Execution*

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is entered into as of the 13th day of September, 2021 (the "Effective Date"), by and between Tri-Wire Engineering Solutions, Inc., a Massachusetts corporation ("Seller"), and ITG Communications, LLC, a Texas limited liability company ("Purchaser").

### Recitals

A.      Seller provides installation, construction, maintenance and other technical support services to cable and telecommunications companies throughout North America (the "Business") including, without limitation, Comcast Cable Communications Management, LLC ("Comcast"), CSC Holding, LLC, (formerly known as Altice Technical Services) ("Altice"), Consolidated Communications Enterprise Services, Inc. ("CCI"), Matrix Design Group, Inc. ("Matrix"), Tilson Technology Management, Inc. ("Tilson"), and RCN Telecom Services of Massachusetts, LLC ("RCN"), operating from the locations listed on Exhibit A (each location individually a "Facility" and, collectively, the "Facilities").

B.      Purchaser wishes to purchase from Seller, and Seller is willing to sell to Purchaser, substantially all of the assets of the Business, including without limitation Seller's leases of the real properties at which the Facilities are located, and, to the extent transferable, Seller's agreements with customers and suppliers underlying the Business and its revenues, all on the terms and conditions hereinafter set forth.

C.      Seller desires to effectuate the contemplated sale of the Business to Purchaser through a sale conducted under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), and to that end Seller intends to file presently (such filing date, the "Petition Date"), in the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court"),  a voluntary petition for relief under chapter 11 of the Bankruptcy Code commencing Seller's bankruptcy case (the "Bankruptcy Case"), and to seek the Bankruptcy Court's approval of the contemplated sale pursuant to sections 105, 363 and 365 of the Bankruptcy Code.

### Agreement

NOW, THEREFORE, in consideration of the mutual covenants and undertakings herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby mutually acknowledged, Purchaser and Seller agree as follows:

### ARTICLE I

### SALE OF ASSETS

1.1      Purchased Assets.  Subject to the terms, provisions and conditions contained in this Agreement, Purchaser shall purchase from Seller, and Seller shall sell, convey or cause to be

conveyed to Purchaser, free and clear of all Liens: (i) all of Seller's right, title, and interest in and to all assets real, personal and mixed, tangible and intangible, which relate to, or are used or held for use in connection with, the Business, including but not limited to the assets described in Sections 1.1(A) through (D), other than the Excluded Assets (as defined in Section 1.2 below), including but not limited to the following (collectively, the "Assets"):

(A)	the leases, subleases, licenses or other agreements to occupy all or any part of the real property at which the Facilities are located as set forth on Schedule 1.1(A) hereto and selected by Purchaser for assignment and assumption (collectively, the "Assumed Leases");

(B)	all furniture, equipment, fixtures, furnishings, supplies and inventories, and other tangible personal property including, without limitation, the property set forth on Schedule 1.1(B) hereto;

(C)	all motor vehicles including, without limitation, any motor vehicles leased by the Seller pursuant to fleet lease agreements selected by Purchaser (the "Selected Fleet Lease Agreements") (such vehicles collectively referred to as the "Leased Vehicles") and the motor vehicles set forth on Schedule 1.1(C) hereto;

(D)	accounts receivable ("AR") as of 12:01 of Closing Date with a target AR of Five Million Three Hundred Thousand Dollars ($5,300,000.00) ("AR Target"). For the purpose of this Agreement, AR on the Closing Date shall include amounts billable for goods delivered or services rendered on or before the Closing Date, for which bills have not been generated solely because the Closing Date occurs during a billing cycle;

(E)	all rights to lease deposits and prepaid items under Assumed Leases, including those set forth on Schedule 1.1(C), to the extent allocable to the Assumed Obligations (as defined below);

(F)	all intangible property now or hereafter used in connection with the Business or otherwise comprising a portion of the Assets including, but not limited to:

(i)	all licenses, permits, certifications, accreditations and authorizations issued by any federal, state, municipal or quasi-governmental authority relating to the Business running to, or in favor of Seller, including but not limited to such property described on Schedule 1.1(F)(i) attached hereto, but only to the extent assignable and accepted and assumed by Purchaser;

(ii)	all service agreements, statements of work, and similar agreements with customers in the telecommunications and cable industries selected by Purchaser for assignment and assumption (the "Assumed Service Agreements") described on Schedule 1.1(F)(ii) attached hereto, including, without limitation, agreements with Comcast, Altice, CCI, Matrix, Tilson, and RCN;

(iii)	all business records, including, but not limited to, financial books and records, payroll records, personnel records and manuals used in the Business;

2

(iv)      the agreements, contracts, purchase orders or other documentation with subcontractors (collectively, the "Subcontractors" and each, a "Subcontractor") entered into in connection with the performance of the Service Agreements and selected by Purchaser for assignment and assumption, such selected agreements described on Schedule 1.1(F)(iv) (the "Assumed Subcontractor Agreements");

(v)       those existing commitments, contracts, equipment or other personal property leases, purchase orders and agreements relating to the Business selected by Purchaser for assignment and assumption, as listed on Schedule 1.1(F)(v) attached hereto (the "Other Assumed Operating Agreements," and, together with the Assumed Service Agreements and Assumed Subcontractor Agreements, the "Assumed Contracts");

(vi)      all third-party warranties relating to Assets to the extent transferable;

(vii)     all patents and patent applications for inventions and discoveries used in or with regard to the Business;

(viii)    all copyrights, copyright registrations and applications, and all related rights in mask works and works of authorship, including moral rights used in or with regard to the Business;

(ix)      all registered and common law trademarks, trademark registrations and applications therefor, trade dress rights, trade names, registered and common law service marks, service mark registrations and applications therefor used in or with regard to the Business;

(x)       all corporate names;

(xi)      all domain name registrations, IP addresses, network addresses and the like and the applications therefor in respect of internet domain names; and

(xii)     all email accounts, telephone numbers and fax numbers owned by or licensed to Seller and used in connection with the Business.

The Assets described in Section 1.1(B), (C), and (D) are collectively referred to herein as the "Personal Property". Subject to the terms of this Agreement, Seller and Purchaser may supplement or amend the Schedules of specific Personal Property at any time prior to Closing and the Schedules as so amended and supplemented as of the Closing Date shall operate to delineate those particular Assets identified in such Schedules to be acquired by Purchaser at Closing.

1.2      Excluded Assets. Notwithstanding Section 1.1 above, the following shall be excluded from the assets sold by Seller to Purchaser hereunder (the "Excluded Assets"):

(A)      Seller's cash on hand, and other cash equivalents of the Business, and all rights and interests in and to bank accounts;

3

(B)      Seller's leases, subleases, licenses or other agreements to occupy all or any part of the real property, in each case that are not Assumed Leases;

(C)      Seller's Contracts that are not Assumed Contracts;

(D)      Seller's corporate records and securities, including stock in affiliated entities;

(E)      Duplicate copies of Seller's records;

(F)      Seller's insurance policies and Employee Benefit Plans;

(G)      Seller's claims and causes of action, including without limitation causes of action arising under Chapter 5 of the Bankruptcy Code;

(H)      Seller's interest in and rights under this Agreement and any other agreement between Purchaser and Seller executed in connection with this Agreement;

(I)      Such other assets as may be described in Schedule 1.2(I).

(J)      all claims, refunds, credits, causes of action, choices in action, rights of recovery and rights of set-off of any kind, and all proceeds under insurance policies and rights of recovery relating thereto;

(K)      claims and causes of action arising under Assumed Leases and Assumed Contracts;  and

(L)      all claims for and rights to receive tax refunds.

1.3      Assumed Obligations.  As of the Closing, Purchaser shall not assume any liabilities of Seller, other than the obligations specifically included in this Section 1.3, which shall be timely paid, performed and discharged (collectively, the "Assumed Obligations"):

(A)      all liabilities and obligations of Seller under the Assumed Leases arising after the Closing Date.

(B)      all liability and obligations arising after the Closing Date under the Assumed Contracts.

(C)      Accrued but unpaid vacation or paid time off for Hired Employees (as defined below) up to an aggregate cap (across all Hired Employees) of Four Hundred Ninety Five Thousand Dollars ($495,000.00) (the "Accrued Vacation Cap").

(D)      Subcontractor accounts payable for Assumed Subcontractor Agreements, including amounts due under the Assumed Subcontractor Agreements (collectively, "Subcontractor AP") not in arrears under the payment terms of said accounts payable and Subcontractor Agreements (i.e., net 30, net 21, etc., as applicable), up to an aggregate cap (for all Subcontractor AP) of Nine Hundred Fifty Thousand Dollars

4

($950,000.00)(the "Accrued Subcontractor AP Cap").  For purposes of this Agreement, Subcontractor AP shall include amounts billable by any Subcontractor pursuant to Assumed Subcontractor Agreements for services rendered on or before the Closing Date for which a bill has not been generated solely because the Closing Date occurs during such Subcontractor's billing cycle.  For the avoidance of doubt, Purchaser is not assuming any liabilities including, without limitation, accounts payable, for any Subcontractors who are not parties to an Assumed Subcontractor Agreement.

> (E)  all liabilities and obligations related to the Assets arising after the Closing Date.

1.4  <u>Excluded Liabilities</u>.  Notwithstanding anything herein to the contrary, Purchaser shall not assume or incur any liability or obligation for any other liabilities or obligations of Seller other than the specifically identified Assumed Obligations (collectively, the "<u>Excluded Liabilities</u>"), including, but not limited to, the following:

> (A)  any of Seller's liabilities or obligations under this Agreement or any other agreements entered into by Seller in connection with the transactions contemplated by this Agreement;

> (B)  any of Seller's liabilities or obligations for expenses or fees incident to or arising out of the negotiation, preparation, approval or authorization of this Agreement or the consummation (or preparation for the consummation) of the transactions contemplated hereby (including all attorneys' and accountants' fees and brokerage fees) and transfer taxes;

> (C)  any liability or obligation of Seller for taxes for any period;

> (D)  any liability or obligation under or with respect to any Employee Benefit Plan or any other employee benefit plan, program, policy or arrangement presently or formerly maintained or contributed to by Seller, or with respect to which Seller has any liability;

> (E)  any liability or obligation with respect to any products or services that were marketed or sold prior to the Closing, including product liability, malpractice, tort liability, infringement claims and any related claims and Actions;

> (F)  except to the extent assumed by Purchaser pursuant to Section 1.3(C), any of Seller's liabilities or obligations for vacation pay, sick pay, holiday pay, salary, bonuses or other payments or liabilities of any kind to any employee of Seller or current or former employee of Seller, including any liabilities or obligations arising prior to the Closing with respect to the exempt or non-exempt status of any employee of Seller;

> (G)  any liability or obligation relating to workers' compensation claims which were filed or presented on or before the Closing Date or which are filed or presented after the Closing Date but relate to claims and/or injuries first arising on or before the Closing Date;

(H)     any of Seller's liabilities or obligations (i) arising by reason of any violation or alleged violation of any Law, or (ii) arising by reason of any breach or alleged breach by Seller of any Contract;

(I)     any of Seller's liabilities or obligations relating to any Action, proceeding or claim arising out of or in connection with Seller's conduct of the Business or any other conduct of Seller or Seller's officers, directors, employees, consultants, agents or advisors on or prior to the Closing Date;

(J)     any of Seller's liabilities or obligations for indebtedness, including without limitation any funding under the Coronavirus Aid, Relief and Economic Security Act (the "CARES Act") or similar local, state, or federal act or program;

(K)     any liabilities or obligations in respect of any of the Excluded Assets (including under any Contracts, leases, commitments or understandings related thereto);

(L)     any claims, actions, or liability relating to the Tri-Wire Employee Stock Ownership Trust or related matters;

(M)     any claims, actions, or liability brought by or relating to John R. Wade, III ("Wade") including, without limitation, any lawsuits filed by Wade;

(N)     any debt, claims, or actions relating to transactions with Massachusetts Capital Resource Company and Mass Growth Capital Corp.;

(O)     applicable cure amounts payable incident to Seller's assignment to Purchaser of Assumed Leases as determined pursuant to Section 6.5;  and

(P)     applicable cure amounts payable incident to Seller's assignment to Purchaser of Assumed Contracts.

1.5     Assignability of Certain Contracts; Effectiveness.    To the extent that the assignment to Purchaser of any Assumed Contract or Assumed Lease pursuant to this Agreement is not permitted without the consent of a third party and such restriction cannot be effectively overridden or canceled by the Sale Order or other related order of the Bankruptcy Court, then the parties will use their commercially reasonable efforts, before the Closing, to obtain such consent, and, if any such consent is not obtained prior to the Closing Date, (A) this Agreement will not be deemed to constitute an assignment of or an undertaking or attempt to assign such Contract or any right or interest therein unless and until such consent is obtained and (B) Seller and Purchaser will reasonably cooperate with each other in any lawful and feasible arrangement designed to provide Purchaser with the benefits and obligations of any such Contract and Purchaser shall be responsible for performing all obligations under such Contract required to be performed by Seller on or after the Closing Date; provided, however, that, notwithstanding anything to the contrary in this Agreement, the assumption and assignment of any particular Assumed Contract or Assumed Lease, whether pursuant to the Sale Order, related order of the Bankruptcy Court, or this Section 1.5, shall, as permitted by Section 3.2, become effective only

6

upon the Closing to the extent expressly designated as an "Assumed Contract" or "Assumed Lease" under the Assignment and Assumption Agreement.

## ARTICLE II
## PURCHASE PRICE

2.1     Purchase Price.  The purchase price for the Assets (the "Purchase Price") shall be Eight Million Eight Hundred Thousand and no/100 Dollars ($8,800,000.00), subject to the following deposits and adjustments; provided, however, that Purchaser reserves the right to increase the Purchase Price and otherwise modify the bid represented by this Agreement as may be permitted by the Bid Procedures Order.

(A)     Deposit. Purchaser will deliver within three Business Days after the date of this Agreement to Seller's counsel (Casner & Edwards, LLP), in escrow, the sum of Eight Hundred Eighty Thousand and no/100 Dollars ($880,000.00) as an initial deposit (the "Deposit") for the payment of the Purchase Price.  The Deposit shall not be invested and shall be held in escrow by Seller's counsel as escrow agent under this Agreement (in such capacity, the "Escrow Agent"), and disbursed by Escrow Agent in accordance with this Agreement and the escrow provisions attached as Schedule 2.2 (the "Escrow Provisions").  Notwithstanding anything to the contrary herein, the Deposit shall be promptly returned to Purchaser, without deduction or offset, if Seller enters an Alternative Transaction.

(B)     The Purchase Price shall be subject to a dollar-for-dollar downward adjustment to the extent that AR on the Closing Date is less than the Target AR.

(C)     The Purchase Price shall be subject to a dollar-for-dollar upward adjustment based on the amount by which the AR on the Closing Date exceeds Six Million and No/100 Dollars ($6,000,000.00).  For the avoidance of doubt, if the AR on the Closing Date exceeds the AR Target but is less than $6,000,000.00, there will be no upward adjustment of the Purchase Price.

(D)     The Purchase Price shall be subject to a downward adjustment if the aggregate number of (i) Seller employees in the job titles included on Schedule 2.1(D) and to whom are offered employment with Buyer as part of this transaction at comparable compensation packages (the "Offered Employees") who accept such offers and begin employment with Purchaser (each a "Hired Employee") is less than 257 individuals (the "Employee Threshold") and (ii) subcontractors who are parties to Assumed Subcontractor Agreements or are employed by entities that are parties to Assumed Subcontractor Agreements who accept engagement by Purchaser (each an "Engaged Subcontractor") is less than 172 individuals (the "Subcontractor Threshold"), as follows: if the Employee Threshold is not met, the following formula shall be used to determine the downward adjustment of the Purchase Price: 257 minus the aggregate number of Hired Employees multiplied by Seven Thousand Five Hundred and No/100 Dollars ($7,500.00); if the Subcontractor Threshold is not met, the following formula shall be used to determine the downward adjustment of the Purchase Price: 172 minus the aggregate number of Engaged Subcontractors multiplied by Five Thousand and No/100 Dollars ($5,000.00).

Notwithstanding the foregoing, if an individual is employed by Seller in a non-management role as of the Effective Date and is hired by Purchaser prior to the Closing Date or is a subcontractor engaged by Seller as of the Effective Date and is engaged by Purchaser prior to the Closing Date, such individual shall be considered a Hired Employee or Engaged Subcontractor, as applicable, for the purposes of this provision.  For the avoidance of doubt, the preceding sentence is not intended and shall not be construed as altering either party's obligations and covenants set forth in the Confidentiality Agreement.

(E)      In the event that Purchaser elects to pay off and retire a vehicle lease agreement or a vehicle financing agreement at Closing, the Purchase Price shall be increased by any amount required to be paid to retire such applicable vehicle lease agreement or vehicle financing agreement to lenders, leasing companies or other third parties in connection with the termination of any lease or financing arrangement for the Leased Vehicles, including without limitation redemption or buy-out payments, termination charges or penalties and other amounts arising in connection with the transfer of the Leased Vehicles.

2.2      Payment of Balance of the Purchase Price. At the Closing, Purchaser shall deposit with Escrow Agent in immediately available funds an amount equal to the Purchase Price less the Deposit and plus or minus, as applicable, the prorations, payments, adjustments, and credits, contemplated by this Agreement, all as set forth in a closing statement to be executed and delivered by Seller and Purchaser pursuant to Section 4.5(B). Upon the consummation of Closing, the Escrow Agent shall deliver to Seller the Purchase Price, as adjusted pursuant to the agreed upon closing statement pursuant to Section 4.5(B).

2.3      Purchase Price Allocation.  The Purchase Price shall be allocated as set forth in Schedule 2.3, which the parties shall agree upon prior to the Closing.  The parties shall be bound by such allocation for all purposes and shall file Form 8594 with their respective federal income tax returns in a manner consistent with such allocation.

### ARTICLE III
### TRANSFER AND ASSIGNMENT

3.1      Bill of Sale.  At the Closing, Seller shall convey or cause to be conveyed all of Seller's right, title and interest in and to the Personal Property to Purchaser by delivery to Purchaser of a bill of sale in the form attached as Schedule 3.1 (the "Bill of Sale"), which Bill of Sale shall convey Seller's right, title and interest, free and clear of all Liens, all as and to the extent provided for in the Sale Order (as defined below).

3.2      Assumption and Assignment Agreement.  At the Closing, Seller shall, subject to Section 6.5, assign or cause to be assigned to Purchaser, and Purchaser shall assume, all of Seller's right, title and interest in and to the Assumed Leases and the Assumed Contracts, through their mutual execution and delivery of an assignment and assumption agreement in the form attached as Schedule 3.2 (the "Assignment and Assumption Agreement").  Notwithstanding anything to the contrary herein, Purchaser may at any time prior to three (3) Business Days prior to the Closing designate any previously designated Assumed Lease or Assumed Contract to be

8

an Excluded Asset, and Purchaser shall have no obligation with respect to, nor assume any liability under, any such lease or contract so designated to be an Excluded Asset.

3.3    PURCHASER ACKNOWLEDGEMENT. PURCHASER ACKNOWLEDGES AND AGREES THAT THE REPRESENTATIONS AND WARRANTIES MADE BY SELLER IN THIS AGREEMENT, AS QUALIFIED OR SUPPLEMENTED BY THE DISCLOSURE SCHEDULES (THE "SELLER REPRESENTATIONS"), ARE THE EXCLUSIVE REPRESENTATIONS AND WARRANTIES MADE BY SELLER, AND EXCEPT FOR THE SELLER REPRESENTATIONS, IT IS ACQUIRING THE ASSETS ON AN "AS-IS WHERE-IS" BASIS, WITHOUT REPRESENTATION, WARRANTY OR COVENANT (EXPRESS OR IMPLIED) BY SELLER AND IN EACH CASE SUBJECT TO (A) THE RIGHTS OF ANY PARTIES IN POSSESSION THEREOF (IF ANY), (B) ANY STATE OF FACTS REGARDING ITS PHYSICAL CONDITION OR WHICH AN ACCURATE SURVEY OR AN INSPECTION MIGHT SHOW, (C) ALL APPLICABLE LEGAL REQUIREMENTS, (D) LAWS, (C) VIOLATIONS OF LAWS WHICH MAY EXIST ON THE DATE HEREOF, AND (E) ANY MATTER CAUSED OR PERMITTED BY PURCHASER OR ANY AGENT, EMPLOYEE OR AFFILIATE OF PURCHASER.    EXCEPT FOR SELLER REPRESENTATIONS, SELLER HAS NOT MADE NOR SHALL BE DEEMED TO HAVE MADE ANY REPRESENTATION, WARRANTY OR COVENANT (EXPRESS OR IMPLIED) OR SHALL BE DEEMED TO HAVE ANY LIABILITY WHATSOEVER AS TO THE TITLE, VALUE, HABITABILITY, USE, CONDITION, DESIGN, OPERATION, MERCHANTABILITY OR FITNESS FOR USE OF THE ASSETS (OR ANY PART THEREOF), OR ANY OTHER REPRESENTATION, WARRANTY OR COVENANT WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO THE ASSETS (OR ANY PART THEREOF), AND SELLER SHALL NOT BE LIABLE FOR ANY LATENT, HIDDEN, OR PATENT DEFECT THEREON OR THE FAILURE OF THE ASSETS, OR ANY PART THEREOF, TO COMPLY WITH ANY LEGAL REQUIREMENT. PURCHASER HAS PRIOR TO THE DATE HEREOF BEEN AFFORDED FULL OPPORTUNITY TO INSPECT THE ASSETS AND THE IMPROVEMENTS THEREON (IF ANY), IS (INSOFAR AS SELLER IS CONCERNED) SATISFIED WITH THE RESULTS OF ITS INSPECTIONS AND IS ENTERING INTO THIS AGREEMENT SOLELY ON THE BASIS OF THE RESULTS OF ITS OWN INSPECTIONS, AND ALL RISKS INCIDENT TO THE MATTERS DESCRIBED IN THE PRECEDING SENTENCE, AS BETWEEN SELLER ON THE ONE HAND, AND PURCHASER, ON THE OTHER HAND, ARE TO BE BORNE BY PURCHASER

## ARTICLE IV
## CLOSING

4.1    Date and Place.  Subject to the terms and conditions of this Agreement (including the satisfaction or waiver of the conditions set forth in Article VII, the closing (the "Closing") of the transactions contemplated herein shall be held virtually by the exchange of documents via PDF on the day that is five (5) Business Days following the satisfaction or waiver of the conditions set forth in Article VII or at such other date as determined by the parties hereto. The date on which the Closing actually occurs is referred to in this Agreement as the "Closing Date". The Closing shall be deemed to be effective as of 12:01 a.m. on the Closing Date. Notwithstanding the foregoing, the parties may mutually agree to a different Closing Date.

4.2    Seller's Deliverables and Documents. At the Closing, Seller will deliver or cause to be delivered to Purchaser the following documents or duly-executed counterparts in the case of agreements or instruments to be executed:

(A)    Bill of Sale in favor of Purchaser in the condition required by Section 3.1 hereof.

(B)    The Assignment and Assumption Agreement in the condition required by Section 3.2 hereof.

(C)    Any and all required individual written consents to particular assignment and assumption of particular Assumed Leases or Assumed Contracts the assumption and assignment of which is not approved by the Sale Order, if any.

(D)    Counterpart of the Seller Closing Certificate in the form attached hereto at Schedule 4.2(D).

(E)    Such other customary instruments of transfer, assumption, filings, or documents, in a form and substance reasonably satisfactory to Seller and Purchaser, as may be required to give effect to this Agreement.

(F)    Certified resolutions of Seller authorizing the transactions under this Agreement.

(G)    Originals of all material certificates of occupancy, licenses, permits, authorizations, and approvals issued by governmental authorities having jurisdiction, if available or in existence.

(H)    An affidavit sworn to by an officer of Seller to the effect that Seller is not a "foreign person", as that term is defined in Section 1445(f)(3) of the Code, which affidavit shall be in the form prescribed by federal regulations.

(I)    A certified copy of the Sale Order meeting the minimum requirements for the Closing Conditions, which shall have become final and non-appealable.

(J)    The Seller noncompete in the form attached hereto at Schedule 4.2(J).

All of the documents and instruments to be delivered by Seller hereunder shall be in form and substance reasonably satisfactory to counsel for Purchaser.

4.3    Purchaser's Deliverables and Documents. At the Closing, Purchaser will deliver the following to Seller:

(A)    The Purchase Price, as adjusted pursuant to the agreed upon closing statement pursuant to Section 4.3(A).

10

(B)     The Assignment and Assumption Agreement, in the condition required by Section 3.2 hereof.

(C)     Certified written consent of Purchaser authorizing the transactions under this Agreement.

(D)     Counterpart of the Seller Closing Certificate in the form attached hereto at Schedule 4.3(D).

(E)     All other documents required to be delivered by Purchaser to Seller under this Agreement, or which Seller reasonably deem necessary or appropriate to consummate and document the transactions contemplated herein.

All of the documents and instruments to be delivered by Purchaser hereunder shall be in form and substance reasonably satisfactory to counsel for Seller.

4.4     General.  At any time and from time to time after the Closing, at the request of one of the parties hereto and without additional consideration, the other party hereto shall execute and deliver such other documents and take such action as one of the parties may reasonably request to more effectively consummate the actions contemplated by this Agreement, provided the requested matter can be undertaken and achieved without material cost to the other party.

4.5     Joint Documents.  On the Closing Date, Purchaser and Seller shall exchange the following:

(A)     Any and all certificates, statements and declarations as may be required by federal, state, county or local law, regulation or ordinance including without limitation certificates, statements, and declarations regarding taxes assessed on or with respect to transfer of the Business, all of which such taxes, if any, shall be payable by Seller.

(B)     A closing statement by and between Seller and Purchaser reflecting Purchaser's payment of the net Purchase Price after accounting for the Deposit and any prorations, payments, adjustments, and credits set forth on Schedule 4.3(A).

4.6     Possession.  Possession of the Facilities that are  the subject of the Assumed Leases assumed and assigned pursuant to the Assignment and Assumption Agreement shall be delivered to Purchaser on the Closing Date. All tangible Personal Property and all books, files, records, Contracts, leases, third party warranties, regulatory materials and other assets constituting intangible Personal Property that are located at such Facilities on the Closing Date shall be deemed delivered to Purchaser on such date through such delivery of possession of such Facilities, subject to Section 8.1.

11

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF THE PARTIES

5.1     Representations and Warranties of Seller.  Subject to disclosures made in the disclosure schedules delivered by Seller to Purchaser concurrently with the execution of this Agreement (the "Disclosure Schedules"), Seller hereby represents and warrants to Purchaser as of the date of this Agreement as follows:

(A)     Due Organization.  Seller is a business corporation, duly organized and validly existing under the laws of the Commonwealth of Massachusetts.  Seller is duly qualified to do business and is in good standing in the Commonwealth of Massachusetts. Seller has the requisite corporate power and authority to enter into this Agreement and to perform its obligations hereunder.

(B)     Power and Authority; Enforceability; Consents.  Subject to the Sale Order, the execution, delivery and performance of this Agreement by Seller and all other agreements referenced in or ancillary hereto to which Seller is a party and the consummation of the transactions contemplated herein by Seller:

(i)     is within its company powers and are not in contravention of the terms of its certificate of organization, operating agreement or any amendments thereto and have been duly authorized by all appropriate company action.

(ii)     will not violate any judgment of any court or Governmental Entity applicable to Seller or the Assets.

(iii)     will not require the approval, consent or authorization of, waiver from, or declaration, filing or registration with, any other Person or Governmental Entity, except as set forth in Schedule 5.1(B)(iii).

(iv)     will neither conflict with nor result in any breach or contravention of any other Contract to which such Seller is a party or by which it or the Assets is bound, except as set forth in Schedule 5.1(B)(iv).

(C)     Binding Agreement.  Subject to the Sale Order, this Agreement and all agreements to which Seller will become a party hereunder are and will constitute the valid and legally binding obligations of Seller, and are and will be enforceable against Seller in accordance with the respective terms hereof and thereof, except as enforceability may be restricted, limited or delayed by applicable bankruptcy or other laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

(D)     Financial Statements.  Seller's financial statements made available to Purchaser in the Data Room (x) were prepared in good faith, (y) are based upon, and accurately reflect in all material respects, the books and records of Seller and the Business as of the time of their preparation, and (z) fairly present, in all material respects, the financial position of the Business as of the dates thereof and the results of operations for

12

the periods referred to therein, in each case in accordance with GAAP applied on a consistent basis throughout.

(E)     Leases.

(i)     True, correct, and complete copies of all of Seller's leases for the Facilities (including any amendments, extensions, renewals, guaranties, and other agreements with respect thereto) have been uploaded to the Data Room, and have been provided to Purchaser through Purchaser's access to the Data Room. To Seller's Knowledge, Seller is not in material default of its obligations under the Assumed Leases except to the extent set forth in Schedule 5.1(E)(i) and other than specifically set forth on Schedule 1.1(A) or Schedule 1.1(D)(iii), there are no amounts that would be due by Purchaser to cure any defaults or amounts owed. To Seller's Knowledge, no event has occurred that (with or without notice, lapse of time or both) would constitute a material breach or default by Seller under the Assumed Leases.

(ii)     To Seller's Knowledge, there are no pending or threatened appropriation, condemnation, eminent domain or like proceedings relating to the Facilities or the real property on which each of the Facilities is situated.

(F)     Assumed Contracts.  True, correct, and complete copies of all of the Assumed Contracts set forth or required to be set forth in Schedule 5.1(F) have been uploaded to the Data Room and have been provided to Purchaser through Purchaser's access to the Data Room.  To Seller's Knowledge, Seller is not in material default of its obligations under the Assumed Contracts except to the extent set forth in Schedule 5.1(F). To Seller's Knowledge, no event has occurred that (with or without notice, lapse of time or both) would constitute a material breach or default by Seller.

(G)     Employee Benefits.

(i)     Each "employee benefit plan" as defined in Section 3(3) of ERISA and each material bonus, deferred compensation, stock purchase, stock option, severance plan, salary continuation, vacation, paid-time-off, sick leave, fringe benefit, cafeteria, incentive, insurance, welfare or similar arrangement that is in each case sponsored or maintained by Seller or to which Seller contributes or has any liability (each, an "Employee Benefit Plan") is listed in Schedule 5.1(G)(i).  No Employee Benefit Plan, and no party in interest to, disqualified person of, or fiduciary of, any Employee Benefit Plan, has engaged in any non-exempt "prohibited transaction" as defined in ERISA or the Code.

(ii)     Except as set forth in Schedule 5.1(G)(ii), neither Seller nor any affiliate of Seller as determined under Code Sections 414(b), (c), (m) or (o) ("ERISA Affiliate") or any of their respective predecessors maintains, contributes to, has any obligation to contribute to (or has any other liability, including contingent liability or current or potential withdrawal liability, with respect to) or has, ever, contributed to or been obligated to contribute to (1) any "multiemployer plan" (as that term is defined in Section 3(37) of ERISA), (2) any "employee pension benefit plan" (within the meaning of Section 302 of ERISA) that is subject to Section 412 of the Code, Section 302 of ERISA or Title IV of ERISA, (3) any "multiple employer plan" (within the meaning of Section 413 of the Code), or (4) any "multiple employer welfare

13

arrangement" (within the meaning of Section 3(40) of ERISA), in each case, whether or not terminated.

        (H)     <u>Employees</u>.

        (i)     Except to the extent set forth in <u>Schedule 5.1(H)</u>, Seller is in compliance in all material respects with all applicable Laws, contracts, policies, plans, and programs applicable to it respecting labor, wage and hour, employment and employment practices in the jurisdictions within which it operates and there are no material obligations relating to employment with respect to which the Company may have any liability, including but not limited to any accrued but unpaid compensation, vacation, and other benefits.

        (ii)     Seller is not a party to or bound by any collective bargaining agreement, project labor agreement, or other Contract, commitment, arrangement or bargaining relationship with any labor organization, trade organization, or other representative of any of its employees, and no employee of Seller is represented by a labor union or other labor organization and there is no such contract, commitment or arrangement presently being negotiated by Seller.  There is no labor strike, work stoppage, lockout, grievance, labor arbitration, walkout, picket, slowdown, work stoppage, or other material labor dispute pending or threatened against or affecting the Business.  To Seller's knowledge, no labor union, organization, or other collective bargaining unit represents, claims to represent or is currently seeking to organize or represent the employees of the Business, and there have not been any union organizing activities or efforts among the employees of the Business within the past three years.  There is presently no union campaign being conducted to solicit cards from employees to authorize a union to request a National Labor Relations Board certification election, and no question concerning representation exists or has existed respecting such employees; and there is no unfair labor practice charge or complaint pending or threatened against Seller. No labor union, labor organization, or group of employees has made a pending demand for recognition or certification, and there are no representation or certification proceedings or petitions seeking a representation proceeding presently pending or threatened in writing to be brought or filed with the National Labor Relations Board or any other labor relations Governmental Entity.

        (I)     <u>Compliance with Law</u>.

        (i)     Except as set forth on <u>Schedule 5.1(I)(i)</u>, Seller is currently in compliance in all material respects with (1) all Laws applicable to it or its business, properties or assets, and (2) any orders of any Governmental Entity applicable to it or the Business. Except as set forth on <u>Schedule 5.1(I)(i)</u>, Seller is not under investigation by any Governmental Entity with respect to any violation of any Laws applicable to it or its business, properties or assets.

        (ii)     Except as set forth on <u>Schedule 5.1(I)(i)</u>, Seller has not has received any written notice, order, inquiry, investigation, complaint or other written communication by any Governmental Entity alleging any violation by it under any Laws applicable to it or its business, employees (in their capacity as such), properties or assets.

        (J)     <u>No Proceedings</u>.  Except as disclosed on <u>Schedule 5.1(J)</u>, there are no lawsuits, administrative proceedings, or other legal actions of any kind pending or, to

Seller's knowledge, threatened, against Seller, or against or relating to the Business or the Personal Property or any portion thereof, and, Seller has not received notice of any lawsuits, administrative proceedings or other legal actions of any kind pending or threatened against Seller.

(K)     Permits.  Seller possesses all Permits necessary to operate the Business, or that are necessary for the lawful ownership of its properties and assets or operation of the Business, and Schedule 5.1(K) sets forth a true, complete and correct list of such Permits.  Except as set forth in Schedule 5.1(K), each Seller is in material compliance with all such Permits, and all such Permits are in full force and effect.  There is not now pending or threatened in writing any action to revoke, cancel, rescind, modify or refuse to renew any of such Permits.  During the past three years, Seller has not received written notice of any petition, objection or other pleading with any Governmental Entity alleging the failure to hold any of the foregoing or any violations in respect thereof.

(L)     Intellectual Property.  Schedule 5.1(L) contains a true, complete and correct list of all registered Intellectual Property that relate to, or are used or held for use in connection with, the Business (the "Business Intellectual Property"). All material registration, maintenance and renewal fees due in connection with such Business Intellectual Property have been paid and all documents, recordations and certificates in connection with such Business Intellectual Property required to be filed have been filed with the relevant patent, copyright, trademark or other authorities for the purposes of prosecuting and maintaining such Business Intellectual Property and recording the Seller's ownership interests therein.

(M)     Brokerage.  Except as set forth in Schedule 5.1(M), no agent, broker, Person or firm acting on behalf of Seller is, or shall be, entitled to any broker's fees, finder's fees or commissions from Seller in connection with this Agreement or any of the transactions contemplated hereby.

(N)     Tangible Property.  The property listed on Schedule 1.1(B) and Schedule 1.1(C) reflect all of the property owned by Seller of the type described in Section 1.1(B) and Section 1.1(C) as of the Effective Date.

(O)     Taxes.  Seller has timely filed all tax returns that were required to be filed (taking into account any applicable extension of time within which to file).

(P)     Duty to Update.  Seller covenants and agrees that to the extent it becomes aware prior to the Closing that any of the representations or warranties made by Seller hereunder have materially changed and are no longer accurate or Seller's Knowledge has materially changed with respect to those representations or warranties limited by such knowledge, Seller shall promptly update Purchaser in writing and by e-mail of such changes including, without limitation, any amounts necessary to cure any defaults of the Assumed Leases.

5.2     Representations and Warranties of Purchaser.  Purchaser hereby represents and warrants to Seller as follows:

15

(A)     Due Organization.   Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Texas.  Purchaser has the requisite corporate power and authority to enter into this Agreement, perform its obligations hereunder and to conduct its business or operations as now being conducted.

(B)     Power and Authority; Enforceability; Consents.  The execution, delivery and performance of this Agreement by Purchaser and all other agreements referenced in or ancillary hereto to which it is a party and the consummation of the transactions contemplated herein by Purchaser:

(i)     are within its powers and are not in contravention of the terms of its articles of incorporation or bylaws or any amendments thereto and have been duly authorized by all requisite limited liability company action.

(ii)     will neither conflict with nor result in any breach or contravention of, or the creation of any lien under, any indenture, agreement, lease, instrument or understanding to which Purchaser is a party or by which Purchaser is bound.

(iii)     will not violate any judgment of any court or Governmental Entity applicable to Purchaser.

(iv)     will not require the approval or consent of any other party or authority, except as set forth in Schedule 5.2(B).

(C)     Binding Agreement.  This Agreement and all other agreements to which Purchaser will become a party hereunder are and will constitute the valid and legally binding obligations of Purchaser and are and will be enforceable against it in accordance with the respective terms hereof and thereof, except as enforceability may be restricted, limited or delayed by applicable bankruptcy or other laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

(D)     Purchaser's Due Diligence.  Purchaser is fully aware of all the regulatory, operational, and federal and state licensure and survey matters relating to the operation of the Business and is not relying on any representations by Seller with respect thereto, or on Seller to furnish or supply any information with respect to such matters.

(E)     Financing.  Purchaser has or at the Closing will have the funds sufficient to pay the Purchase Price and perform its obligations under this Agreement.

## ARTICLE VI
## COVENANTS PRIOR TO THE CLOSING

6.1     Seller Operations.  Between the date of this Agreement and the earlier of the date of the termination of this Agreement and the Closing Date, Seller will operate the Business in the ordinary course of business and, without limiting the foregoing, will use its commercially reasonable efforts to:

(A)      take or cause to be taken all actions necessary and appropriate to consummate the transactions contemplated by this Agreement, including without limitation those necessary to enable Seller to make the deliveries set forth in Section 4.3.

(B)      keep in full force and effect present insurance policies or other comparable insurance.

6.2     Seller Negative Covenants.  Between the date of this Agreement and the earlier of the date of the termination of this Agreement and the Closing Date, Seller will not, without the prior written consent of Purchaser, implement any reduction in force, create any new mortgage, pledge or other lien or encumbrance upon any of the Assets, whether now owned or hereafter acquired, or sell, assign or otherwise transfer or dispose of any property, plant or equipment (other than supplies) included in the Assets, owned by Seller and relating to the Business, except in the normal course of business or operations.

6.3     Bankruptcy Court Approval.  Seller's entry into this Agreement will not become effective and binding on Seller until the Bankruptcy Court has entered an appropriate order approving Seller's entry into this Agreement and the sale of the Business and the Assets pursuant to this Agreement, which order shall authorize, approve and provide for the sale of the Assets to Purchaser free and clear of all Liens (other than Permitted Liens) and shall otherwise be in form and substance reasonably agreeable to Seller and Purchaser (in the form entered by the Court, the "Sale Order").  Upon execution and delivery of this Agreement by both Seller and Purchaser, and upon Seller's commencement of the Bankruptcy Case, Seller shall, subject to Section 6.4, promptly undertake, to obtain entry of the Bid Procedures Order (as hereinafter defined) and the Sale Order pursuant to one or more customary and appropriate sale and sale procedures motions (singly or together, the "Sale Motion"). From and after the date hereof until the Closing Date, Seller shall deliver to Purchaser copies of all pleadings, motions, notices, statements, schedules, applications, reports and other papers that are filed by Seller in the Bankruptcy Case that relate, in whole or in part, to this Agreement or Purchaser.

6.4     Alternative Transaction.

(A)      For purposes of this Agreement:

(i)      The term "Alternative Transaction" means one or more agreements to sell, transfer, or otherwise dispose of all or any portion of the Assets in a transaction or series of transactions with one or more Persons, other than Purchaser.

(ii)      The term "Break-Up Fee" means Three Hundred Fifty-Two Thousand and No/100 Dollars ($352,000.00).

(iii)      The term "Expense Reimbursement Cap" means One Hundred Fifty Thousand No/100 Dollars ($150,000.00).

(iv)      The term "Expense Reimbursement" means the reimbursement by the Seller of the third-party, out-of-pocket costs incurred by Purchaser in connection with the transactions contemplated by this Agreement, including without limitation reasonable attorneys' fees, fees of outside consultants, and travel and other costs associated with Purchaser's due

17

diligence, provided that Expense Reimbursement shall not exceed the Expense Reimbursement Cap.

(B)     This Agreement is subject to approval by the Bankruptcy Court. Purchaser acknowledges that, in connection with obtaining such approval, Seller must take reasonable steps to demonstrate that it has sought to obtain the highest or best price for the Assets, including giving notice thereof to Seller's creditors and other interested parties, providing information about the Assets to prospective bidders, entertaining higher or better qualified offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Assets, conducting an auction, all in accordance with an order of the Bankruptcy Court governing the procedures for the solicitation of competing offers which shall be in form and substance reasonably satisfactory to Seller and Purchaser (in the form entered by the Court, the "Bid Procedures Order"). In connection with the solicitation of competing bids, from the date hereof (and any prior time) and until Seller's designation of a winning bid at the conclusion of any competitive bidding process described in the Bid Procedures Order, Seller is permitted to cause its representatives and Affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser) in connection with any sale or other disposition of all or any part of the Business and the Assets, alone or in connection with the sale or other disposition of any other asset of Seller. In addition, Seller shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Business and the Assets and perform any and all other acts related thereto which are required by any order of the Bankruptcy Court, the Bankruptcy Code, applicable procedural rules, or other applicable law, including, without limitation, supplying information relating to the Business and the Assets to prospective purchasers.

(C)     Following the date of the entry of the Sale Order approving this Agreement and until the earlier of (i) the Closing and (ii) such time as this Agreement has been terminated in accordance with its express terms, and provided that Purchaser is not in material default of its obligations under this Agreement, Seller shall not, nor shall it authorize or permit any other Person to, (1) directly or indirectly solicit, initiate or encourage the submission of any offer or proposal concerning any Alternative Transaction not authorized by the Sale Order or (2) directly or indirectly participate in any discussions or negotiations regarding, or furnish to any person any information with respect to, or take any other action to facilitate the making of, any proposal or expression of interest that constitutes or is reasonably likely to lead to an Alternative Transaction not authorized by the Sale Order.

(D)     In the event that Seller enters an Alternative Transaction following the Effective Date and the commencement of the Bankruptcy Case, Purchaser shall be entititled to receive from the proceeds received by Seller upon the closing of an Alternative Transaction as an administrative expense of the Bankruptcy Case the Break-Up Fee and reimbursement of Purchaser's outside costs and expenses relating to due diligence incurred in furtherance of this Agreement up to the Expense Reimbursement Cap.

6.5     Assumed Leases and Assumed Contracts; Cure Amounts.

18

(A)     Seller shall take all commercially reasonable actions required to assume the Assumed Leases and Assumed Contracts and to assign them to Purchaser, including taking all actions (i) reasonably requested by Purchaser to facilitate any negotiations with the counterparties to such Assumed Leases and Assumed Contracts and (ii) to obtain an order (which may be the Sale Order) containing a finding that the proposed assumption and assignment of the Assumed Leases and Assumed Contracts to Purchaser satisfies all applicable requirements of Section 365 of the Bankruptcy Code.  In connection with the foregoing and as the case may be, Purchaser covenants to provide adequate assurance of performance, represents and warrants that it is capable of providing adequate assurance of future performance, and agrees to use its best commercial efforts to provide Seller with such evidence of adequate assurance of performance as Seller may require in connection with its procuring the Sale Order.

(B)     Schedules 1.1(A) and 1.1(D)(iii) shall each include Seller's good-faith estimate of the Cure Costs (if any) associated with each Assumed Lease and Assumed Contract.  At the Closing, upon Purchaser's final designation of the Assumed Leases and Assumed Contracts to be assigned, (i) Seller pursuant to the Assignment and Assumption Agreement shall assume and assign to Purchaser each of the Assumed Leases and Assumed Contracts that is capable of being assumed and assigned, and (ii) Purchaser pursuant to the Assignment and Assumption Agreement shall assume and perform and discharge the Assumed Obligations under the Assumed Leases and Assumed Contracts (including without limitation the prompt payment of any Cure Costs); provided that nothing in this Section 6.5(B) shall require Purchaser to to take assignment of any particular Assumed Lease or Assumed Contract, as provided by Section 1.5.

(C)     If, after giving effect to the provisions of sections 363 and 365 of the Bankruptcy Code, the consent of the non-Seller party to any Assumed Lease or Assumed Contract is required but not obtained, Seller shall, at Purchaser's sole cost and expense, cooperate with Purchaser in any reasonable arrangement proposed by Purchaser, including Purchaser's provision of credit support, designed to provide Purchaser the benefits and obligations of or under any such Assumed Lease or Assumed Contract; provided, however, that nothing in this Section 6.5 shall (i) require Seller to make any expenditure or incur any obligation on its own or on Purchaser's behalf or (ii) prohibit Seller from ceasing operations or winding up its affairs following the Closing.  Any assignment to Purchaser of the Assumed Leases and the Assumed Contracts that, notwithstanding the Sale Order (or other Bankruptcy Court order approving the assumption and assignment of such lease or contract), requires the consent of any third party for such assignment to be effective shall be made subject to such consent being obtained.  If Purchaser determines that such consent cannot be obtained on terms reasonably satisfactory to Purchaser within 30 days after the Closing, Purchaser may on notice to Seller reclassify each such Assumed Lease or Assumed Contract as an Excluded Asset.

6.6     Closing Conditions.  Between the date of this Agreement and the earlier of the termination of this Agreement and the Closing Date, Seller and Purchaser will use their respective commercially reasonable efforts to cause the conditions specified in this Agreement over which they have control to be satisfied as soon as reasonably practicable, but in all events before the Closing Date.

19

6.7     Tax Returns. All income, sales, franchise and payroll tax returns and reports required by law to be filed by Seller prior to the Closing will be timely filed (subject to Seller's right to timely extend the filing thereof), and all taxes respectively due under such tax returns will be paid by Seller. Purchaser is not assuming under this Agreement any tax liabilities owed by Seller or any other tax liabilities as a result of the operation of the Business prior to the Closing Date.

6.8     Transfer Taxes. All transfer, documentary, sales, use, stamp, registration and other substantially similar taxes (including any real property transfer or similar tax) incurred in connection with this Agreement and the consummation of the transactions contemplated hereby (collectively, "Transfer Taxes"), if any, and that are not exempt under Section 1146(a) of the Bankruptcy Code, shall be borne by Seller and shall be paid by Seller when due. Seller will, at the Sellers' own expense, timely file all necessary tax returns and other documentation with respect to all such Transfer Taxes that are required by applicable Law.

6.9     Bid Procedures Order. The Bid Procedures Order shall be in form and substance satisfactory to Seller, Purchaser and Agent. The Bid Procedures Order shall, without limitation:

(A)     set dates for (i) the hearing on entry of the Sale Order; (ii) the deadline for the filing of objections to entry of the Sale Order, and (iii) an auction sale of the Assets (the "Auction");

(B)     define the components of a qualified bid for the Assets (a "Qualified Bid"); provided that only bidders who have submitted a Qualified Bid (each a "Qualified Bidder") or who are otherwise qualified and identified by Seller pursuant to the Bid Procedures Order may participate at the Auction, and provide that this Agreement constitutes a Qualified Bid and that Purchaser is a Qualified Bidder who may, but is not required to, bid at the Auction;

(C)     (i) set a deadline for the submission of bids for the Assets that is no later than 30 days after the entry of the Bid Procedures Order and (ii) provide that, if there are no Qualified Bids other than this Agreement submitted by such deadline, Seller shall seek approval of a sale of the Assets to Purchaser;

(D)     provide that a Qualified Bid must (i) be in writing; (ii) be for substantially all of the Assets; (iii) provide for total cash consideration of at least the sum of Nine Million Seven Hundred Fifty Thousand and No/100 Dollars ($9,750,000); (iv) include an executed asset purchase agreement that uses this Agreement as a form and is accompanied by a redlined or blacklined version of this Agreement showing all changes made to this Agreement; (v) such asset purchase agreement contains an assumption of liabilities that are consistent with this Agreement  (vi) not contain any financing or due diligence contingencies, and (vii) be accompanied by an earnest money deposit in immediately available funds of no less than the Deposit provided by Purchaser;

(E)     provide that (i) the Seller shall designate the highest or best Qualified Bid received by Seller as the starting bid at the Auction, and (ii) each successive

20

higher bid for the Assets made at the Auction must be in an amount at least $100,000 more than the immediately preceding bid(s); and

(F)     approve the payment of the Break-Up Fee and the Expense Reimbursement from the proceeds received by Seller upon the closing of an Alternative Transaction as an actual and necessary cost of preserving the Seller's bankruptcy estates that is entitled to administrative priority under Sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code.

6.10     Sale Order. The Sale Order and any associated findings of fact shall be in form and substance satisfactory to Purchaser and Seller.  Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (x) demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code; (y) including a determination in the Sale Order that Purchaser has not engaged in any conduct that would result in avoidance of the transactions contemplated by this Agreement under Section 363(n) of the Bankruptcy Code, and (z) establishing adequate assurance of future performance in connection with the Assumed Leases and Assumed Contracts within the meaning of Section 365 of the Bankruptcy Code.  The Sale Order shall, without limitation:

(A)     approve, pursuant to Sections 363 and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Seller of this Agreement; (ii) the sale of the Assets to Purchaser on the terms set forth herein and free and clear of all Liens, claims, and interests (other than Permitted Liens), and (iii) the performance by Seller of its obligations under this Agreement;

(B)     find that Purchaser is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code and grant Purchaser the protections of Section 363(m) of the Bankruptcy Code;

(C)     find that Purchaser and Seller have engaged in no conduct that would result in the avoidance of the transactions contemplated under this Agreement pursuant to Section 363(n) of the Bankruptcy Code;

(D)     find that Purchaser is not a successor in interest to Seller for any purpose and, thus, is not liable for pre-Closing Date claims or liability except as expressly stated in this Agreement; and

(E)     find that Purchaser shall have no liability for any obligation of Seller that is not an Assumed Obligation.

## ARTICLE VII
## CONDITIONS PRECEDENT TO CLOSING

7.1     Conditions Precedent to Seller's Obligations.  Notwithstanding anything herein to the contrary, the obligations of Seller to consummate the transactions described herein are

21

subject to the fulfillment, on or prior to the Closing Date, of the following conditions precedent unless (but only to the extent) waived in writing by Seller at or prior to Closing:

(A)    (i) The representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects when made and as of the Closing Date as though such representations and warranties had been made on and as of such Closing Date; (ii) each and all of the terms, covenants and conditions of this Agreement to be complied with or performed by Purchaser on or before the Closing Date pursuant to the terms hereof shall have been materially complied with and performed; and (iii) Purchaser shall deliver to Seller a certification to the foregoing effect.

(B)    Purchaser shall have, at or prior to the Closing, delivered to Seller the documents required to be delivered by it pursuant to Section 4.4.

(C)    The Bankruptcy Court shall have entered the Sale Order (in form and substance acceptable to Purchaser), which shall have become final and non-appealable.

7.2    Conditions Precedent to Purchaser's Obligations.    Notwithstanding anything herein to the contrary, the obligations of Purchaser to consummate the transactions described herein are subject to the fulfillment, on or prior to the Closing Date, of the following conditions precedent unless (but only to the extent) waived in writing by Purchaser at or prior to Closing:

(A)    (i) The representations and warranties of Seller contained in this Agreement shall be true in all material respects when made and as of the Closing Date, as though such representations and warranties had been made on and as of such Closing Date; (ii) each and all of the terms, covenants and conditions of this Agreement to be complied with or performed by Seller on or before the Closing Date pursuant to the terms hereof shall have been materially complied with and performed; and (iii) Seller shall deliver to Purchaser a certification to the foregoing effect.

(B)    All consents, approvals, permits, waivers and estoppels of third parties that are listed on Schedule 7.2(B) shall have been obtained on terms reasonably satisfactory to Purchaser.

(C)    Seller shall have, at or prior to the Closing, delivered to Purchaser the documents required to be delivered by it pursuant to Section 4.3.

(D)    Except for the Subcontractor AP assumed by Purchaser pursuant to Section 1.3(D), all Subcontractor AP has been paid.

(E)    At least sixty-five percent (65%) of the Offered Employees have accepted employment with Purchaser and at least sixty-five percent (65%) of contractors engaged pursuant to Assumed Subcontractor Agreements agree to become Engaged Subcontractors.

(F)    Other than the Subcontractor AP for which Purchaser is responsible pursuant to Section 1.3(D), all Subcontractor AP for subcontractors which are

parties to Assumed Subcontractor Agreements shall have been paid and brought current at Closing.

(G)     The Bankruptcy Court shall have entered the Sale Order, which shall have become final and non-appealable.

## ARTICLE VIII
## ADDITIONAL AGREEMENTS

8.1     Books and Records.  For purposes of this Agreement, the term "Retention Period" shall mean the latest of occur of any of the following:  (a) the running of applicable statutes of limitations; (b) the final adjudication of any claim, cause of action, dispute or investigation arising out of the Business before the Closing Date or arising under the Bankruptcy Code; or (c) the conclusion of any period prescribed by law or regulation for Seller to retain possession of or access to records for any purpose.  Until the conclusion of the Retention Period, (A) Purchaser will maintain all books and records of Seller constituting a part of the Assets which are delivered to Purchaser at Closing and which relate to the pre-Closing Business in a manner reasonably consistent with Purchaser's record retention policies or practices and (B) subject to applicable Law and solely as reasonably necessary in connection with the preparation and filing of tax returns by Seller or other proper purpose, including the administration of the Bankruptcy Case, upon reasonable advance written notice from Seller to Purchaser, afford Seller reasonable access to such records during normal business hours; provided, that the foregoing shall not require Purchaser or any of its Affiliates (i) to provide access to any books, records or other information to the extent such books, records or other information do not pertain to the Business (and Purchaser shall be entitled to withhold access to or redact any portion of such books and records or other information that does not pertain to the Business), (ii) to permit any inspection, or to disclose any information, that in the reasonable judgment of Purchaser would violate applicable Law, fiduciary duty, or binding agreement entered into prior to the Closing Date, or (iii) to take any action that would cause unreasonable disruption to the business of Purchaser or the Business.

8.2     Employee Related Matters.

(A)     Hired Employees.  As of the Closing Date, Purchaser shall offer employment to only those employees of the Business as Purchaser shall determine in its sole discretion and such offers of employment shall contain terms and conditions of employment that Purchaser shall determine in its sole discretion. On the Closing Date, Seller shall take all steps necessary to terminate the employment of each employee of the Seller who is offered employment by Purchaser as set forth in the immediately preceding sentence. The employees of the Seller who accept Purchaser's offer of employment and who become employed by Purchaser shall be referred to herein as "Hired Employees." Nothing in this Agreement shall confer upon any Hired Employee any right with respect to continued employment with Purchaser, nor shall anything herein limit or interfere with Purchaser's right to terminate the employment of any Hired Employee at any time (subject to applicable Law), with or without cause or notice, or restrict Purchaser in the exercise of independent business judgment in modifying any terms or conditions of employment of the Hired Employees on and after the Closing Date.

(B)    <u>Pre-Closing Obligations to Hired Employees</u>. Except for the Assumed Obligations with respect to Hired Employees assumed by Purchaser pursuant to Section 1.3(C), Seller shall be responsible for all other liabilities, obligations and commitments relating to Seller's employment of the Hired Employees, including any severance compensation that may be owed by Seller to any Hired Employee as a result of this transactions contemplated by this Agreement in accordance with the applicable severance agreement, and bonus payments payable to any Hired Employees in accordance with applicable bonus arrangements entered into prior to the Closing Date (collectively, the "<u>Hired Employee Expenses</u>").

(C)    <u>Employee Information</u>. Seller shall use commercially reasonable efforts to provide promptly to Purchaser, at Purchaser's request, any information or copies of personnel records (including addresses, dates of birth, date of hire and dependent information) relating to the Hired Employees or relating to the service of Hired Employees with Seller (and predecessors of Seller, as applicable) prior to the Closing Date; provided that Purchaser shall not request any information, or use any disclosed information in any manner that may violate applicable Laws, including but not limited to salary history, equal pay, discrimination and leave laws.  Seller and Purchaser shall each cooperate with the other and shall provide to the other such documentation, information and assistance as is reasonably necessary to effect the provisions of this <u>Section 8.2</u>.

## ARTICLE IX
## MISCELLANEOUS

9.1    <u>Exhibits and Schedules and Other Instruments</u>.  Each Exhibit and Schedule to this Agreement shall be considered a part hereof as if set forth herein in full.  Any other provision herein to the contrary notwithstanding, initial drafts of all Exhibits and Schedules (including, without limitation, schedules or exhibits to Exhibits or Schedules) or other instruments provided for herein and not delivered at the time of execution of this Agreement or which are incomplete at the time of execution of this Agreement shall be delivered or completed by Purchaser as promptly as possible after the date hereof.  Purchaser agrees to cooperate with Seller's efforts to verify the information contained in such draft Schedules and Exhibits, and shall provide all information requested by Seller in connection therewith.  Purchaser and Seller shall use commercially reasonable efforts negotiate mutually agreeable Schedules and Exhibits, which shall remain subject to modification consistent with this Agreement including without limitation for purposes of identifying the Assumed Contracts and specific Excluded Assets.  Any disclosure made in a schedule to this Agreement shall be deemed a disclosure for all purposes under this Agreement.

9.2    <u>Additional Assurances</u>.  The provisions of this Agreement shall be self-operative and shall not require further agreement by the parties except as may be herein specifically provided to the contrary; provided, however, at the reasonable request of a party, the other party shall execute such additional instruments and take such additional actions as the requesting party may deem necessary to effectuate this Agreement.  Seller shall, at any time and from time to time at and after the Closing, upon the reasonable request of Purchaser and at Purchaser's sole expense, take any and all steps necessary to place Purchaser in possession and operating control of the Assets to be transferred hereunder and will do, execute, acknowledge and deliver, or will

24

cause to be done, executed, acknowledged and delivered, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney and assurances as may reasonably be required or requested to more effectively transfer and confirm to Purchaser or to its successors or assigns, or to reduce to possession, any or all of the Assets and to carry out the purposes and intent of this Agreement, provided however, that Purchaser shall bear all costs associated with such acts.

9.3     Consents.  Except as herein expressly provided to the contrary, whenever this Agreement requires any consent or approval to be given by a party or a party must or may exercise discretion, the parties agree that such consent or approval shall not be unreasonably withheld or delayed and such discretion shall be reasonably exercised.

9.4     Choice of Law.

(A)     The parties agree that this Agreement shall be governed by and construed in accordance with the internal laws of the Commonwealth of Massachusetts, without giving effect to principles of conflicts of laws, but subject as necessary or appropriate to the Bankruptcy Code.

(B)     The Bankruptcy Court will have jurisdiction over any and all disputes between or among the parties, whether at law or in equity, arising out of or relating to this Agreement.

(C)     Each of the parties hereby waives, to the fullest extent permitted by Law, any right to trial by jury of any claim, demand, Action, or cause of action (i) arising under this Agreement or (ii) in any way connected with or related or incidental to the dealings of the parties in respect of this Agreement or any of the transactions related hereto or thereto, in each case whether now existing or hereafter arising, and whether in contract, tort, equity, or otherwise.

9.5     Benefit/Assignment.  Subject to provisions herein to the contrary, this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective legal representatives, successors and assigns; provided, however, that no party may assign this Agreement without the prior written consent of the other party and any such attempted assignment shall be null and void.  This Agreement is intended solely for the benefit of the parties hereto and is not intended to, and shall not, create any enforceable third party beneficiary rights.  Notwithstanding the foregoing:

(A)     Purchaser may, without the written consent of Seller, assign, in whole or in part, its rights and obligations pursuant to this Agreement to one or more of its Affiliates, provided that Purchaser will nonetheless remain liable for all of Purchaser's obligations hereunder;

(B)     Purchaser may, without the written consent of Seller, collaterally assign its rights under this Agreement for security purposes to any lender providing financing to Purchaser or any of its Affiliates, and any such lender may exercise all of the rights and remedies of Purchaser hereunder; and

(C)     Following the Closing, Purchaser may, without the written consent of Seller, assign its rights under this Agreement, in whole or in part, to any subsequent third party purchaser of Purchaser or all or substantially all of its assets (whether such sale is structured as a sale of stock, a sale of assets, a merger, or otherwise).

9.6     Cost of Transactions.  Whether or not the transactions contemplated hereby shall be consummated, the parties agree as follows: except as otherwise expressly provided in this Agreement (i) Seller will pay the fees, expenses, and disbursements of Seller and its agents, representatives, accountants, and counsel incurred in connection with the subject matter hereof and any amendments hereto, and (ii) Purchaser shall pay the fees, expenses and disbursements of Purchaser and its agents, representatives, accountants and counsel incurred in connection with the subject matter hereof and any amendments hereto.

9.7     Confidentiality.  Purchaser agrees that (except as may be required to obtain Bankruptcy Court approval of this Agreement or as may otherwise be required by law or court order), it will not disclose or use, and will cause its officers, directors and employees, representatives, agents and advisors not to disclose or use any Confidential Information (as hereinafter defined) furnished by or otherwise obtained regarding the Business at any time or in any manner and it will not disclose or use such information other than in connection with its evaluation and consummation of the transactions contemplated hereby. "Confidential Information" means any information which is not a matter of public record which relates to Seller or the Business.  If the transactions contemplated herein are not consummated, Purchaser will promptly return all Confidential Information and all documents containing the same to Seller.  This Section shall survive the Closing and/or termination of this Agreement.  From and after the Closing, Seller shall, and shall cause its Affiliates to, keep confidential and not use any written, oral, or other information relating to the Business or the Assets obtained by virtue of Seller's ownership of the Business and the Assets prior to the Closing ("Confidential Information"), except (i) to the extent disclosure is required by applicable Law (in which case, unless prohibited by Law, the disclosing party shall promptly notify the other party in writing of the same, and such disclosing party shall reasonably cooperate with the non-disclosing party (at the disclosing party's sole cost and expense) to preserve the confidentiality of such information consistent with applicable Law), (ii) to the extent such information has been made public through no fault of the applicable party, and (iii) each of Purchaser and Seller may disclose such information to such Person's equityholders or Affiliates, and their respective representatives and financing sources (provided that such equityholders, Affiliates, representatives or financing sources are instructed to keep such Confidential Information confidential, and Purchaser and/or Seller (as applicable) shall be responsible for any breach of this Section 9.7 by their respective equityholders, Affiliates, representatives or financing sources as if they were a party hereto).

9.8     Public Announcements.  Seller and Purchaser mutually agree that no party hereto shall release, publish or otherwise make available to the public in any manner whatsoever any information or announcement regarding the transactions herein contemplated without the prior written consent of the other party, except for information and filings reasonably necessary to obtain Bankruptcy Court approval of this Agreement or required by any Governmental Entity, or by Purchaser or its Affiliates after the Closing if made in the ordinary course.

9.9    Waiver of Breach.   The waiver by any party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to constitute, a waiver of any subsequent breach of the same or any other provision hereof.

9.10    Notice.   Any notice, demand or communication required, permitted or desired to be given hereunder shall be in writing and shall be delivered in person, by electronic mail (e-mail), by overnight delivery service such as Federal Express or Express Mail, or by certified mail, return receipt requested, with postage prepaid, to the parties at the following addresses (or such other or further addresses as the parties may hereafter designate by written notice):

      (a)    If to Seller:

> Tri-Wire Engineering Solutions, Inc.
> Attention:  Ruben Klein, President
> 5 Gill Street B
> Woburn, MA 01801
> E-mail:  rklein@triwire.net
>
> With a copy to (which shall not constitute notice):
> Casner & Edwards, LLP
> Attention:  Michael J. Goldberg, Esq.
> 303 Congress Street, #201
> Boston, MA 02210
> E-mail:  goldberg@casneredwards.com

      (b)    If to Purchaser:

> ITG Communications, LLC
> Attention: Michael Brooks and Peter Giacalone
> 152 Molly Walton Drive
> Gallatin, TN 37075
> E-mail: mbrooks@i-t-g.net
>       pgiacalone@i-t-g.net
>
> With a copy to (which shall not constitute notice):
>
> Safford Motley PLC
> Attention: Jonathan Motley, Esq.
> 1102 17th Avenue South, Suite 401
> Nashville, TN 37212
> E-mail: jonathan@saffordmotley.com

      (c)    If to Escrow Agent:

> Casner & Edwards, LLP
> Attention:  Michael J. Goldberg, Esq.
> 303 Congress Street, #201

27

Boston, MA 02210

E-mail:  goldberg@casneredwards.com

All notices given in accordance with the foregoing shall be deemed to have been duly given and to be effective when delivered and received.

9.11   Interpretation

(A)   Whenever the context of this Agreement requires, the gender of all words herein shall include the masculine, feminine and neuter, and the number of all words herein shall include the singular and plural.

(B)   The words "hereof," "herein," and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

(C)   Wherever the word "include," "includes," or "including" is used in this Agreement, it shall be deemed to be followed by the words "without limitation."

(D)   The word "or" shall be inclusive and not exclusive.

(E)   Each reference herein to "days" shall be to calendar days unless "Business Days" are otherwise specified.

(F)   Each reference herein to any Contract shall be to such Contract as amended, supplemented, waived or otherwise modified from time to time.

(G)   Each reference herein to a Law is to such Law as it may be amended from time to time.

(H)   The phrase "made available to Purchaser" and phrases of similar import when used in this Agreement will mean uploaded to the Data Room on or prior to the date that is one Business Day prior to the date hereof (and remains available to Purchaser therein through the Closing); and

(I)   The phrase "ordinary course of business" and phrases of similar import when used in this Agreement will mean the ordinary course of business consistent with past practice.

9.12   Divisions and Headings.  The divisions of this Agreement into sections and subsections and the use of captions and headings in connection therewith are solely for convenience and shall have no legal effect in construing the provisions of this Agreement.

9.13   Entire Agreement.  This Agreement, together with all other agreements and documents to be delivered hereunder, constitutes the entire agreement of Seller and Purchaser and supersedes all prior agreements and understandings, both oral and written, between them concerning the subject matter hereof.

9.14    Counterparts.  This Agreement may be executed in several counterparts by one or more of the undersigned and all such counterparts so executed shall together be deemed and constitute one final agreement, as if one document had been signed by all parties hereto; and each such counterpart shall be deemed an original, binding the parties subscribed hereto and multiple signature pages affixed to a single copy of this Agreement shall be deemed to be a fully executed original Agreement. Signatures delivered by facsimile or by e-mail in PDF format shall be deemed to be effective as original signatures.

9.15    Proration.  The operation of the Business and the income and normal operating expenses attributable thereto through the date preceding the Closing Date shall be for the account of Seller and thereafter for the account of Purchaser, and, if any income or expense is properly allocable or credited, then it shall be allocated, charged or prorated accordingly.  Expenses for goods or services received both before and after the Closing Date, such as power and utilities charges and rents and similar prepaid and deferred items shall be prorated between Seller and Purchaser as of the Closing Date in accordance with GAAP.  All special assessments and similar charges or Liens imposed against the Assets in respect of any period of time through the Closing Date, whether payable in installments or otherwise, shall be the responsibility of Seller, and amounts payable with respect to such special assessments, charges or liens in respect of any period of time after the Closing Date shall be the responsibility of Purchaser, and such charges shall be adjusted as required hereunder.  To the extent that any of the foregoing prorations and adjustments cannot be determined as of the Closing Date, Purchaser and Seller shall conduct a final accounting and make any further payments, as required on a date mutually agreed upon, within 90 days after the Closing.

9.16    Termination of Agreement.

(A)    Termination.  This Agreement may be terminated prior to Closing:

(i)    by the mutual written consent of Seller and Purchaser;

(ii)    as provided in Sections 9.16(B) and (C);

(iii)    by Seller or Purchaser upon the closing of an Alternative Transaction;

(iv)    by Purchaser if (a) any person files a motion seeking to have the Bankruptcy Court enter an Order (1) dismissing the Bankruptcy Case or either one of them; (2) converting the Bankruptcy Case or either one of them from Chapter 11 to Chapter 7 of the Bankruptcy Code; (3) appointing a trustee in the Bankruptcy Case or either one of them; and/or (4) appointing in the Bankruptcy Case or in either of them a responsible officer or an examiner with enlarged powers relating to the operation of the Business (beyond those powers set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Bankruptcy Code Section 1106(b), or (b) an order granting any of the relief described in the preceding clause (iii)(a) is entered for any reason and is not vacated within 14 days after entry thereof;

(v)    by written notice from the Purchaser, if the Petition Date has not occurred on or before the date this is seven days after the date of this Agreement as set forth in the preamble to this Agreement;

(vi)     by written notice from Purchaser, if (a) the Bid Procedures Order shall not have been approved by the Bankruptcy Court by the close of business on the date that is twenty-five (25) days after the Petition Date, or (b) following its entry, the Bid Procedures Order shall fail to be in full force and effect or shall have been stayed, reversed, modified, supplemented or amended in any respect without the prior written consent of Purchaser;

(vii)     by written notice from Purchaser if (a) the Bankruptcy Court has not held a hearing on the Sale Motion on or prior to the first Business Day after the date that is one hundred twenty (120) days after the Petition Date; (b) the Bankruptcy Court has not entered the Sale Order on or prior to the first Business Day after the date that is one hundred twenty-two (122) days following the Petition Date; (c) the Sale Order shall not have become final and non-appealable on the 15th day after its entry; or (d) following its entry, the Sale Order shall fail to be in full force and effect or shall have been stayed, vacated, reversed, modified, supplemented or amended in any respect without the prior written consent of Purchaser;

(viii)     by Purchaser or, prior to entry of the Sale Order, by Seller, if: (a) Seller or either one of them enters into an asset purchase agreement or other definitive agreement with respect to an Alternative Transaction; (b) the Bankruptcy Court enters an order approving an Alternative Transaction; or (c) Purchaser is not the successful bidder at the Auction;

(ix)     by Seller or Purchaser, if an order is entered by a court, tribunal, or other adjudicatory body of competent jurisdiction having valid enforcement authority permanently restraining, prohibiting or enjoining either party from consummating the transactions described in this Agreement and such order shall have become final and non-appealable or shall not have been vacated prior to the Outside Date;

(x)     by Purchaser if Closing has not occurred on or before 5:00 p.m. Eastern time on the date that is sixty (60) days from the date hereof (the "Outside Date"); provided, however, that the right to terminate this Agreement under this Section 9.16(A) shall not be available to any party if the action of such party or any of its Affiliates has been a principal cause of or resulted in the failure of the Closing to occur on or before such date, and such action or failure to act constitutes a breach of any of such party's representations, warranties, covenants or obligations under this Agreement.    Upon a termination of this Agreement pursuant to this Section 9.16(A), and except as otherwise provided by Sections 9.16(B), 9.16(C), and 9.16(D), the Deposit shall be returned by the Escrow Agent to Purchaser and the parties hereto shall have no further obligations under this Agreement except as shall expressly survive the termination hereof; or

(xi)     prior to the entry of the Bid Procedures Order, by Purchaser if Purchaser's due diligence is not completed to Purchaser's satisaction.

(B)     Seller's Default.  Notwithstanding anything to the contrary contained herein, if, prior to or at the Closing, there has been a material violation or breach by (i) Seller of any representation or warranty set forth in Section 5.1 (or any such representation or warranty shall have become untrue in any material respect after the date

30

of this Agreement) or (ii) Seller of any covenant or agreement contained in this Agreement which, in the case of either clause (i) or (ii), would prevent the satisfaction of or result in the failure of any condition to the obligations of Purchaser at the Closing and such violation or breach has not been waived by Purchaser or, in the case of a breach of any covenant or agreement under this Agreement that is curable, has not been cured by Seller (as applicable) prior to the earlier to occur of (a) 10 days after receipt by Seller, as applicable, of written notice of such breach from Purchaser and (b) the Outside Date, then Purchaser may elect to (1) terminate this Agreement by written notice to Seller, in which case the Deposit shall be promptly refunded to Purchaser by Escrow Agent, or (2) seek specific performance of Seller's obligations that are to be performed on or prior to Closing, including without limitation Seller's delivery obligations under Section 4.3 of this Agreement, unless such obligations cannot reasonably be performed by Seller for reasons beyond Seller's reasonable control.

(C)     Purchaser's Default. Notwithstanding anything to the contrary contained herein, if, prior to or at the Closing, there has been a material violation or breach by (i) Purchaser of any representation or warranty set forth in Section 5.2 (or any such representation or warranty shall have become untrue in any material respect after the date of this Agreement) or (ii) Purchaser of any covenant or agreement contained in this Agreement which, in the case of either clause (i) or (ii), would prevent the satisfaction of or result in the failure of any condition to the obligations of Seller at the Closing and such violation or breach has not been waived by Seller or, in the case of a breach of any covenant or agreement under this Agreement that is curable, has not been cured by Purchaser (as applicable) prior to the earlier to occur of (a) 10 days after receipt by Purchaser, as applicable, of written notice of such breach from Seller and (b) the Outside Date, then Seller may elect to (1) terminate this Agreement by written notice to Purchaser, in which case the Deposit shall be promptly delivered by Escrow Agent to Seller as Seller's liquidated damages, in which case such liquidated damages shall be the sole remedy of Seller for Purchaser's default and Seller shall not be entitled to any additional legal or equitable relief against Purchaser, or (2) seek (a) specific performance of Purchaser's obligations to be performed on or prior to Closing, including without limitation Purchaser's delivery obligations under Section 4.4 of this Agreement, and (b) such other remedies available to Seller at law or in equity.

(D)     Alternative Transaction. If this Agreement is terminated without breach by Purchaser pursuant to Section 9.15(A)(viii), (i) the Deposit shall be promptly refunded to Purchaser by Escrow Agent, in which event the Deposit shall be returned upon the earlier to occur of the closing of an Alternative Transaction or the Outside Date, and (ii) Purchaser shall be entitled to payment of, and Seller shall pay or cause to be paid, the Break-Up Fee and Expense Reimbursement subject to the Expense Reimbursement Cap from the proceeds received by Seller upon the closing of an Alternative Transaction.

9.17    Amendments.    Except as otherwise expressly provided herein, neither this Agreement nor any term or provision hereof may be changed, waived, discharged or terminated except by the mutual written agreement of the parties.

9.18    Construction.    The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict

construction will be applied against any of the parties hereto, and this Agreement shall be deemed to have been prepared jointly by the parties, and thus shall not necessarily be construed against any of the parties as the drafter hereof.

      9.19    Certain Definitions.  When used in this Agreement, the following terms have the meanings set forth below:

      "Action" means any claim, charge, audit, complaint, order, decree, ruling, eminent domain action, judgment, injunction, inspection, condemnation, notice of violation, citation, penalty or administrative action or proceeding, whether private or by or before any Governmental Entity.

      "Affiliate" means, with respect to any subject Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such subject Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made.  For purposes of this definition, the term "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

      "Business Day" means any day other than a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in Boston, Massachusetts.

      "Code" means the Internal Revenue Code of 1986, as amended.

      "Confidentiality Agreement" means that certain Project Connected Non-Disclosure Agreement, dated as of August 17, 2021, executed by SSG Capital Advisors, LLC, on behalf of Seller, and ITG Communications, LLC.

      "Contracts" means all agreements, contracts, leases and subleases, arrangements, letters of credit, guarantees and binding commitments, whether written or oral.

      "Data Room" means the "Project Connected" virtual data room created by Seller for the transaction governed by this Agreement.

      "Dollars" or "$" means the lawful currency of the United States of America.

      "ERISA" means the Employment Retirement Income Security Act of 1974, as amended.

      "GAAP" means United States generally accepted accounting principles, consistently applied during the periods involved.

      "Governmental Entity" means any United States or foreign federal, state, provincial or local government or other political subdivision thereof, any entity, authority or body exercising executive, legislative, judicial, regulatory or administrative functions of any such government or political subdivision, and any supranational organization of sovereign states exercising such functions for such sovereign states.

"Law" means any constitution, law, common law, statute, ordinance, rule, regulation, regulatory requirement, code, order, judgment, injunction or decree enacted, issued, promulgated, enforced or entered by a Governmental Entity or securities exchange.

"Lien" means any charge, mortgage, pledge, security interest, lien, preference, license, covenant, claim, easement, encroachment or other similar encumbrance.

"Permits" means all licenses, permits, certificates, grants, franchises, waivers, consents, expirations of waiting periods, and other similar authorizations or approvals issued by or obtained from a Governmental Entity or any securities exchange.

"Permitted Liens" means (i) zoning, entitlement, building and other land use and similar laws or regulations imposed by any Governmental Entity having jurisdiction over such parcel which are not violated by the current use and operation thereof; (ii) non-exclusive licenses to Intellectual Property granted in the ordinary course of business; and (iii) easements, covenants, conditions, restrictions and other similar matters of record which would not materially impair the use or occupancy of such parcel in the operation of the Business.

"Person" means an individual, a corporation, a partnership, an association, a limited liability company, a Governmental Entity, a trust or other entity or organization.

"Seller's Knowledge" or any similar knowledge qualification with respect to Seller, means the actual knowledge, after reasonable inquiry, of any of the following individuals: Ruben Klein, Michael Salvas, Ray Price and David Poplawski.

IN WITNESS WHEREOF, Seller and Purchaser have executed this Agreement, and Escrow Agent has executed this Agreement for purposes of Sections 2.2, 2.3, 6.6, and 9.16, as of the day and year first above written.

"SELLER"                                         "PURCHASER"

TRI-WIRE ENGINEERING                             ITG COMMUNICATIONS, LLC, a Texas
SOLUTIONS, INC.,                                 corporation
a Massachusetts corporation

By:_____                         By: _____
   Ruben Klein, President                        Its: _____


"ESCROW AGENT"


CASNER & EDWARDS, LLP


By:_____
   Michael J. Goldberg, Esq.

*[Signature Page to Asset Purchase Agreement]*

IN WITNESS WHEREOF, Seller and Purchaser have executed this Agreement, and Escrow Agent has executed this Agreement for purposes of Sections 2.2, 2.3, 6.6, and 9.16, as of the day and year first above written.

"SELLER"                                    "PURCHASER"

TRI-WIRE ENGINEERING                        ITG COMMUNICATIONS, LLC, a Texas
SOLUTIONS, INC.,                            corporation
a Massachusetts corporation

                                            By: _____
By:_____            Its: _____Chairman_____
    Ruben Klein, President


"ESCROW AGENT"

CASNER & EDWARDS, LLP


By:_____
    Michael J. Goldberg, Esq.


*[Signature Page to Asset Purchase Agreement]*

IN WITNESS WHEREOF, Seller and Purchaser have executed this Agreement, and Escrow Agent has executed this Agreement for purposes of Sections 2.2, 2.3, 6.6, and 9.16, as of the day and year first above written.

"SELLER"                                "PURCHASER"

TRI-WIRE ENGINEERING                    ITG COMMUNICATIONS, LLC, a Texas
SOLUTIONS, INC.,                        corporation
a Massachusetts corporation

                                        By: _____
By: _____      Its: _____

    Ruben Klein, President


"ESCROW AGENT"

CASNER & EDWARDS, LLP

By: _____
    Michael J. Goldberg, Esq.


*[Signature Page to Asset Purchase Agreement]*

## LIST OF EXHIBITS AND SCHEDULES

Exhibit A—Facility Locations

Schedule 1.1(A)—Assumed Leases and Estimated Cure Costs

Schedule 1.1(B)—Furniture, Equipment, Fixtures, Furnishings

Schedule 1.1(C)—Motor Vehicles (including Leased Vehicles)

Schedule 1.1(E)—Lease Deposits and Prepaid Items Under Assumed Leases

Schedule 1.1(F)(i)— Licenses, Permits, Certifications, Accreditations And Authorizations

Schedule 1.1(F)(ii)— Service Agreements and Estimated Cure Costs

Schedule 1.1(F)(iv)— Sub-contractor Agreements and Estimated Cure Costs

Schedule 1.1(F)(v)— Other Commitments, Contracts, Equipment Or Other Personal Property
Leases, Purchase Orders and Agreements and Estimated Cure Costs

Schedule 1.2(I)—Other Excluded Assets

Schedule 2.1(A)— Escrow Provisions

Schedule 2.1(D)— Offered Employees

Schedule 2.3— Purchase Price Allocation

Schedule 3.1—Bill of Sale

Schedule 3.2—Assumption and Assignment Agreement

Schedule 4.2(D)—Seller's Closing Certificate

Schedule 4.2(J)—Seller Non-Compete and Non-Interference Agreement

Schedule 4.3(A)—Purchase Price and Adjustments

Schedule 4.3(D)—Purchaser's Closing Certificate

Schedule 5.1(B)(iii)— Required Consents or Filings

Schedule 5.1(B)(iv)— Conflict, Contravention, or Breach

Schedule 5.1(E)(i)—Material Defaults under Assumed Leases

Schedule 5.1(F)—Assumed Contracts; Material Defaults

Schedules 5.1(G)(i)—Employee Benefit Plans

Schedules 5.1(G)(ii)—Multiemployer Plans, Employee Pension Benefit Plans, Multiple Employer Plans, Multiple Employer Welfare Arrangements

Schedules 5.1(H)(i)—Non-Compliance with Labor, Wage and Hour and Employment Laws

Schedule 5.1(I)(i)— Non-Compliance With Laws; Investigations

Schedule 5.1(J)—Legal Proceedings

Schedule 5.1(K)—Permits

Schedule 5.1(L)—Registered Intellectual Property

Schedule 5.1(M)—Brokers

Schedule 5.2(B)—Purchaser's Required Consents

Schedule 7.2(B)— Required Third-Party Consents, Approvals, Permits, Waivers and Estoppels

# EXHIBIT A

## Facility Locations

1.  5 Industrial Way
    Unit #2A
    Salem, NH 03079

2.  3-B Gill Street
    Woburn, MA 01801

3.  140 Florida St.
    Farmingdale, NY 11735

4.  1020 Essex Street
    Brooklyn, NY

5.  2024 Westover Road
    Chicopee, MA 01022

6.  85 Faltin Dr.
    Manchester, NH 03101

7.  Unit A-700
    30 Robert Boyden Road
    Myles Standish Business Condo.
    Taunton, MA 02780

8.  73 Thornton Drive
    Hyannis, MA 02601
    Units 4 and 5
    Have W-9

9.  821/825/829 Edgewater Rd
    Bronx, NY  10455

10. 3918 Vero Road
    Suite E-F
    Baltimore, MD 21227

11. 1001 Grand Street South
    Unit 1
    Hammonton, NJ  08037

12. 216 Tingley Lane
    Bldg. 1
    Edison, NJ  08820

13. 247 Sullivan Street
    #2
    Claremont, NH  03743

14. 27 Berard Dr.
    Suite 2703
    So. Burlington, VT

15. Unit 2C
    3 Simm Lane
    Newtown, CT 06470

16. 12 Commerce Pkwy.
    Unit #105
    Fredericksburg, VA 22406

17. 6814-6816-6818 Atmore St.
    201 Arcadia St.
    Richmond, VA 23225

18. 7 Saint Mark St.
    Auburn, MA 01501

19. 18 Jacobs Rd, Room 124
    Heath, MA  01346

20. Auburn, MA
    Room Rental

*Final*

## DISCLOSURE SCHEDULES

### TO

### ASSET PURCHASE AGREEMENT

### BETWEEN

## TRI-WIRE ENGINEERING SOLUTIONS, INC.

### AND

## ITG COMMUNICATIONS, LLC

### DATED AS OF

### SEPTEMBER 13, 2021

The following Disclosure Schedules are being furnished by the Seller to the Purchaser pursuant to and as part of that certain Asset Purchase Agreement (the "**Agreement**"), dated as of September 13, 2021, by and between Tri-Wire Engineering Solutions, Inc., a Massachusetts corporation ("**Seller**"), and ITG Communications, LLC, a Texas limited liability company ("**Purchaser**"). Capitalized terms used herein but not otherwise defined herein have the meanings ascribed to such terms in the Agreement.

## Schedule 1.1(A)

### Assumed Leases and Estimated Cure Costs

| LOCATION | LANDLORD INFO | LEASE ADDRESS | LEASE TERM START | LEASE TERM END | ESTIMATED CURE COST |
|---|---|---|---|---|---|
| **Salem, NH Headquarters** | **Metz Realty, Inc.** 5 Industrial Way Salem, NH 03079 | 5 Industrial Way Unit #2A Salem, NH 03079 | 02/01/21 | 01/31/26 | $7,362.50 |
| **Woburn, MA** | **Cummings Properties** 200 West Cummings Park Woburn, MA 01801 | 3-B Gill Street Woburn, MA 01801 | 10/01/20 | 09/30/25 | $11,435.00 |
| **Farmingdale, NY** **Long Island** | **Dardad, LLC** PO Box 8081 Greenwich, CT 06836 | 140 Florida St. Farmingdale, NY 11735 | 11/01/20 | 10/31/25 | $7,000.00 |
| **Brooklyn, NY** | **SHS Flatlands LLC** 12501 Flatlands Ave. | 1020 Essex Street Brooklyn, NY | 03/01/21 | 02/29/23 | $14,802.89 |
| **Chicopee, MA** (Springfield) | **Porchlight VNA** 32 Park St Lee, MA 01238 | 2024 Westover Road Chicopee, MA 01022 | 07/01/21 | 06/30/23 | $3,021.33 |
| **Manchester, NH** | **655 South Willow Commons, LLC** 670 North Commercial St. Manchester, NH 03101 | 85 Faltin Dr. Manchester, NH 03101 | 03/01/21 | 02/28/22 | $2,821.69 |

| | | | | | |
|---|---|---|---|---|---|
| **Taunton, MA** | **David Development LLC** <br><br> Post Office Box 446 Weymouth, MA 02188 | Unit A-700 30 Robert Boyden Road Myles Standish Business Condo. Taunton, MA 02780 | 11/01/21 | 10/31/22 | $3,550.00 |
| **Yarmouth, MA** | **CTL4 Real Estate Trust** P.O. Box 480 Cummaquid, MA 02637-0398 | 73 Thornton Drive Hyannis, MA 02601 <br><br> Units 4 and 5 | 04/01/20 | 03/31/23 | $2,700.00 |
| **Bronx, NY** | **Edgewater Realty LLC** 421 Bruckner Blvd. Bronx, NY 10455 | 821/825/829 Edgewater Rd Bronx, NY 10455 | 03/01/21 | 02/28/22 | $13,659.09 |
| **Anne Arundel, MD** | **St. John Properties, Inc. - G** P.O. Box 62771 Baltimore, Maryland 21264-2771 | 3918 Vero Road, Suite E-F Baltimore, MD 21227 | 07/01/22 | 06/30/23 | $3,703.63 |
| **Freedom, NJ Absecon & Blackstone** | **1001 Grant LLC** <br><br> 647 James Street Lakewood, NJ 08701 | 1001 Grand Street South, Unit 1 Hammonton, NJ 08037 | 08/01/24 | 07/31/25 | $6,106.50 |
| **Freedom, NJ** <br><br> **Edison** | **216 Tingley Partners, LLC** 85 Broad Street, 29th Floor New York, NY 10004 | 216 Tingley Lane, Bldg. 1 <br><br> Edison, NJ 08820 | 04/01/23 | 03/31/24 | $3,090.00 |
| **Claremont, NH** | **Sugar River Storage LLC** 427 Washington | 247 Sullivan Street #2 Claremont, NH | 08/01/21 | 07/31/22 | $720.00 |

| | | Street, Suite 2 | 03743 | | | |
|---|---|---|---|---|---|---|
| **Burlington, VT** | **Tri-D III, LLC** PO BOX 1 Winooski, VT 05404 | 27 Berard Dr. Suite 2703 So. Burlington, VT | 11/01/20 | 10/31/21 | $2,314.00 |
| **Danbury, CT** | **Simm Lane, LLC** 55 Church Street Suite 204 | Unit 2C 3 Simm Lane Newtown, CT 06470 | 08/01/21 | 07/31/22 | $3,200.00 |
| **Fredericksburg, VA** | **Marquis Properties** 10411 Hall Industrial Dr. Fredericksburg, VA 22408 | 12 Commerce Pkwy. Unit #105 Fredericksburg, VA 22406 | 01/01/21 | 12/31/21 | $3,620.42 |
| **Richmond, VA** | **DEL Partnership** c/o Sterling Management 17 S. Belmont Ave. Richmond, VA 23221 | 6814-6816-6818 Atmore St. + 201 Arcadia St. Richmond, VA 23225 | 11/01/21 | 10/31/22 | $3,075.00 |
| **Auburn, MA** | **Johnson Pleasant Realty** PO Box 238 (mailing address) Auburn, MA 01501-0283 | 7 Saint Mark St. Auburn, MA 01501 | 08/01/25 | 07/31/26 | $4,333.33 |
| **Chicopee/Springfield Room Rental** | **Town of Heath** PO Box 35 Heath, MA 01346 | 18 Jacobs Rd, Room 124 Heath, MA 01346 | 11/01/20 | TBD | $575.00 |

| | Town of | | |
|---|---|---|---|
| **Auburn, MA** | **Charlemont** | 02/01/21 | $250.00 |
| **Room Rental** | PO Box 465 | | |
| | Charlemont, MA | | |
| | 01339 | | |

## Schedule 1.1(B)

### Furniture, Equipment, Fixtures, Furnishings

| |
|---|
| TW 210-Construction |
| (2) 50" Capstan Wheels |
| OTDR |
| FiberFox Mini Fusion Splicer |
| Installation Supplies-No Descr. |
| OTDR Module/Duel Core CPU/OLT Unit |
| 1 PON Meter + 1 Inno Instrument |
| (6) Inno-View1 Fusion Splicers |
| (6) PON Meters PPM-352C |
| (3) Fusion Splicers, 3 Meters |
| (4) PON Meters PPM-352C |
| (4) Inno Instruments |
| (1) PON Meter PPM-352C |
| (4) PON Meters + Inno Instruments |
| (1) PON Meter PPM-352C |
| (3) PON Meters + (3) Inno Instruments |
| (2) PON Meters + (2) Inno Instruments |
| (20) 28ft Fiberglass Ladders |
| (3) Fusion Splicers |
| (2) PON Meters + Inno Instruments |
| (2) 28ft Fiberglass Ladders |

| |
|---|
| (2) PON Meters |
| (3) Inno Instruments |
| (2) 28ft Fiberglass Ladders |
| (20) 28ft Fiberglass Ladders |
| Cable Signal Generator |
| (2) Hitron Meters w/batteries |
| (2) PON Meters + Inno Instruments |
| (2) Inno Instruments |
| (1) PON Meter |
| (1) Viavi FPT Digital Analyzer |
| (1) Viavi Trilithic Analyzer |
| (4) Hitron Meters w/batteries |
| (8) Hitron Meters w/batteries |
| (16) 28 ft. Fiberglass Ladders |
| (4) Hitron Meters w/batteries |
| (8) Hitron Meters w/batteries |
| (4) Inno Instruments |
| (2)Swift Fusion Splicers |
| (2) PON Meters PPM-352C |
| (2) Inno Instruments |
| (1) Inno Instrument |
| (5) PON Meters PPM-352C |
| (12) Howlers |

| |
|---|
| 6 MacBook Pros |
| 2 MacBook Pros |
| 4 MacBook Pros |
| 4 MacBook Pros + Accessories |
| 3 MacBook Pros |
| 4 Lenovo Thinkpads |
| 5 Lenovo Thinkpads |
| IT Sophos Firewall |
| 5 IT RAID Servers |
| 18 Lenovo Thinkpads + Acc. |
| Switches for Server |
| 2  APC Backup Batteries |
| Various IT Equipment for Office |
| Team Logic Server Installation |
| Lenovo Thinkpads/PC's/Acc. |
| 4 Lenovo Thinkpads |
| IT Materials - Salem server room |
| Firewall Replacements - Salem |
| Firewall Replacements - Woburn |
| Dell Desktop Computer |
| 5 Lenovo Laptops |
| 1 Dell Precision 5000 Series Laptop |

## Schedule 1.1(C)

## Motor Vehicles (including Leased Vehicles)

| TriWire No. | Year | Make | Model |
|---|---|---|---|
| XTW1629 | 2006 | Dodge | Sprinter |
| XTW1630 | 2016 | Ford | F250 |
| XTW1668-TRAILER | 2017 | Roose | RR-33 |
| XTW1669-TRAILER | 2017 | Roose | RR-135 |
| XTW1670-TRAILER | 2017 | Roose | RR-33 |
| XTW1677-TRAILER | 2017 | Roose | RR-135 |
| XTW1676-TRAILER | 2017 | Roose | RR-135 |
| XTW1675-TRAILER | 2017 | Roose | RR-135 |
| TW1628 | 2016 | Ford | F250 |
| TW1630 | 2016 | Ford | F250 |
| TW1632 | 2017 | Ford | F550 |
| TW1631 | 2017 | Ford | F250 |
| TW1633 | 2017 | Ford | F250 |
| TW1635 | 2017 | Ford | F250 |
| TW1671 | 2016 | Mercedes | Sprinter |
| TW1672 | 2017 | Mercedes | Sprinter |
| TW1808 | 2018 | Ford | F550 |
| TW1809 | 2018 | Mercedes | Sprinter |
| TBD Splicer Trailer | 2000 | Unknown Trailer/Honda Generator | |
| 23PS66 | 2020 | Nissan | NV200 |
| 23PS69 | 2020 | Nissan | NV200 |
| 23PS6G | 2020 | Nissan | NV200 |
| 23Q394 | 2020 | Nissan | NV200 |
| 23Q4F7 | 2020 | Nissan | NV200 |
| 23Q4F8 | 2020 | Nissan | NV200 |
| 23Q4F9 | 2020 | Nissan | NV200 |
| 23Q4FB | 2020 | Nissan | NV200 |
| 23Q4FC | 2020 | Nissan | NV200 |
| 23Q4FF | 2020 | Nissan | NV200 |
| 23Q4FG | 2020 | Nissan | NV200 |
| 23Q4FH | 2020 | Nissan | NV200 |
| 23Q4FJ | 2020 | Nissan | NV200 |
| 23Q6MB | 2011 | Ford | Transit Connect |
| 23Q6MN | 2012 | Ford | Transit Connect |
| 23Q6MZ | 2012 | Ford | Transit Connect |
| 23Q6NF | 2012 | Ford | Transit Connect |
| 23Q6NV | 2016 | Ford | F-250 |

| 23Q6PK | 2016 | Ford | F-250 |
|--------|------|------|-------|
| 23Q6Q6 | 2017 | Ford | F-150 |
| 23Q6QL | 2017 | Ford | F-150 |
| 23Q6R2 | 2016 | Mercedes-Benz | Sprinter |
| 23Q6R7 | 2017 | Mercedes-Benz | Sprinter 3500XD |
| 23Q6RG | 2017 | Ford | F-550 Chassis |
| 23Q6RP | 2017 | Ford | F-550 Chassis |
| 23Q6S3 | 2017 | Ford | F-550 Chassis |
| 23Q6X4 | 2017 | Ford | F-550 Chassis |
| 23SVFH | 2021 | Toyota | Tacoma |
| 23SVFL | 2021 | Toyota | Tacoma |
| 23SVFX | 2021 | Toyota | Tacoma |
| 23SVG8 | 2021 | Toyota | Tacoma |
| 23SVGG | 2021 | Toyota | Tacoma |
| 23SVGH | 2021 | Toyota | Tacoma |
| 23SVGK | 2021 | Toyota | Tacoma |
| 23SVGN | 2021 | Toyota | Tacoma |
| 23SVGQ | 2021 | Toyota | Tacoma |
| 23SVGV | 2021 | Toyota | Tacoma |
| 23SVGX | 2021 | Toyota | Tacoma |
| 23SVGZ | 2021 | Toyota | Tacoma |
| 23SVH2 | 2021 | Toyota | Tacoma |
| 23SVTS | 2021 | Toyota | Tacoma |
| 23SVTV | 2021 | Toyota | Tacoma |
| 23SVTW | 2021 | Toyota | Tacoma |
| 23SVTX | 2021 | Toyota | Tacoma |
| 23SVTZ | 2021 | Toyota | Tacoma |
| 23SVV3 | 2021 | Toyota | Tacoma |
| 23SVV4 | 2021 | Toyota | Tacoma |
| 23SVV7 | 2021 | Toyota | Tacoma |
| 23SVVC | 2021 | Toyota | Tacoma |
| 23SVVF | 2021 | Toyota | Tacoma |
| 23T9P5 | 2021 | Nissan | NV200 |
| 23T9P9 | 2021 | Nissan | NV200 |
| 23T9PH | 2021 | Nissan | NV200 |
| 23T9PQ | 2021 | Nissan | NV200 |
| 23T9PV | 2021 | Nissan | NV200 |
| 23T9Q2 | 2021 | Nissan | NV200 |
| 23T9RQ | 2021 | Nissan | NV200 |
| 23T9RV | 2021 | Nissan | NV200 |
| 23T9ST | 2021 | Nissan | NV200 |
| 23T9T2 | 2021 | Nissan | NV200 |

| 23Q3VV | 2013 | Nissan | Frontier |
| 23Q47T | 2017 | Nissan | Frontier |
| 23Q48V | 2016 | Nissan | Frontier |
| 23Q4B2 | 2017 | Nissan | Frontier |
| 23Q4QV | 2013 | Nissan | Frontier |
| 23Q4R9 | 2017 | Nissan | Frontier |
| 23Q4RS | 2014 | Toyota | Tacoma |
| 23Q4TR | 2018 | Nissan | NV200 |
| 23Q4TS | 2014 | Nissan | Frontier |
| 23Q4V2 | 2014 | Toyota | Tacoma |
| 23Q4V3 | 2018 | Nissan | NV200 |
| 23Q4V9 | 2014 | Nissan | Frontier |
| 23Q4VC | 2018 | Nissan | NV200 |
| 23Q4VW | 2018 | Nissan | NV200 |
| 23Q4WB | 2018 | Nissan | NV200 |
| 23Q4Z2 | 2014 | Toyota | Tacoma |
| 23Q4Z7 | 2014 | Toyota | Tacoma |
| 23Q4ZF | 2016 | Nissan | Frontier |
| 23Q4ZR | 2016 | Nissan | Frontier |
| 23Q55D | 2015 | Nissan | Frontier |
| 23Q55L | 2018 | Nissan | NV200 |
| 23Q55V | 2016 | Nissan | Frontier |
| 23Q568 | 2018 | Nissan | NV200 |
| 23Q58B | 2016 | Nissan | Frontier |
| 23Q58P | 2016 | Nissan | Frontier |
| 23Q5LL | 2016 | Nissan | Frontier |
| 23Q5S9 | 2016 | Nissan | Frontier |
| 23Q5SZ | 2017 | Nissan | Frontier |
| 23Q5TJ | 2017 | Nissan | Frontier |
| 23Q5TQ | 2016 | Nissan | Frontier |
| 23Q5WC | 2016 | Nissan | Frontier |
| 23Q629 | 2016 | Nissan | Frontier |
| 23Q62V | 2016 | Nissan | Frontier |
| 23Q63N | 2016 | Nissan | Frontier |
| 23Q64M | 2016 | Nissan | Frontier |
| 23Q652 | 2016 | Nissan | Frontier |
| 23Q666 | 2016 | Nissan | Frontier |
| 23Q66W | 2016 | Nissan | Frontier |
| 23Q68M | 2016 | Nissan | Frontier |
| 23Q699 | 2016 | Nissan | Frontier |
| 23Q6BL | 2016 | Nissan | Frontier |
| 23Q6CQ | 2016 | Nissan | Frontier |

| 23Q6J4 | 2016 | Nissan | Frontier |
| 23Q6JJ | 2017 | Nissan | Frontier |
| 23Q6JT | 2016 | Nissan | Frontier |
| 23Q73W | 2013 | Nissan | Frontier |
| 23QGXK | 2014 | Nissan | Frontier |
| 23QH78 | 2018 | Nissan | NV200 |
| 23Q5VV | 2013 | Nissan | Frontier |
| 23Q6KD | 2013 | Nissan | Frontier |
| 23Q6KK | 2013 | Nissan | Frontier |
| 23Q75S | 2013 | Toyota | Tacoma |
| 23Q7N3 | 2016 | Nissan | Frontier |
| 23Q7P5 | 2016 | Nissan | Frontier |
| 23Q7R3 | 2016 | Nissan | Frontier |
| 23Q7VR | 2016 | Nissan | Frontier |
| 23Q7XS | 2016 | Nissan | Frontier |
| 23Q7ZP | 2016 | Nissan | Frontier |
| 23Q82X | 2016 | Nissan | Frontier |
| 23Q846 | 2016 | Nissan | Frontier |
| 23Q852 | 2016 | Nissan | NV Cargo NV2500 HD |
| 23Q8CV | 2015 | Nissan | NV200 |
| 23Q8DG | 2016 | Nissan | Frontier |
| 23Q6GZ | 2011 | Ford | Ranger |
| 23Q75Q | 2014 | Nissan | Frontier |
| 23Q788 | 2013 | Toyota | Tacoma |
| 23Q79Z | 2014 | Toyota | Tacoma |
| 23Q7C5 | 2014 | Nissan | Frontier |
| 23Q7F8 | 2014 | Nissan | Frontier |
| 23Q7H6 | 2014 | Toyota | Tacoma |
| 23Q7HX | 2014 | Nissan | Frontier |
| 23Q7KJ | 2014 | Nissan | Frontier |
| 23Q7LL | 2014 | Nissan | Frontier |
| 23Q7MQ | 2014 | Nissan | Frontier |
| 23Q7N4 | 2014 | Toyota | Tacoma |
| 23Q7NB | 2014 | Toyota | Tacoma |
| 23Q7NH | 2014 | Toyota | Tacoma |
| 23Q7NR | 2016 | Nissan | Frontier |
| 23Q7PC | 2016 | Nissan | Frontier |
| 23Q83R | 2011 | Ford | Ranger |
| 23Q84L | 2011 | Ford | Ranger |
| 23Q85F | 2011 | Ford | Ranger |
| 23Q862 | 2016 | Nissan | Frontier |

| 23Q86D | 2016 | Nissan | Frontier |
|--------|------|--------|----------|
| 23Q875 | 2016 | Nissan | Frontier |
| 23Q87D | 2012 | Chevrolet | Colorado |
| 23Q87Q | 2016 | Nissan | Frontier |
| 23Q889 | 2016 | Nissan | Frontier |
| 23Q88W | 2016 | Nissan | Frontier |
| 23Q89K | 2012 | Chevrolet | Colorado |
| 23Q89Z | 2012 | Chevrolet | Colorado |
| 23Q8CJ | 2013 | Toyota | Tacoma |
| 23Q8D3 | 2013 | Toyota | Tacoma |
| 23QBFC | 2013 | Toyota | Tacoma |
| 23QBFG | 2013 | Toyota | Tacoma |
| 23QFSX | 2013 | Toyota | Tacoma |
| 23QFT4 | 2013 | Toyota | Tacoma |
| 23Q6T6 | 2014 | Toyota | Tacoma |
| 23Q6TB | 2014 | Toyota | Tacoma |
| 23Q6TH | 2016 | Nissan | Frontier |
| 23Q6TJ | 2016 | Nissan | Frontier |
| 23Q8DX | 2017 | Nissan | Frontier |
| 23Q8F4 | 2017 | Nissan | Frontier |
| 23Q6C7 | 2016 | Nissan | Frontier |
| 23Q6FH | 2016 | Nissan | Frontier |
| 23Q6GG | 2016 | Nissan | Frontier |
| 23Q6HB | 2016 | Nissan | Frontier |
| 23Q6JC | 2016 | Nissan | Frontier |
| 23Q6JW | 2016 | Nissan | Frontier |
| 23Q6KW | 2016 | Nissan | Frontier |
| 23Q85J | 2016 | Nissan | Frontier |
| 23Q865 | 2016 | Nissan | Frontier |
| 23Q8G9 | 2016 | Nissan | Frontier |
| 23Q8JL | 2013 | Toyota | Tacoma |
| 23Q8K8 | 2015 | Nissan | NV200 |
| 23Q8BX | 2016 | Nissan | Frontier |
| 23Q6HK | 2014 | Nissan | Frontier |
| 23Q6J5 | 2014 | Nissan | Frontier |
| 23Q6KJ | 2016 | Nissan | Frontier |
| 23Q6QT | 2015 | Nissan | NV200 |
| 23Q6R4 | 2016 | Nissan | Frontier |
| 23Q6TK | 2014 | Nissan | Frontier |
| 23Q6TL | 2014 | Nissan | Frontier |
| 23Q6TQ | 2014 | Toyota | Tacoma |
| 23Q738 | 2016 | Nissan | Frontier |

| 23Q73M | 2016 | Nissan | Frontier |
| 23Q73S | 2017 | Nissan | Frontier |
| 23Q747 | 2017 | Nissan | Frontier |
| 23Q74J | 2016 | Nissan | Frontier |
| 23Q7C2 | 2016 | Nissan | Frontier |
| 23Q7CG | 2016 | Nissan | Frontier |
| 23Q7D3 | 2017 | Nissan | Frontier |
| 23Q7DR | 2016 | Nissan | Frontier |
| 23Q7F9 | 2017 | Nissan | Frontier |
| 23Q7FP | 2017 | Nissan | Frontier |
| 23Q7G5 | 2017 | Nissan | Frontier |
| 23Q7HL | 2017 | Nissan | Frontier |
| 23Q7JB | 2017 | Nissan | Frontier |
| 23Q84J | 2016 | Nissan | Frontier |
| 23Q84T | 2018 | Nissan | NV200 |
| 23Q859 | 2018 | Nissan | NV200 |
| 23Q86G | 2018 | Nissan | NV200 |
| 23Q86Z | 2018 | Nissan | NV200 |
| 23Q87F | 2018 | Nissan | NV200 |
| 23Q8GC | 2014 | Nissan | Frontier |
| 23QBGH | 2013 | Nissan | Frontier |
| 23QBGP | 2015 | Nissan | NV200 |
| 23QBGX | 2015 | Nissan | NV200 |
| 23QBHB | 2015 | Nissan | NV200 |
| 23QBHK | 2015 | Nissan | NV200 |
| 23QBHP | 2015 | Nissan | NV200 |
| 23QBHT | 2016 | Nissan | Frontier |
| 23QBFL | 2014 | Nissan | Frontier |
| 23QBFT | 2014 | Nissan | Frontier |
| 23QBFZ | 2016 | Nissan | Frontier |
| 23QBG9 | 2016 | Nissan | Frontier |
| 23Q6TS | 2016 | Nissan | Frontier |
| 23Q6V6 | 2016 | Nissan | Frontier |
| 23Q6VK | 2016 | Nissan | Frontier |
| 23Q6VR | 2016 | Nissan | Frontier |
| 23Q7FM | 2014 | Nissan | Frontier |
| 23Q7GF | 2016 | Nissan | Frontier |
| 23Q7XL | 2016 | Nissan | Frontier |
| 23Q83Q | 2016 | Nissan | Frontier |
| 23Q882 | 2016 | Nissan | Frontier |
| 23Q89G | 2016 | Nissan | Frontier |
| 23Q89N | 2016 | Nissan | Frontier |

| 23Q8BB | 2016 | Nissan | Frontier |
| 23Q8BT | 2017 | Nissan | Frontier |
| 23Q8FW | 2014 | Toyota | Tacoma |
| 23QBNL | 2016 | Nissan | Frontier |
| 23Q7Z7 | 2016 | Nissan | Frontier |
| 23Q7ZF | 2016 | Nissan | Frontier |
| 23Q7ZM | 2016 | Nissan | Frontier |
| 23Q822 | 2016 | Nissan | Frontier |
| 23Q84X | 2016 | Nissan | Frontier |
| 23Q86N | 2016 | Nissan | Frontier |
| 23Q8FT | 2016 | Nissan | Frontier |
| 23Q8JC | 2013 | Nissan | Frontier |
| 23Q8K2 | 2014 | Nissan | Frontier |
| 23Q5XN | 2011 | Ford | Ranger |
| 23Q5ZD | 2013 | Toyota | Tacoma |
| 23Q624 | 2013 | Toyota | Tacoma |
| 23Q63B | 2013 | Nissan | Frontier |
| 23Q6HT | 2013 | Toyota | Tacoma |
| 23Q6J9 | 2013 | Toyota | Tacoma |
| 23Q6JN | 2017 | Nissan | Frontier |
| 23Q6VV | 2014 | Toyota | Tacoma |
| 23Q7DB | 2013 | Toyota | Tacoma |
| 23Q8CL | 2016 | Nissan | Frontier |
| 23Q8FN | 2014 | Toyota | Tacoma |
| 23Q6CF | 2018 | Nissan | NV200 |
| 23Q6DN | 2012 | Toyota | Tacoma |
| 23Q6FP | 2014 | Nissan | Frontier |
| 23Q6G3 | 2014 | Nissan | Frontier |
| 23Q6H3 | 2014 | Nissan | Frontier |
| 23Q6T4 | 2013 | Nissan | Frontier |
| 23Q7QJ | 2016 | Nissan | Frontier |
| 23Q7R8 | 2016 | Nissan | Frontier |
| 23Q7RR | 2016 | Nissan | Frontier |
| 23Q7SN | 2016 | Nissan | Frontier |
| 23Q7TQ | 2016 | Nissan | Frontier |
| 23Q82V | 2018 | Nissan | NV200 |
| 23Q83C | 2018 | Nissan | NV200 |
| 23Q845 | 2018 | Nissan | NV200 |
| 23Q84P | 2018 | Nissan | NV200 |
| 23Q854 | 2018 | Nissan | NV200 |
| 23Q85X | 2018 | Nissan | NV200 |
| 23Q867 | 2016 | Nissan | Frontier |

| 23Q86F | 2016 | Nissan | Frontier |
| 23Q86Q | 2016 | Nissan | Frontier |
| 23Q86S | 2018 | Nissan | NV200 |
| 23Q86W | 2016 | Nissan | Frontier |
| 23Q876 | 2016 | Nissan | Frontier |
| 23Q877 | 2018 | Nissan | NV200 |
| 23Q87M | 2016 | Nissan | Frontier |
| 23Q87T | 2016 | Nissan | Frontier |
| 23Q88C | 2016 | Nissan | Frontier |
| 23Q88R | 2016 | Nissan | Frontier |
| 23Q88X | 2018 | Nissan | NV200 |
| 23Q8C8 | 2018 | Nissan | NV200 |
| 23Q8CK | 2018 | Nissan | NV200 |
| 23Q8CW | 2018 | Nissan | NV200 |
| 23Q8FH | 2013 | Ford | Transit Connect |
| 23QBP4 | 2018 | Nissan | NV200 |
| 23Q6F8 | 2016 | Nissan | Frontier |
| 23Q6GK | 2016 | Nissan | Frontier |
| 23Q6GS | 2016 | Nissan | Frontier |
| 23Q6HH | 2016 | Nissan | Frontier |
| 23Q6JQ | 2018 | Nissan | NV200 |
| 23Q6KF | 2018 | Nissan | NV200 |
| 23Q6M2 | 2018 | Nissan | NV200 |
| 23Q6ML | 2018 | Nissan | NV200 |
| 23Q6MQ | 2018 | Nissan | NV200 |
| 23Q6N2 | 2018 | Nissan | NV200 |
| 23Q6NC | 2018 | Nissan | NV200 |
| 23Q6NN | 2018 | Nissan | NV200 |
| 23Q6P6 | 2018 | Nissan | NV200 |
| 23Q6PR | 2018 | Nissan | NV200 |
| 23Q6QV | 2018 | Nissan | NV200 |
| 23Q6RD | 2013 | Nissan | Frontier |
| 23Q6RR | 2013 | Nissan | Frontier |
| 23Q6SV | 2013 | Nissan | Frontier |
| 23Q6SW | 2013 | Nissan | Frontier |
| 23Q6SZ | 2013 | Nissan | Frontier |
| 23Q73C | 2018 | Nissan | NV200 |
| 23Q73R | 2018 | Nissan | NV200 |
| 23Q74B | 2018 | Nissan | NV200 |
| 23Q74P | 2018 | Nissan | NV200 |
| 23Q7BV | 2018 | Nissan | NV200 |
| 23Q7CJ | 2018 | Nissan | NV200 |

| 23Q7D6 | 2018 | Nissan | NV200 |
|--------|------|--------|-------|
| 23Q7JX | 2016 | Nissan | Frontier |
| 23Q7LD | 2016 | Nissan | Frontier |
| 23Q7MH | 2016 | Nissan | Frontier |
| 23Q7S6 | 2016 | Nissan | Frontier |
| 23Q85S | 2013 | Nissan | Frontier |
| 23Q87N | 2014 | Nissan | Frontier |
| 23Q87S | 2013 | Nissan | Frontier |
| 23Q888 | 2016 | Nissan | Frontier |
| 23Q88P | 2016 | Nissan | Frontier |
| 23Q89C | 2016 | Nissan | Frontier |
| 23Q89T | 2016 | Nissan | Frontier |
| 23Q8C4 | 2016 | Nissan | Frontier |
| 23Q8CR | 2016 | Nissan | Frontier |
| 23Q8DB | 2016 | Nissan | Frontier |
| 23Q8DL | 2016 | Nissan | Frontier |
| 23Q8DZ | 2016 | Nissan | Frontier |
| 23Q8FL | 2016 | Nissan | Frontier |
| 23Q8FV | 2016 | Nissan | Frontier |
| 23Q8G7 | 2014 | Nissan | Frontier |
| 23Q8GM | 2014 | Nissan | Frontier |
| 23Q8GV | 2016 | Nissan | Frontier |
| 23Q8HM | 2014 | Nissan | Frontier |
| 23Q8J3 | 2016 | Nissan | Frontier |
| 23Q8JM | 2014 | Nissan | Frontier |
| 23Q8JS | 2014 | Nissan | Frontier |
| 23Q8K3 | 2014 | Nissan | Frontier |
| 23Q8KD | 2014 | Toyota | Tacoma |
| 23Q8KG | 2014 | Nissan | Frontier |
| 23RP85 | 2016 | Nissan | Frontier |
| 23Q6M3 | 2013 | Nissan | Frontier |
| 23Q6MK | 2014 | Nissan | Frontier |
| 23Q6MT | 2015 | Nissan | NV200 |
| 23Q6N8 | 2015 | Nissan | NV200 |
| 23Q6NQ | 2014 | Toyota | Tacoma |
| 23Q6P2 | 2014 | Toyota | Tacoma |
| 23Q6Q4 | 2016 | Nissan | Frontier |
| 23Q6QM | 2016 | Nissan | Frontier |
| 23Q6QX | 2016 | Nissan | Frontier |
| 23Q6R6 | 2016 | Nissan | Frontier |
| 23Q6RK | 2016 | Nissan | Frontier |
| 23Q7XM | 2016 | Nissan | Frontier |

| 23Q8D5 | 2017 | Nissan | Frontier |
|--------|------|--------|----------|
| 23Q8DK | 2017 | Nissan | Frontier |
| 23Q8F6 | 2017 | Nissan | Frontier |
| 23Q8GK | 2017 | Nissan | Frontier |
| 23Q8H3 | 2017 | Nissan | Frontier |
| 23Q8HN | 2017 | Nissan | Frontier |
| 527753 | 2012 | Nissan | Frontier |
| 527761 | 2012 | Nissan | Frontier |
| 534812 | 2013 | Toyota | Tacoma |
| 534814 | 2013 | Toyota | Tacoma |
| 534816 | 2013 | Toyota | Tacoma |
| 543960 | 2013 | Nissan | Frontier |
| 548081 | 2013 | Nissan | Frontier |
| 548088 | 2013 | Nissan | Frontier |
| 551964 | 2013 | Ford | Transit Connect |
| 565348 | 2015 | Nissan | Frontier |
| 610211 | 2017 | Nissan | NV200 |
| 610233 | 2017 | Nissan | NV200 |
| 610238 | 2017 | Nissan | NV200 |
| 610255 | 2017 | Nissan | NV200 |
| 610256 | 2017 | Nissan | NV200 |
| 610258 | 2017 | Nissan | NV200 |
| 610259 | 2017 | Nissan | NV200 |
| 610263 | 2017 | Nissan | NV200 |
| 610264 | 2017 | Nissan | NV200 |
| 610265 | 2017 | Nissan | NV200 |
| 610268 | 2017 | Nissan | NV200 |
| 610269 | 2017 | Nissan | NV200 |
| 610272 | 2017 | Nissan | NV200 |
| 610273 | 2017 | Nissan | NV200 |
| 610274 | 2017 | Nissan | NV200 |
| 610275 | 2017 | Nissan | NV200 |
| 610276 | 2017 | Nissan | NV200 |
| 610277 | 2017 | Nissan | NV200 |
| 610279 | 2017 | Nissan | NV200 |
| 610280 | 2017 | Nissan | NV200 |
| 610281 | 2017 | Nissan | NV200 |
| 610283 | 2017 | Nissan | NV200 |
| 610284 | 2017 | Nissan | NV200 |
| 610285 | 2017 | Nissan | NV200 |
| 610286 | 2017 | Nissan | NV200 |
| 610287 | 2017 | Nissan | NV200 |

| 610291 | 2017 | Nissan | NV200 |
| 610292 | 2017 | Nissan | NV200 |
| 610294 | 2017 | Nissan | NV200 |
| 610299 | 2017 | Nissan | NV200 |
| 610303 | 2017 | Nissan | NV200 |
| 610305 | 2017 | Nissan | NV200 |
| 610307 | 2017 | Nissan | NV200 |
| 610308 | 2017 | Nissan | NV200 |
| 610309 | 2017 | Nissan | NV200 |
| 610310 | 2017 | Nissan | NV200 |
| 610311 | 2017 | Nissan | NV200 |
| 610312 | 2017 | Nissan | NV200 |
| 610313 | 2017 | Nissan | NV200 |
| 610315 | 2017 | Nissan | NV200 |
| 664884 | 2018 | Ford | F550 |
| 664885 | 2018 | Mercedes | Sprinter 3500 |
| 672087 | 2019 | Nissan | Nv200 |
| 672088 | 2019 | Nissan | Nv200 |
| 672089 | 2019 | Nissan | Nv200 |
| 672090 | 2019 | Nissan | Nv200 |
| 672296 | 2019 | Nissan | Nv200 |
| 672297 | 2019 | Nissan | Nv200 |
| 672298 | 2019 | Nissan | Nv200 |
| 672299 | 2019 | Nissan | Nv200 |
| 672388 | 2019 | Nissan | Nv200 |
| 672389 | 2019 | Nissan | Nv200 |
| 672390 | 2019 | Nissan | Nv200 |
| 672391 | 2019 | Nissan | Nv200 |
| 672392 | 2019 | Nissan | Nv200 |
| 672393 | 2019 | Nissan | Nv200 |
| 672394 | 2019 | Nissan | Nv200 |
| 672395 | 2019 | Nissan | Nv200 |
| 672396 | 2019 | Nissan | Nv200 |
| 672397 | 2019 | Nissan | Nv200 |
| 673119 | 2019 | Nissan | Nv200 |
| 673120 | 2019 | Nissan | NV200 |
| 673262 | 2019 | Nissan | Nv200 |
| 673263 | 2019 | Nissan | Nv200 |
| 673264 | 2019 | Nissan | Nv200 |
| 673265 | 2019 | Nissan | Nv200 |
| 673266 | 2019 | Nissan | Nv200 |
| 673267 | 2019 | Nissan | Nv200 |

| | | | |
|---|---|---|---|
| 673268 | 2019 | Nissan | Nv200 |
| 673269 | 2019 | Nissan | Nv200 |
| 673270 | 2019 | Nissan | Nv200 |
| 673272 | 2019 | Nissan | Nv200 |
| 673273 | 2019 | Nissan | Nv200 |
| 673274 | 2019 | Nissan | Nv200 |
| 678699 | 2019 | Nissan | Nv 200 |
| 770303 | 2020 | Nissan | Frontier |
| 770304 | 2020 | Nissan | Frontier |
| 770305 | 2020 | Nissan | Frontier |
| 770306 | 2020 | Nissan | Frontier |
| 770307 | 2020 | Nissan | Frontier |
| 770308 | 2020 | Nissan | Frontier |
| 770309 | 2020 | Nissan | Frontier |
| 770310 | 2020 | Nissan | Frontier |
| 770311 | 2020 | Nissan | Frontier |
| 770312 | 2020 | Nissan | Frontier |
| 770313 | 2020 | Nissan | Frontier |
| 770314 | 2020 | Nissan | Frontier |
| 770315 | 2020 | Nissan | Frontier |
| 770316 | 2020 | Nissan | Frontier |
| 770317 | 2020 | Nissan | Frontier |
| 770318 | 2020 | Nissan | Frontier |
| 770319 | 2020 | Nissan | Frontier |
| 770320 | 2020 | Nissan | Frontier |
| 770321 | 2020 | Nissan | Frontier |
| 770322 | 2020 | Nissan | Frontier |
| 770323 | 2020 | Nissan | Frontier |
| 770324 | 2020 | Nissan | Frontier |
| 770325 | 2020 | Nissan | Frontier |
| 770326 | 2020 | Nissan | Frontier |
| 770327 | 2020 | Nissan | Frontier |
| 770328 | 2018 | Nissan | Nv200 |

## Schedule 1.1(E)

### Lease Deposits and Prepaid Items Under Assumed Leases

**Lease Deposits and Prepaid Items Under Leases**

| LOCATION | LEASE ADDRESS | Lease Deposits and Prepaids |
|---|---|---|
| **Salem, NH Headquarters** | 5 Industrial Way Unit #2A<br><br>Salem, NH 03079 | Paid Security Deposit 10/22/20 $8,163.33 Paid 1st month's rent (Feb 2021) 10/22/20 $7,362.50 |
| **Woburn, MA** | 3-B Gill Street Woburn, MA 01801 | |
| **Farmingdale, NY Long Island** | 140 Florida St. Farmingdale, NY 11735 | paid security deposit+rent $14,000 paid first month's rent $7,000 |
| **Brooklyn, NY** | 1020 Essex Street Brooklyn, NY | STOP&STOR LETTER RENT IS 9,039.22 AND CAM IS 2,385.09 = $11,425.01 |
| **Chicopee, MA** (Springfield) | 2024 Westover Road Chicopee, MA 01022 | |
| **Manchester, NH** | 85 Faltin Dr. Manchester, NH 03101 | Paid Security & 1st month's rent (August) |
| **Taunton, MA** | Unit A-700<br><br>30 Robert Boyden Road Myles Standish Business Condo. Taunton, MA 02780 | Paid $3,000 dep and $3,000 last month on 5/01/2012 |

| Yarmouth, MA | 73 Thornton Drive<br>Hyannis, MA 02601<br><br>Units 4 and 5 | $1000.00 security added 4/1/17<br>2/26/2020 - SENT $200 Deposit Lease renewal<br>3/6/2020 - SENT $200.00 last month rent (1825) |
|---|---|---|
| Bronx, NY | 821/825/829 Edgewater Rd<br>Bronx, NY  10455 | 1st month and $12,500 |
| Anne Arundel, MD | 3918 Vero Road, Suite E-F<br>Baltimore, MD 21227 | |
| Freedom, NJ<br>Absecon &<br>Blackstone | 1001 Grand Street South, Unit 1<br><br>Hammonton, NJ  08037 | 5/2020 Paid $3,450 Deposit + 1st month rent $5,175 |
| Freedom, NJ<br><br>Edison | 216 Tingley Lane, Bldg. 1<br><br>Edison, NJ  08820 | Paid $6k sec dept 3/23/19 + 1st month rent $3000 |
| Claremont, NH | 247 Sullivan Street #2<br>Claremont, NH  03743 | Paid Lease deposit $300.00 on 3/6/2020<br>Paid Lease deposit $500.00 on 7/19/20 for larger unit |
| Burlington, VT | 27 Berard Dr.<br>Suite 2703<br>So. Burlington, VT | |
| Danbury, CT | Unit 2C<br>3 Simm Lane<br>Newtown, CT 06470 | |
| Fredericksburg, VA | 12 Commerce Pkwy.<br>Unit #105<br>Fredericksburg, VA 22406 | |
| Richmond, VA | 6814-6816-6818 Atmore St.<br>+<br>201 Arcadia St.<br>Richmond, VA 23225 | Paid 1,500 security deposit on 9/27. |

| | | |
|---|---|---|
| **Auburn, MA** | 7 Saint Mark St.<br>Auburn, MA 01501 | Security Deposit of $4,333.33 pd 4/28/21 |
| **Chicopee/Springfield<br>Room Rental** | 18 Jacobs Rd, Room 124<br>Heath, MA  01346 | Security Deposit of $500 paid 11/16/20 |
| **Auburn, MA<br>Room Rental** | | |

## Schedule 1.1(F)(i)

### Licenses, Permits, Certifications, Accreditations And Authorizations

### COMPANY

**New Jersey Electrical Business Permit**

**Commonwealth of Massachusetts Registered Electrical Business**

### ELECTRICAL LICENSE HOLDERS

FREEDOM
Craig Middleton

WNE
Jerome Walker
Luis Cano
Christopher Morle

NEW JERSEY
Craig Middleton

CONNECTICUT
Jerome Walker

SECURITY LICENSE FOR VIRGINIA
Damien Bird

SECURITY LICENSE FOR MARYLAND
Damien Bird

## Schedule 1.1(F)(ii)

### Service Agreements and Estimated Cure Costs

| Contract Description | Contract Type | Counter Party Name | Contract Date |
|---|---|---|---|
| Bid 20-03H - Charlemont MLP Underground Conduit Installation in Charlemont, MA | Contract Terms and General Conditions between the Owner and the Contractor | Town of Charlemont by its Charlemont Municipal Lighting Plant | May 13, 2020 |
| Fiber to the Premises Network Upgrade in Shrewsbury, Massachusetts | Contract | Shrewsbury Electric and Cable Operations | October 28, 2020 |
| Bid 20-02H Goshen MLP Telecommunication Distribution Network Installation in Goshen, MA | Contract Terms and General Conditions between the Owner and the Contractor | Town of Goshen by its Goshen Municipal Light Plant | May 13, 2020 |
| Bid 19-08H Heath MLP Telecommunication Distribution Network Installation in Heath, MA | Contract Terms and General Conditions between the Owner and the Contractor | Town of Heath by its Heath Municipal Light Plant | November 1, 2019 |
| 19/20-72 Fiber Plant Repairs, Transfers and Related Work | Contract | Town of Manchester | June 23, 2020 |
| Agreement to provide "break/fix services" | Maintenance Contract | Crocker Communications | July 11, 2019 |
| Service Agreement for Emergency Restoration | Service Agreement | Westfield Gas & Electric Light Department | May 27, 2020 |
| Extension to Contract #: 20-110 with original date of 8/4/2020 | Contract Change Order Form | Westfield Gas & Electric Light Department | July 7, 2021 |
| Fiber to the Premises Network Upgrade in Shrewsbury, Massachusetts | Contract | Shrewsbury Electric and Cable Operations | November 13, 2020 |
| Amendment #1 2021 Rates to the Agreement dated 30 November 2011 | Amendment | CSC Holding, LLC., (formerly known as Altice Technical Services) | February 28, 2021 |
| Amended and Restated Preferred Vendor Agreement for Broadband Installation / Disconnection / Drop Bury | Preferred Vendor Agreement | Comcast Cable Communications Management, LLC | August 22, 2019 |
| Amendment to Statement of Work SOW 2 BLI-I (2021 Rates and Tasks) | Amendment to Statement of Work | Comcast Cable Communications Management, LLC | December 22, 2020 |
| Amendment to Statement of Work SOW 3 FRE-I (2021 Rates and Tasks) | Amendment to Statement of Work | Comcast Cable Communications Management, LLC | December 27, 2020 |

| | | | |
|---|---|---|---|
| Amendment to Statement of Work SOW 6 GBR-I (2021 Rates and Tasks) | Amendment to Statement of Work | Comcast Cable Communications Management, LLC | December 22, 2020 |
| Amendment to Statement of Work SOW 1 WNE-I (2021 Rates and Tasks) | Amendment to Statement of Work | Comcast Cable Communications Management, LLC | December 22, 2020 |
| Master Contract Agreement | Contract | RCN Telecom Services of Massachusetts, LLC | June 25, 2018 |
| Construction Services Agreement | Construction Services Agreement | Consolidated Communications Enterprise Services, Inc. | January 1, 2021 |
| SELCO Cable Services Agreement | Cable Services Agreement | Shrewsbury Electric and Cable Operations | October 11, 2019 |
| Contractor Construction Services Agreement | Construction Services Agreement | ValleyNet, Inc. | August 1, 2020 |
| Bid 19-06 Whip City Fiber (WCF) Installation Contract for FTTX Services | Contract Terms and General Conditions between the Owner and the Contractor | Westfield Gas & Electric Light Department | July 18, 2019 |
| Standard Installation and Services Agreement (Single Family Residences, Multiple Dwelling Units and Commercial Buildings) | Installation Agreement | CSC Holdings, Inc. | July 31, 2006 |
| Construction Services | Master Construction Services Agreement | Tilson Technology Management, Inc. | August 10, 2017 |
| Construction Services | Second Amendment to Master Construction Services Agreement | Tilson Technology Management, Inc. | April 15, 2019 |
| Petersham FTTH Construction | Award Letter | Matrix Design Group, Inc. | June 28, 2019 |

**Schedule 1.1(F)(iv)**

**Sub-contractor Agreements and Estimated Cure Costs**

| Subcontractor | Contract Start | Contract End | Estimated Cure Costs |
|---|---|---|---|
| Advantage Utilities LLC | 2/26/21 | 2/26/22 | $3,052.86 |
| Alpha Communications Inc. | 12/31/20 | 12/31/21 | |
| Atlas Cable Solutions | 12/31/20 | 12/31/21 | |
| Broadband Access Services, Inc. | 3/9/21 | 3/8/22 | |
| Broadcom Technical Group (BTG) | 3/22/21 | 12/31/21 | $5,484.84 |
| Cable Comm Connect, LLC | 3/15/21 | 3/15/22 | $1,938.00 |
| Cavcomm, LLC | | | |
| Conex | 3/18/21 | 12/30/21 | $65,348.28 |
| Core Solutions | 3/9/21 | 3/8/22 | |
| Davi Communications | 2/26/21 | 2/26/22 | |
| Demar Group Corp. | 4/1/21 | 3/31/22 | $29,032.02 |
| Demarc Telecom & Utility LLC | 4/27/21 | 12/31/21 | |
| Domestic Supply Inc. (DSI) | 12/11/20 | indefinite | $39,869.63 |
| Eris Prime LLC | 4/6/21 | 4/6/2022 | $142,023.13 |
| Evolution Cable Technology, LLC | 1/1/21 | 12/31/21 | |
| Franklin Underground LLC | 5/12/21 | 5/12/22 | |
| Global Communications Group LLC | 1/1/21 | 12/31/21 | $17,463.68 |
| Horizon Telecommunications, Inc. | 7/23/21 | 7/22/22 | |
| Insight Elite | 3/5/21 | 3/5/22 | |
| Jcomm LLC | 3/1/21 | 3/1/22 | $7,328.30 |
| JT Wiring LLC | 1/1/21 | 12/31/21 | $4,284.00 |
| Koscom Cable | 1/1/21 | 12/31/21 | $3,928.00 |
| Lantech Communications, LLC | 4/12/21 | 4/11/22 | $5,442.00 |
| Matrix Cable | 1/1/21 | 12/31/21 | $9,240.45 |
| MK-1 Communication | 1/1/21 | 12/31/21 | $43,350.34 |
| Moldcable | 1/1/21 | 12/31/21 | |
| MPEG Communications | 1/1/21 | 12/31/21 | $112,793.52 |
| Multiplex Network Inc | 4/7/21 | 4/7/22 | $30,084.26 |
| New Comm LLC | 4/20/21 | 4/19/22 | $83,694.90 |
| Online Installations | 1/4/21 | 1/3/22 | |
| Pro-Tech Communications LLC | 1/1/21 | 12/31/21 | $31,215.86 |
| Sary Bala | 1/1/21 | 12/31/21 | |
| SJS Communications | 6/23/21 | 6/22/22 | |
| Star Linesmen LLC, Inc. | 1/1/21 | 12/31/21 | |
| Tech Bros LLC | 3/19/21 | 3/19/22 | $10,041.46 |
| Technical Media Technicians LLC | 1/1/21 | 12/31/21 | $50,770.36 |
| TLC Media Solutions | | | $1,632.86 |

| | | |
|---|---|---|
| Top Tier Cable | 12/14/20 | 12/13/21 |
| Underground Construction Experts | 12/30/20 | 12/30/21 |

## Schedule 1.1(F)(v)

## Other Commitments, Contracts, Equipment Or Other Personal Property Leases, Purchase Orders and Agreements and Estimated Cure Costs

### Loan Agreements with Secured Creditors:

| Secured Creditor | Estimated Cure Costs |
|---|---|
| JPMorgan Chase Bank, N.A. | N/A |
| Massachusetts Capital Resource Company | N/A |
| Massachusetts Growth Capital Corporation | N/A |
| Marlin Business Bank | N/A |

### Tool/Equipment/Vehicle Leases:

| Tool/Equipment/Vehicle Lessor | Estimated Cure Costs |
|---|---|
| Altec Capital Services, LLC | $20,382.44 |
| CIT Bank, N.A. | |
| BB&T Commercial Equipment Capital Corporation | |
| Marlin Business Bank | $403.74 |
| Ascentium Capital | $433.31 |
| Navitas Credit Corp | $811.20 |
| Penske Truck Leasing | $4,011.66 |
| Merchants Automotive | $66,190.51 |
| Enterprise Fleet Services | $132,666.38 |

## Schedule 1.2(I)

## Other Excluded Assets

NONE.

### Schedule 2.1(A)

### Escrow Provisions

### ESCROW AGREEMENT

THIS ESCROW AGREEMENT (this "Agreement"), dated as of September __, 2021, by and among ITG Communications, LLC, a Texas limited liability company (**"Purchaser"**), and Tri-Wire Engineering Solutions, Inc., a Massachusetts corporation (**"Seller"**), and **CASNER & EDWARDS, LLP** ("**Escrow Agent**").

### W I T N E S E T H:

WHEREAS, Purchaser and Seller entered into that certain Asset Purchase Agreement dated as of September __, 2021 (collectively, the "**Purchase Agreement**");

WHEREAS, Seller intends to file a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Massachusetts (the "**Bankruptcy Court**"), and intends, in such case, to seek approval of the Purchase Agreement and the transactions provided for therein;

WHEREAS, all capitalized terms herein shall have the same meaning ascribed to them in the Purchase Agreement, unless otherwise specified herein; and

WHEREAS, Purchaser and Seller have agreed that Escrow Agent shall serve as Escrow Agent for purposes of holding and disbursing the Earnest Money (as defined below) as contemplated under the Purchase Agreement and in accordance with the terms and conditions hereof.

NOW, THEREFORE, for and in consideration of the foregoing, the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1. Purchaser and Seller do hereby appoint Escrow Agent to be and act as escrow agent, and Escrow Agent hereby accepts its appointment to hold in an escrow account the Earnest Money upon the terms and conditions as set forth in this Agreement.

2. Pursuant to the terms of the Purchase Agreement, on the date hereof, Purchaser delivered to Escrow Agent an earnest money deposit in the amount of $900,000 (the "Earnest Money").

3. Escrow Agent shall deposit the Earnest Money in a non-interest bearing bank account. The Escrow Agent shall not be responsible for any bank charges or bank service fees, or for any loss, diminution in value or failure to achieve a greater profit as a result of such investment or bank charges or bank service fees. Also, the Escrow Agent assumes no responsibility for, nor shall said Escrow Agent be

held liable for, any loss occurring which arises from the fact that the amount of the Earnest Money may cause the aggregate amount of any depositor's accounts to exceed $250,000 and that the excess amount is not insured by the Federal Deposit Insurance Corporation.

4.   Escrow Agent shall hold the Earnest Money with the same degree of care as it gives to its own similar property and shall only deliver the Earnest Money (or a portion thereof) to Seller or Purchaser, as the case may be, as follows:

a)   to Seller, concurrent with the Closing under the Purchase Agreement;

b)   to Purchaser, upon Seller executing an asset purchase agreement for an Alternative Transaction (as defined in the Purchase Agreement); or

c)   to Seller or Purchaser, as designated by an instruction letter jointly executed by both Seller and Purchaser or upon order of the Bankruptcy Court.

5.   Purchaser and Seller, jointly and severally, hereby agree to indemnify the Escrow Agent and hold it harmless from any and all claims, liabilities, losses, actions, suits or proceedings at law or in equity, or any other expense, fees or charges of any character or nature, which it may incur or with which it may be threatened by reason of its acting as Escrow Agent under this Agreement, including, without limitation, reasonable documented and out-of-pocket attorneys' fees and costs of defending any actions, suit or proceeding or resisting any claim, except any of the foregoing resulting from the Escrow Agent's gross negligence, willful misconduct or breach of this Agreement.

6.   If the parties hereto shall be in disagreement about the interpretation of this Agreement, or about their rights and obligations hereunder, or the propriety of any action contemplated by the Escrow Agent hereunder, any party hereto, including the Escrow Agent if the Escrow Agent has received conflicting instructions from Purchaser and Seller, may, at its discretion, seek an order of the Bankruptcy Court to resolve such disagreement. To the extent provided herein above, the Escrow Agent shall be indemnified, jointly and severally, by Purchaser and Seller for all costs, including reasonable documented and out-of-pocket attorneys' fees, in connection with any such action, and shall be fully protected in suspending all or a part of its activities under this Agreement until a final judgment, order or decree in the action is received.

7.   Other than this Agreement, Escrow Agent shall not be bound by any other agreement whether or not it has knowledge of the existence thereof or of its terms and conditions, and is required only to hold the Earnest Money and to make payment or other disposition thereof in accordance with the terms of this Agreement.

8.   Escrow Agent shall not be liable for any mistakes of fact, or errors of judgment, or for any acts or omission of any kind unless caused by the willful misconduct or gross negligence of Escrow Agent.

9.    Escrow Agent may resign upon ten (10) days' written notice to the parties to their addresses set forth herein. If a successor escrow agent is not appointed within a seven (7) day period following such resignation, Escrow Agent may petition a court of competent jurisdiction to name a successor. The costs of such action shall be paid by Seller, on the one hand, and Purchaser, on other hand, on an equal basis.

10.   Purchaser and Seller acknowledge that Escrow Agent has served as attorney for Seller (its "Client") in this transaction, and as an accommodation to that Client has agreed to perform the duties as Escrow Agent set forth herein.  The party who is not the Client agrees that nothing herein shall in any manner limit Escrow Agent in continuing to represent its Client in all matters relating to the Agreement, including without limitation the commencement and prosecution of litigation on behalf of its Client against such party.

11.   Any notice, communication or demand required or permitted to be given under this Agreement shall be in writing (including facsimile and email communications) and shall be sent to the applicable party at the following addresses:

If to Seller:

> Tri-Wire Engineering Solutions, Inc.
> Attention:  Ruben Klein, President
> 5 Gill Street B
> Woburn, MA 01801
> E-mail:  rklein@triwire.net

> With a copy to (which shall not constitute notice):
> Casner & Edwards, LLP
> Attention:  Michael J. Goldberg, Esq.
> 303 Congress Street, #201
> Boston, MA 02210
> E-mail:  goldberg@casneredwards.com

If to Purchaser:

> ITG Communications, LLC
> Attention: Michael Brooks and Peter Giacalone
> 152 Molly Walton Drive
> Gallatin, TN 37075
> E-mail: mbrooks@i-t-g.net
>          pgiacalone@i-t-g.net

> With a copy to (which shall not constitute notice):

> Safford Motley PLC
> Attention: Jonathan Motley, Esq.

1102 17th Avenue Sout, Suite 401
Nashville, TN 37212
E-mail: jonathan@saffordmotley.com

If to Escrow Agent:

Casner & Edwards, LLP
Attention: Michael J. Goldberg, Esq.
303 Congress Street, #201
Boston, MA 02210
E-mail: goldberg@casneredwards.com

12. This Agreement may not be amended or modified except by an instrument in writing signed by, or on behalf of, Seller, Purchaser and Escrow Agent.

13. This Agreement shall be construed and interpreted in accordance with the laws of the Commonwealth of Massachusetts without regard to its principles of conflicts of law.

14. This Agreement may be executed in several counterparts, as long as each party to this Agreement executes at least one such counterpart. Each of such counterparts shall be an original but all of the counterparts, when taken together, shall constitute one and the same instrument and shall become effective when each party hereto has executed at least one such counterpart. The parties hereto agree that a signature transmitted by facsimile or email in portable document format (.pdf) shall constitute an original signature hereunder.

15. Purchaser and Seller hereby agree to execute and deliver joint written instructions to Escrow Agent to effect any release that Purchaser and Seller, acting in good faith, believe in their respective reasonable discretion is required by the Purchase Agreement. In the event of a conflict between the provisions of this Agreement and the provisions of the Purchase Agreement, the Purchase Agreement shall govern.

16. Time is of the essence with respect to all time periods in this Agreement.

[signatures begin on next page]

IN WITNESS WHEREOF, the parties hereby have caused this Agreement to be executed by their duly authorized officers on the day and year first above written.

PURCHASER:

**ITG COMMUNICATIONS, LLC,**
a Texas limited liability company

By: _____
Name:
Title:

SELLER:

**TRI-WIRE ENGINEERING SOLUTIONS, INC.,**
a Massachusetts corporation

By: _____
Name: Ruben Klein
Title: President

ESCROW AGENT**:**

**CASNER & EDWARDS, LLP**

By:_____
Name:  Michael J. Goldberg
Title: Partner

## Schedule 2.1(D)

### Offered Employees

Technician
Lead Technician
XH Technician
Fiber Technician
Technician
Service Lineman
Lineman
Fiber Splicer
Lead Lineman
Fiber Technician
Senior Lineman
Groundman
Lead Comm Ops Representative
Field Supervisor
Operations Manager
Trainer
Regional Manager
QC Technician
Call Center Representative
Comm Ops
Dispatcher
Fiber Design Manager
Project Manager

Schedule 2.3

**Purchase Price Allocation**

**TO BE AGREED  UPON BY THE  PARTIES PRIOR TO CLOSING.**

## Schedule 3.1

### Bill of Sale

THIS BILL OF SALE (this "Bill of Sale") is entered into and effective as of [●], 2021 by Tri-Wire Engineering Solutions, Inc., a Massachusetts corporation ("Seller").

### RECITALS

WHEREAS, Seller and ITG Communications, LLC, a Texas limited liability company ("Purchaser"), have entered into an Asset Purchase Agreement, dated September [●], 2021 (the "Purchase Agreement");

WHEREAS, the execution and delivery of this Bill of Sale is contemplated by Section 3.1 of the Purchase Agreement; and

WHEREAS, capitalized terms used herein and not otherwise defined herein have the meanings given to such terms in the Purchase Agreement.

NOW, THEREFORE, in consideration of the promises and mutual agreements set forth in the Purchase Agreement, Seller, intending to be legally bound, hereby agrees as follows:

1.    Sale of Personal Property.  For true and lawful consideration paid to it by Purchaser, Seller hereby sells, conveys, transfers, assigns and delivers to Purchaser all right, title and interest in and to the Personal Property, free and clear of all Liens, in accordance with the Purchase Agreement.

2.    Further Assurances.  Seller shall take, or cause to be taken, such actions, or execute and deliver, or cause to be executed and delivered, to Purchaser such other agreements or instruments, in each case as Purchaser may reasonably request, as reasonably necessary to more effectively consummate, confirm or evidence the sale, conveyance, transfer, assignment and delivery to Purchaser of the Personal Property as contemplated under the Purchase Agreement.

3.    Conflict with the Purchase Agreement.  In the event of a conflict or inconsistency between the terms and conditions of this Bill of Sale and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail.  Notwithstanding anything to the contrary in this Bill of Sale, nothing herein is intended to, nor shall it, extend, amplify, or otherwise alter the representations, warranties, covenants and obligations of the parties contained in the Purchase Agreement or the survival thereof.

4.    Enforceability.  If any provision of this Bill of Sale or the application of any such provision to any Person or circumstance shall be held invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality or unenforceability shall not impede any other provision hereof.

5.      Governing Law.  This Bill of Sale shall be governed by and construed in accordance with the internal Laws of the Commonwealth of Massachusetts, without regard to the Laws of any other jurisdiction that might be applied because of the conflicts of Laws principles of the Commonwealth of Massachusetts.

6.      No Third Party Beneficiaries.  This Bill of Sale shall be binding upon and inure solely to the benefit of Seller and Purchaser and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Bill of Sale.

[*Remainder of page intentionally left blank; signature page follows*]

IN WITNESS WHEREOF, Seller has caused this Bill of Sale to be duly executed as of the day and year first above written.

**SELLER:**

TRI-WIRE ENGINEERING SOLUTIONS, INC.

By: _____
Name:
Its:

## Schedule 3.2

## Assumption and Assignment Agreement

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Assignment and Assumption Agreement") is made and entered into as of [●], 2021, by and ITG Communications, LLC, a Texas limited liability company ("Purchaser"), and Tri-Wire Engineering Solutions, Inc., a Massachusetts corporation ("Seller").

## RECITALS:

WHEREAS, Seller and Purchaser have entered into an Asset Purchase Agreement, dated September [●], 2021 (the "Purchase Agreement");

WHEREAS, the execution and delivery of this Assignment and Assumption Agreement is contemplated by Section 3.2 of the Purchase Agreement; and

WHEREAS, capitalized terms used herein and not otherwise defined herein have the meanings given to such terms in the Purchase Agreement.

NOW, THEREFORE, in consideration of the Recitals and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser, intending to be legally bound, agree as follows:

1. Assignment. Seller does hereby sell, transfer, assign, convey and deliver to Purchaser all of Seller's legal, beneficial and other right, title and interest in and to the Assumed Leases and Assumed Contracts (collectively, the "Assignment").

2. Assumption. Purchaser hereby confirms and accepts the Assignment and agrees to timely pay, discharge and otherwise perform when due the related Assumed Obligations in accordance with the terms of the Purchase Agreement. Purchaser does not assume, and shall have no responsibility for, or any liability with respect to, any of the Excluded Liabilities.

3. Conflict with the Purchase Agreement. In the event of a conflict or inconsistency between the terms and conditions of this Assignment and Assumption Agreement and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail. Notwithstanding anything to the contrary in this Assignment and Assumption Agreement, nothing herein is intended to, nor shall it, extend, amplify, or otherwise alter the representations, warranties, covenants and obligations of the parties contained in the Purchase Agreement or the survival thereof.

4. Further Assurances. The parties hereto shall execute and deliver all such other and further documents and perform all further acts that may be reasonably necessary or appropriate to effectuate the terms and provisions of this Assignment and Assumption Agreement.

5. Governing Law. This Assignment and Assumption Agreement shall be governed by and construed in accordance with the internal Laws of the Commonwealth of Massachusetts,

without regard to the Laws of any other jurisdiction that might be applied because of the conflicts of Laws principles of the Commonwealth of Massachusetts.

6.      Headings.  The headings used in this Assignment and Assumption Agreement are for purposes of convenience only and shall not be used in construing the provisions hereof.

7.      No Third Party Beneficiaries.  This Assignment and Assumption Agreement shall be binding upon and inure solely to the benefit of Seller and Purchaser and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Assignment and Assumption Agreement.

8.      Counterparts; Facsimile Signature.  This Assignment and Assumption Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which shall constitute one agreement, and the signature of any party to any counterpart shall be deemed to be a signature to, and may be appended to, any other counterpart.  Facsimile, telecopied, portable document format (PDF) or electronic signatures may be relied upon as originals.

[*Remainder of page intentionally left blank; signature page follows*]

IN WITNESS WHEREOF, the parties hereto have caused this Assignment and Assumption Agreement to be executed by their duly authorized representatives as of the day and year first written above.

**SELLER:**

TRI-WIRE ENGINEERING SOLUTIONS, INC.

By: _____

Name:

Its:

**PURCHASER:**

ITG COMMUNICATIONS, LLC

By: _____

Name:

Its:

**Schedule 4.2 (D)**

**SELLER'S CLOSING CERTIFICATE**

THIS CLOSING CERTIFICATE, dated as of [●], 2021, is delivered pursuant to Section 4.2(D) of that certain Asset Purchase Agreement, dated as of September [●], 2021 (the "Purchase Agreement"), by and between Tri-Wire Engineering Solutions, Inc., a Massachusetts corporation ("Seller"), and ITG Communications, LLC, a Texas limited liability company ("Purchaser"). Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Purchase Agreement.

The undersigned, in his capacity as President of Seller, and not in his individual capacity, hereby certifies to Purchaser the following:

1. The representations and warranties of Seller contained in the Purchase Agreement were true and correct in all material respects when made and are true and correct in all material respects as of the Closing Date, as though such representations and warranties had been made on and as of such Closing Date (except for those representations and warranties that address matters only as of a particular date, which were true as of such particular date).

2. Seller has materially complied with and performed each and all of the terms, covenants, and conditions of the Purchase Agreement to be complied with or performed by Seller on or before the Closing Date pursuant to the terms of the Purchase Agreement.

[*Signature Page to Follow*]

IN WITNESS WHEREOF, the undersigned has executed this Closing Certificate on the date and year first above written.

TRI-WIRE ENGINEERING SOLUTIONS, INC.

By: _____

Name: Ruben Klein
Title:  President

## Schedule 4.2(J)

### SELLER NON-COMPETE AND NON-INTERFERENCE AGREEMENT

This Non-Compete and Non-Interference Agreement (the **"Agreement"**) is entered into on September _____, 2021 ("Effective Date") by and between **ITG COMMUNICATIONS, LLC**, a Texas limited liability company with a principal address of 152 Molly Walton Drive, Hendersonville, Tennessee 37075 (**"ITG"** or the **"Company"**) and **TRI-WIRE ENGINEERING SOLUTIONS, INC.**, a Massachusetts corporation with a principal address of 5 Gill Street B, Woburn, Massachusetts 01801 **("TriWire"**).

WHEREAS, this Agreement is entered into in connection with an Asset Purchase Agreement (the **"Purchase Agreement"**) by and among Company and TriWire;

WHEREAS, pursuant to the Purchase Agreement, TriWire assigned service contracts and/or relationships (the **"Service Agreements"**) with various organizational and entities including, without limitation, national telecommunications (referred to collectively as the **"Assigned Clients"**) to Company or ITG-affiliated entities;

WHEREAS, the restrictive covenants herein were a material inducement in the Company entering the Purchase Agreement and competition or interference in breach of this Agreement would defeat ITG's benefit of the bargain in entering the Agreement; and

WHEREAS, the parties are entering into this Agreement to provide Company certain protections against TriWire interfering with Company's relationships with the Assigned Customers or otherwise competing against ITG or ITG-affiliated entities.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

**Section 1. Capitalized Terms.** All capitalized terms used herein but not otherwise defined herein shall have the meaning ascribed to such terms in the Purchase Agreement.

**Section 2**. **Non-Interference with Relationships**. During the five (5) year period following the Closing Date (the **"Non-Interference Period"**), TriWire agrees that neither it nor any entity in which it holds a majority or controlling interest (individually and collectively, an **"TriWire Entity"**) will, directly or indirectly, (i) induce, or attempt to induce any business, entity, organization, or person to cease doing business with Company or reduce the amount of business with the Company or any ITG affiliated company; or (ii) provide or seek to provide any services, directly or indirectly, to any Assigned Clients.

**Section 3. Non-Compete.** During the five (5) year  period following the Closing Date (the **"Non-Compete Period"**), TriWire agrees that neither it nor any TriWire Entity shall, directly or indirectly, either for the benefit of itself or for the benefit of any other person, firm, corporation, governmental or private entity, compete with the Company in the Business (as defined herein) anywhere in the United States (the "Restricted Area") in any manner or capacity through any form of ownership or as an advisor, principal, agent, independent contractor, consultant, partner, joint venturer, officer, director, stockholder, lender, executive, or dealer. For the purpose of this Section, the term "Business" means the business of contracting with telecommunication companies to provide fulfillment services in either the commercial or residential telecommunications segments including, without limitation, providing road/box to client cabling connections, drop-bury services for cabling and fiber, and related repair for

telecommunications companies and customers of cable companies, fiber installation and construction, and related telecommunications fulfillment services. Notwithstanding the foregoing, ownership by TriWire or any TriWire Entity, as a passive investment, of less than 5% of the outstanding shares of capital stock, outstanding debt instruments or other securities convertible into capital stock or debt instruments of any corporation listed on a national securities exchange or publicly traded on any nationally recognized over-the-counter market is not a breach of this Section regardless of whether such business is engaged in the Business in the Restricted Area.

**Section 4. No Raid of Employees.** During the Non-Interference Period, TriWire agrees that neither it nor any TriWire Entity shall, directly or indirectly: (a) induce or attempt to induce any employee, consultant or independent contractor of the Company or ITG affiliated entity to leave the employ of the Company or ITG affiliated entity or otherwise terminate or reduce such individual's relationship with the applicable Company or ITG affiliated entity; or (b) employ any of the Hired Employees.

**Section 5. Acknowledgements.** TriWire acknowledges that:

(a) irreparable injury and damage may result from TriWire's breach of its covenants herein;

(b) monetary damages may not be a sufficient remedy for TriWire's breach of its covenants; and

(c) Company is entitled, without waiving any additional rights or remedies available to it at law, in equity, or by statute, to such injunctive or equitable relief as may be deemed proper by a court of competent jurisdiction.

**Section 6. Choice of Law.** The laws of the Commonwealth of Massachusetts (without giving effect to its conflict of laws principles) govern all matters arising out of or relating to this Agreement and the transactions it contemplates, including, without limitation, its interpretation, construction, performance, and enforcement.

**Section 7. Blue Pencil.** If any provision of this Agreement is determined to be invalid, illegal or unenforceable, the remaining provisions of this Agreement will remain in full force, and the essential terms and conditions of this Agreement for each party remain valid, binding, and enforceable. Subject to the foregoing, all terms and conditions of this Agreement must be enforced to the fullest extent permissible under applicable law, and, when necessary, the court is requested to reform any and all terms or conditions to give them such effect.

**Section 8. Complete Agreement.** This Agreement the complete and exclusive expression of the parties' agreement on the matters contained herein. All prior and contemporaneous negotiations, discussions, and agreements between the parties on the matters contained in this Agreement are expressly merged into and superseded by this Agreement. In entering into this Agreement, neither party has relied upon any statement, representation, warranty or agreement of any other party except for those expressly contained in this Agreement. The parties can amend this Agreement only by a written agreement of the parties that identifies itself as an amendment to this Agreement.

**Section 9. No Waiver.** The parties can waive this Agreement only by a writing executed by the party or parties against whom the waiver is sought to be enforced. No failure or delay in exercising any right or remedy, or in requiring the satisfaction of any condition under this Agreement, and no act, omission or course of dealing between the parties, shall operate as a waiver or estoppel of any right,

remedy or condition. A waiver made in writing on one occasion is effective only in that instance and only for the purpose stated. A waiver once given is not to be construed as a waiver on any future occasion or against any other person.

**Section 10. Separate Counterparts.**   This Agreement may be signed in counterparts which, when taken together, shall constitute a fully executed and enforceable agreement.   In addition, for the purpose of enforcement, a facsimile or copy of a signature shall be as effective as the original.

*[Remainder of Page Intentionally Left Blank.  Execution Page Follows.]*

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the day first written above.

ITG COMMUNICATIONS, LLC

By: _____

Name of Signer: _____

Title: _____

Date: _____

TRI-WIRE ENGINEERING SOLUTIONS, INC

By: _____

Name of Signer: _____

Tile: _____

Date: _____

## Schedule 4.3(A)

### Purchase Price and Adjustments

**TO BE AGREED UPON BY THE PARTIES PRIOR TO CLOSING.**

**Schedule 4.3(D)**

**PURCHASER'S CLOSING CERTIFICATE**

THIS CLOSING CERTIFICATE, dated as of [●], 2021, is delivered pursuant to Section 4.3(D) of that certain Bidder Asset Purchase Agreement, dated as of September [●] 2021 (the "Purchase Agreement"), by and between Tri-Wire Engineering Solutions, Inc., a Massachusetts corporation ("Seller"), and ITG Communications, LLC, a Texas limited liability company ("Purchaser"). Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Purchase Agreement.

The undersigned, in his capacity as Chief Executive Officer of Purchaser, and not in his individual capacity, hereby certifies to Seller the following:

1. The representations and warranties of Purchaser contained in the Purchase Agreement were true and correct in all material respects and are true and correct in all material respects as of the Closing Date as though such representations and warranties had been made on and as of the Closing Date.

2. Purchaser has materially complied with and performed each and all of the terms, covenants, and conditions of the Purchase Agreement to be complied with or performed by Purchaser on or before the Closing Date pursuant to the terms of the Purchase Agreement.

[*Signature Page to Follow*]

IN WITNESS WHEREOF, the undersigned has executed this Closing Certificate on the date and year first above written.

ITG COMMUNICATIONS, LLC

By: _____
Name:
Title:

**Schedule 5.1(B)(iii)**

**Required Consents or Filings**

**BANKRUPTCY COURT ORDER APPROVING A SALE WILL OVERRIDE ANY SUCH CONSENTS.**

**THERE ARE NO REQUIRED FILINGS.**

## Schedule 5.1(B)(iv)

### Conflict, Contravention, or Breach

NONE.

## Schedule 5.1(E)(i)

## Material Defaults in Assumed Leases

See Schedule 1.1(A).

## Schedule 5.1(F)

### Assumed Contracts; Material Defaults

See Schedules 1.1(A), 1.1(F)(ii), 1.1(F)(iv), and 1.1(F)(v).

## Schedule 5.1(G)(i)

## Employee Benefit Plans

**Tri-Wire 401(k) Retirement Program by Empower Retirement**

**HMO Blue Inside NE**

**PPO Blue**

**PPO Saver**

**Dental**

**Vision**

## Schedule 5.1(G)(ii)

## Multiemployer Plans, Employee Pension Benefit Plans, Multiple Employer Plans, Multiple Employer Welfare Arrangements

NONE.

## Schedule 5.1(H)(i)

### Non-Compliance with Labor, Wage and Hour and Employment Laws

1.      Javier Rodriguez, et al. v. Tri-Wire Engineering Solutions, Inc., et al., Case No. 1:21-cv-10752-PBS (U.S. District Court, District of Massachusetts).  Complaint seeking available remedies on behalf of plaintiffs and others similarly situated under the Fair Labor Standards Act, 29 U.S.C. §§201-219 and applicable Massachusetts, Maine, New Hampshire, New Jersey and Pennsylvania wage-and-hour laws.

2.      John R. Wade, III, et al. v. Tri-Wire Employee Stock Ownership Trust, et al., Case No. 1:20-cv-10523-LTS (U.S. District Court, District of Massachusetts).  Complaint included two counts alleging wrongful termination of Wade as Chief Executive Officer.  All counts asserted by plaintiffs dismissed upon motion of defendants; counterclaims asserted by defendants remain open.

3.      In September 2020, Tri-Wire Engineering Solutions, Inc. was cited by the Massachusetts Office of Attorney General, Fair Labor Division, for the failure to pay prevailing wages for work performed from 1/5/19 – 11/2/19 on the public works project in the Town of Shutesbury related to the MLP Telecommunications Cable Installation Works project.  The Citation number was 19-10-56956-001 dated 9/25/20, and the Investigator was Agent Joseph Drzyzga.  Tri-Wire was required to pay 23 employees a total restitution of $61,155.74 plus a civil penalty of $7,500, all "without specific intent."  This was the first prevailing wage project that Tri-Wire had been involved in, and Tri-Wire paid those 23 employees based off "net pay" rather than the required "gross pay."  The Attorney General's office represented that Tri-Wire showed a high level of cooperation, including the self-audit and direct payments to the 23 employees, and that resulted in the modest civil penalty.

4.      On September 17, 2019, Tri-Wire Engineering Solutions, Inc. entered into a settlement agreement with the New Jersey Office of Attorney General, Department of Law and Public Safety, based on allegedly improper payroll deduction from employees in Jew Jersey related to home parking benefit (i.e., Tri-Wire allows its technician employees the option to drive company vehicles at the employee's residences).  The Docket number was LID 13037-2018 S.  Tri-Wire was required to pay 63 employees a total restitution of $41,285.12, a penalty of $10,000, and an administrative fee of $4,128.51.  The settlement allowed Tri-Wire to collect payment for this benefit, but not through payroll deduction.

5.      On January 6, 2017, the Federal Department of Labor performed a Review of Tri-Wire's FSLA compliance for the period 12/20/2014 to 12/10/2016.  The DOL sought to confirm how Tri-Wire handled its deductions in accordance with prior audits and agreements.  During the Final Conference on March 17, 2017, the DOL reported Tri Wire was not in violation of: minimum wage laws, overtime laws, record keeping provisions, or child labor laws.  The DOL did not explicitly test Exempt Employee compliance because no violations were noted during the review of payroll records and payments.

**Schedule 5.1(I)(i)**

**Non-Compliance With Laws; Investigations**

NONE.

## Schedule 5.1(J)

## Legal Proceedings

1.      Javier Rodriguez, et al. v. Tri-Wire Engineering Solutions, Inc., et al., Case No. 1:21-cv-10752-PBS (U.S. District Court, District of Massachusetts).   Complaint seeking available remedies on behalf of plaintiffs and others similarly situated under the Fair Labor Standards Act, 29 U.S.C. §§201-219 and applicable Massachusetts, Maine, New Hampshire, New Jersey and Pennsylvania wage-and-hour laws.

2.      John R. Wade, III, et al. v. Tri-Wire Employee Stock Ownership Trust, et al., Case No. 1:20-cv-10523-LTS (U.S. District Court, District of Massachusetts).   Complaint included two counts alleging wrongful termination of Wade as Chief Executive Officer.   All counts asserted by plaintiffs dismissed upon motion of defendants; counterclaims asserted by defendants remain open.

3.      In September 2020, Tri-Wire Engineering Solutions, Inc. was cited by the Massachusetts Office of Attorney General, Fair Labor Division, for the failure to pay prevailing wages for work performed from 1/5/19 – 11/2/19 on the public works project in the Town of Shutesbury related to the MLP Telecommunications Cable Installation Works project.   The Citation number was 19-10-56956-001 dated 9/25/20, and the Investigator was Agent Joseph Drzyzga.   Tri-Wire was required to pay 23 employees a total restitution of $61,155.74 plus a civil penalty of $7,500, all "without specific intent."   This was the first prevailing wage project that Tri-Wire had been involved in, and Tri-Wire paid those 23 employees based off "net pay" rather than the required "gross pay."   The Attorney General's office represented that Tri-Wire showed a high level of cooperation, including the self-audit and direct payments to the 23 employees, and that resulted in the modest civil penalty.

4.      On September 17, 2019, Tri-Wire Engineering Solutions, Inc. entered into a settlement agreement with the New Jersey Office of Attorney General, Department of Law and Public Safety, based on allegedly improper payroll deduction from employees in Jew Jersey related to home parking benefit (i.e., Tri-Wire allows its technician employees the option to drive company vehicles at the employee's residences).   The Docket number was LID 13037-2018 S. Tri-Wire was required to pay 63 employees a total restitution of $41,285.12, a penalty of $10,000, and an administrative fee of $4,128.51.   The settlement allowed Tri-Wire to collect payment for this benefit, but not through payroll deduction.

5.      On January 6, 2017, the Federal Department of Labor performed a Review of Tri-Wire's FSLA compliance for the period 12/20/2014 to 12/10/2016.   The DOL sought to confirm how Tri-Wire handled its deductions in accordance with prior audits and agreements.   During the Final Conference on March 17, 2017, the DOL reported Tri Wire was not in violation of: minimum wage laws, overtime laws, record keeping provisions, or child labor laws.   The DOL did not explicitly test Exempt Employee compliance because no violations were noted during the review of payroll records and payments.

**Schedule 5.1(K)**

**Permits**

See Schedule 1.1(F)(i).

## Schedule 5.1(L)

## Registered Intellectual Property

NONE.

## Schedule 5.1(M)

### Brokers

SSG Capital Advisors, LLC is serving as investment banker for Purchaser.

## Schedule 5.2(B)

### Purchaser's Required Consents

NONE.

## Schedule 7.2(B)

### Required Third-Party Consents, Approvals, Permits, Waivers and Estoppels

**BANKRUPTCY COURT ORDER APPROVING A SALE WILL OVERRIDE ANY SUCH REQUIRED CONSENTS.**

**<u>Exhibit B</u>**

[Assumed Contracts and Cure Amounts]

**Real Estate Leases**

| Landlord | Contract Name | Date | Cure Amount |
|---|---|---|---|
| 1001 Grant LLC | Lease Agreement | 6/1/2021 | $6,106.50 |
| 216 Tingley Partners, LLC | Lease Agreement | 3/16/2019 | $3,090.00 |
| 655 South Willow Commons, LLC | Lease Agreement | 3/1/2017 | $2,821.69 |
| CTL4 Real Estate Trust | Commercial Lease | 4/1/2020 | $2,700.00 |
| Cummings Properties | Standard Form Commercial Lease | 8/1/2005 | $12,694.69 |
| Dardad, LLC | Agreement of Lease | 10/26/2020 | $7,000.00 |
| David Development LLC | Commercial Lease Agreement, as amended | 11/1/2016 | $3,550.00 |
| DEL Partnership | Year-to-Year Commercial Lease Agreement | 9/11/2019 | $3,075.00 |
| Edgewater Realty, LLC | Lease Agreement, as amended | 3/1/2018 | $13,659.09 |
| Johnson Pleasant Realty | Lease Agreement | 4/15/2021 | $4,333.33 |
| Marquis Properties | Lease Agreement, as amended | 10/19/2015 | $3,620.42 |
| Metz Realty, Inc. | Lease Agreement | 10/31/2020 | $7,362.50 |
| Porchlight VNA | Agreement of Lease, as amended | 6/16/2015 | $3,021.33 |
| SHS Flatlands LLC | Lease at 120 Essex St., Brooklyn, as amended | 02/2010 | $14,802.89 |
| Simm Lane, LLC | Basic Terms Sheet & Indenture of Lease | 7/10/2013 | $3,200.00 |
| St. John Properties, Inc. - G | Lease at 3918 Vero Rd., Suites E-F, Baltimore , Maryland, as amended | 4/16/2014 | $3,703.63 |
| Sugar River Storage LLC | Lease Agreement, as amended | 2/7/2018 | $720.00 |
| Town of Charlemont | Storage Rental Contract | 2/1/2021 | $250.00 |
| Town of Heath | Rental Agreement between the Town of Heath and Triwire Engineering Solutions of Chicopee, Massachusetts | 11/1/2020 | $575.00 |
| Tri-D III, LLC | Commercial Lease Agreement, as amended | 11/1/2014 | $2,314.00 |

**Subcontractor Agreements**

| Subcontractor | Contract Name | Contract Start | Cure Amount |
|---|---|---|---|
| Advantage Utilities LLC | Contractor Agreement | 2/26/2021 | $70,979.65 |
| Alpha Communications Inc. | Contractor Agreement | 12/31/2020 | $8,400.86 |
| Atlas Cable Solutions | Contractor Agreement | 12/31/2020 | $4,533.91 |
| Broadband Access Services, Inc. | Contractor Agreement | 3/9/2021 | $0.00 |
| Broadcom Technical Group LLC | Contractor Agreement | 3/22/2021 | $18,422.88 |
| Cable Comm Connect, LLC | Contractor Agreement | 3/15/2021 | $4,138.04 |
| Cavcomm, LLC | Contractor Agreement |  | $0.00 |
| Conex | Contractor Agreement | 3/18/2021 | $97,768.19 |
| Core Solutions | Contractor Agreement | 3/9/2021 | $0.00 |
| Davi Communications | Contractor Agreement | 2/26/2021 | $0.00 |
| Demar Group Corp. | Contractor Agreement | 4/1/2021 | $80,361.98 |
| Demarc Telecom & Utility LLC | Contractor Agreement | 4/27/2021 | $0.00 |
| Domestic Supply Inc. (DSI) | Contractor Agreement | 12/11/2020 | $70,246.75 |
| Eris Prime LLC | Contractor Agreement | 4/6/2021 | $304,264.13 |
| Evolution Cable Technology, LLC | Contractor Agreement | 1/1/2021 | $10,070.67 |
| Franklin Underground LLC | Contractor Agreement | 5/12/2021 | $12,290.36 |
| Global Communications Group LLC | Contractor Agreement | 1/1/2021 | $101,796.91 |
| Horizon Telecommunications, Inc. | Contractor Agreement | 7/23/2021 | $0.00 |
| Insight Elite | Contractor Agreement | 3/5/2021 | $0.00 |
| Jcomm LLC | Contractor Agreement | 3/1/2021 | $28,589.42 |

| JT Wiring LLC | Contractor Agreement | 1/1/2021 | $19,578.60 |
|---|---|---|---|
| Koscom Cable | Contractor Agreement | 1/1/2021 | $7,872.00 |
| Lantech Communications, LLC | Contractor Agreement | 4/12/2021 | $9,135.68 |
| Matrix Cable | Contractor Agreement | 1/1/2021 | $26,081.15 |
| Merchant Global Assistance LLC | Contractor Agreement | 8/25/2021 | $0.00 |
| MK-1 Communication | Contractor Agreement | 1/1/2021 | $122,925.30 |
| Moldcable | Contractor Agreement | 1/1/2021 | $0.00 |
| MPEG Communications | Contractor Agreement | 1/1/2021 | $211,255.31 |
| Multiplex Network Inc | Contractor Agreement | 4/7/2021 | $154,300.12 |
| New Comm LLC | Contractor Agreement | 4/20/2021 | $136,320.63 |
| Online Installations | Contractor Agreement | 1/4/2021 | $0.00 |
| Pro-Tech Communications LLC | Contractor Agreement | 1/1/2021 | $134,771.97 |
| SJS Communications | Contractor Agreement | 6/23/2021 | $0.00 |
| Star Linesmen LLC, Inc. | Contractor Agreement | 1/1/2021 | $52,544.06 |
| Tech Bros LLC | Contractor Agreement | 3/19/2021 | $29,492.87 |
| Technical Media Technicians LLC | Contractor Agreement | 1/1/2021 | $42,194.75 |
| TLC Media Solutions | Contractor Agreement | 1/1/2021 | $8,909.34 |
| Top Tier Cable | Contractor Agreement | 12/14/2020 | $25,052.50 |
| Underground Construction Experts | Contractor Agreement | 12/30/2020 | $0.00 |

**Tool, Equipment, Vehicle Leases**

| Lessor | Contract Name | Date | Cure Amount |
|---|---|---|---|
| Altec Capital Services, LLC | Equipment Lease TRAC | 12/22/2017 | $20,382.44 |
| Ascentium Capital | Finance Agreement | 8/11/2020 | $433.31 |
| BB&T Commercial Equipment Capital Corporation | Equipment Finance Agreement | 5/26/2020 | $0.00 |
| BB&T Commercial Equipment Capital Corporation | Equipment Finance Agreement | 6/5/2020 | $0.00 |
| CIT Bank, N.A. | Equipment Lease RICOH | Circa 11/29/2019 | $0.00 |
| Enterprise Fleet Services | Master Equity Lease Agreement | 8/31/2010 | $132,666.38 |
| Marlin Business Bank | Equipment Finance Agreement | 9/28/2018 | $403.74 |
| Merchants Automotive | Open-End Lease Agreement | 10/18/2018 | $66,190.51 |
| Navitas Credit Corp | Contract No. 40748902 | 9/1/2020 | $811.20 |

**Operating Contracts**

| Contract Party | Contract Name | Contract Date | Estimated Cure Amount |
|---|---|---|---|
| Comcast | Preferred Vendor Agreement for Broadband Installation/Disconnection/Drop Bury, as amended | 8/22/2019 | To Be Determined |
| Consolidated Communications Enterprise Services, Inc. | Construction Services Agreement | 1/1/2021 | $0.00 |
| Crocker Communications | Maintenance Contract | 7/11/2019 | $0.00 |
| CSC Holding, LLC (fka Altice Technical Services) | Installation Agreement, as amended | 7/31/2006 | $1,560.00 |
| Matrix Design Group, Inc. | Award Letter | 6/28/2019 | $0.00 |
| RCN Telecom Services of Massachusetts, LLC | Contract | 6/25/2018 | $0.00 |
| Shrewsbury Electric and Cable Operations | SELCO Cable Services Agreement, as amended | 10/11/2019 | $0.00 |
| Tilson Technology Management, Inc. | Master Construction Services Agreement, as amended | 8/10/2017 | $0.00 |
| Town of Charlemont by its Charlemont Municipal Lighting Plant | Contract Terms and General Conditions between the Owner and the Contractor | 5/13/2020 | $0.00 |
| Town of Goshen by its Goshen Municipal Light Plant | Contract Terms and General Conditions between the Owner and the Contractor | 5/13/2020 | $0.00 |
| Town of Heath by its Heath Municipal Light Plant | Contract Terms and General Conditions between the Owner and the Contractor | 11/1/2019 | $0.00 |
| Town of Manchester | Contract | 6/23/2020 | $0.00 |
| ValleyNet, Inc. | Construction Services Agreement | 8/1/2020 | $0.00 |
| Westfield Gas & Electric Light Department | Contract Terms and General Conditions between the Owner and the Contractor, as amended | 7/18/2019 | $0.00 |

**<u>Exhibit C</u>**

[Final Funds Flow]

**Tri-Wire Engineering Solutions Funds Flow**  DRAFT - NUMBERS SUBJECT TO CHANGE
Closing Date:       10/31/2021 Estimate

| Sources | | | | | Uses | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Purchase Price | $ | 8,800,000.00 | | Actual | Pay JPM DIP Loan (balance for w/e 10/30) | $ | 581,000.00 | Estimate | (g) |
| Less: A/R Purchase Price Adjustment | | TBD | | TBD | Reserve for Technician Payroll - Final Two Weeks of Operations | | 458,928.00 | Actual | (h) |
| Less: Adjustment for Employee / Sub Headcount | | Waived | | Actual | Final Payroll Payable at Closing - Non-Technician Employees | | 153,097.00 | Actual | (h) |
| (a) Net Purchase Price | $ | 8,800,000.00 | $ 8,800,000.00 | | Accrued Vacation for Terminated Employees Not Hired by ITG | | 88,629.00 | Actual | (h) |
| Payment from ITG for Lease Payoffs / Buyouts | | | 5,264,564.56 | Actual | Rent Arrearages (assumed leases only) | | 60,935.46 | Actual | (i) |
| (a) Contribution from ITG for Comcast Settlement | | | 50,000.00 | Actual | Past Due Subcontractor Payables | | 288,450.69 | Actual | (j) |
| | | | | | Incentive Bonuses | | 132,500.00 | Actual | (k) |
| | | | | | Investment Banker Fees | | 400,000.00 | Actual | (q) |
| | | | | | Outstanding BOD Fees | | 12,200.00 | Actual | (k) |
| | | | | | Equipment / Vehicle Lease Cures | | | | |
| | | | | | Enterprise | | 122,426.06 | Actual | (l) |
| | | | | | Merchants Automotive Group | | 66,190.51 | Actual | (m) |
| | | | | | Altec Capital Services (three separate leases) | | 20,382.44 | Actual | (n) |
| | | | | | Equipment / Vehicle Lease Payoffs / Buyouts | | | | |
| | | | | | Ascentium Capital LLC | Buyout | 4,937.48 | Actual | (b) |
| | | | | | Enterprise | Buyout | 3,755,309.41 | Actual | (c) |
| | | | | | Merchants Automotive Group | Buyout | 1,457,121.75 | Actual | (d) |
| | | | | | Huntington National Bank (Formally TCF) | Buyout | 39,000.00 | Actual | (e) |
| | | | | | Marlin Leasing Corporation | Buyout | 8,195.92 | Actual | (f) |
| | | | | | Carve Out for Comcast Indemnification | | 200,000.00 | Actual | (o) |
| | | | | | Payment for Comcast Fees Incurred and Known Damage Claims | | 62,400.00 | Actual | (o) |
| | | | | | (1) Carve Out Reserve | | 313,000.00 | Actual | (r) |
| | | | | | Reserve for UST Fees | | 156,000.00 | Actual | (s) |
| | | | | | Cash Available to Pay JPM Pre-Petition | | 5,733,860.84 | PLUG | (p) |
| **Total Sources** | | $ | 14,114,564.56 | | **Total Uses** | | $ | 14,114,564.56 | |

(1) In satisfaction of professional fee carve-out in Financing Order; Debtor's counsel to hold escrow pending fee approval and excess, if any, to be paid to JPM.